<div align="right">

**EXHIBIT A-1**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 ESL**
**CLASS 1**
**The Secured Claims of Oriental Bank**

</div>

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF PUERTO RICO**

</div>

|  |  |
|---|---|
| **IN RE:** | **CASE NO. 22-01676 (ESL)** |
| **ESJ TOWERS, INC.** | |
| **DEBTOR** | **CHAPTER 11** |

<div align="center">

**CLASS [1] BALLOT FOR ACCEPTING OR REJECTING**
**PLAN OF REORGANIZATION OF**
**ESJ TOWERS, INC.**

</div>

**ESJ Towers, Inc. ("Debtor")**, filed its Amended Plan of Reorganization dated _____, 2023, (the "Plan") for the Debtor in this case. The Court has approved Debtor's Amended Disclosure Statement with respect to the Plan (the "Disclosure Statement"). The Disclosure Statement provides information to assist you in deciding how to vote your ballot. If you do not have a Disclosure Statement, you may obtain a copy from **Charles A. Cuprill, Esq., CHARLES A. CUPRILL, PSC LAW OFFICES, 356 Fortaleza Street (2nd Floor), San Juan, P.R.  00901**. Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in Class [1] under the Plan. If you hold claims in more than one class, you will receive a ballot for each class in which you are entitled to vote.

If your ballot is not received by Charles A. Cuprill, PSC Law Offices, at the address indicated above on or before_____, 2023 at 4:00 P.M. (EST.), and such deadline is not extended, your vote will not count as either an acceptance or rejection of the plan.

If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.

**EXHIBIT A-1**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 -ESL**
**CLASS 1**
**The Secured Claims of Oriental Bank**

ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned, the holder of a Class [1] claim against the Debtor, in the unpaid amount of $_____ ($_____).

☐  ACCEPTS THE PLAN            ☐        REJECTS THE PLAN

Dated: _____

Print or type name of creditor: _____

Signature: _____

Name and Title: _____

Address: _____

_____

RETURN THIS BALLOT TO:

**ESJ TOWERS, INC.**
**Charles A. Cuprill, Esq.**
**CHARLES A. CUPRILL, PSC LAW OFFICES**
356 Fortaleza Street (2nd Floor)
San Juan, PR 00901

<div align="right">

**EXHIBIT A-2**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 ESL**
**CLASS 2**
**The Claim of Acrecent Financial Corporation**

</div>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF PUERTO RICO**

IN RE:

**ESJ TOWERS, INC.**

**DEBTOR**

CASE NO.  22-01676 (ESL)

CHAPTER 11

**CLASS [2] BALLOT FOR ACCEPTING OR REJECTING**
**PLAN OF REORGANIZATION OF**
**ESJ TOWERS, INC.**

**ESJ Towers, Inc. ("Debtor")**, filed its Amended Plan of Reorganization dated _____, 2023, (the "Plan") for the Debtor in this case. The Court has approved Debtor's Amended Disclosure Statement with respect to the Plan (the "Disclosure Statement"). The Disclosure Statement provides information to assist you in deciding how to vote your ballot. If you do not have a Disclosure Statement, you may obtain a copy from **Charles A. Cuprill, Esq., CHARLES A. CUPRILL, PSC LAW OFFICES, 356 Fortaleza Street (2nd Floor), San Juan, P.R.  00901**. Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in Class [2] under the Plan. If you hold claims in more than one class, you will receive a ballot for each class in which you are entitled to vote.

If your ballot is not received by Charles A. Cuprill, PSC Law Offices, at the address indicated above on or before _____, 2023 at 4:00 P.M. (EST.), and such deadline is not extended, your vote will not count as either an acceptance or rejection of the plan.

If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.

**EXHIBIT A-2**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 - ESL**
**CLASS 2**
**The Claim of Acrecent Financial Corporation**

---

ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned, the holder of a Class [2] claim against the Debtor, in the unpaid amount of $_____ ($_____).

☐ ACCEPTS THE PLAN            ☐            REJECTS THE PLAN

Dated: _____

Print or type name of creditor: _____

Signature: _____

Name and Title: _____

Address: _____

_____

RETURN THIS BALLOT TO:

**ESJ TOWERS, INC.**
**Charles A. Cuprill, Esq.**
**CHARLES A. CUPRILL, PSC LAW OFFICES**
356 Fortaleza Street (2nd Floor)
San Juan, PR 00901

**EXHIBIT A-3**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 ESL**
**CLASS 5**
**The Claims of Colebrook Financial Company**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF PUERTO RICO**

IN RE: | CASE NO.  22-01676 (ESL)

**ESJ TOWERS, INC.**

| CHAPTER 11

**DEBTOR**

**CLASS [5] BALLOT FOR ACCEPTING OR REJECTING**
**PLAN OF REORGANIZATION OF**
**ESJ TOWERS, INC.**

  **ESJ Towers, Inc. ("Debtor")**, filed its Amended Plan of Reorganization dated _____, 2023, (the "Plan") for the Debtor in this case. The Court has approved Debtor's Amended Disclosure Statement with respect to the Plan (the "Disclosure Statement"). The Disclosure Statement provides information to assist you in deciding how to vote your ballot. If you do not have a Disclosure Statement, you may obtain a copy from **Charles A. Cuprill, Esq., CHARLES A. CUPRILL, PSC LAW OFFICES, 356 Fortaleza Street (2nd Floor), San Juan, P.R.  00901**. Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in Class [5] under the Plan. If you hold claims in more than one class, you will receive a ballot for each class in which you are entitled to vote.

If your ballot is not received by Charles A. Cuprill, PSC Law Offices, at the address indicated above on or before _____, 2023 at 4:00 P.M. (EST.), and such deadline is not extended, your vote will not count as either an acceptance or rejection of the plan.

If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.

**EXHIBIT A-3**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 -ESL**
**CLASS 5**
**The Claims of Colebrook Financial Company**

ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned, the holder of a Class [5] claim against the Debtor, in the unpaid amount of $_____ ($_____).

☐  ACCEPTS THE PLAN          ☐          REJECTS THE PLAN

Dated: _____

Print or type name of creditor: _____

Signature: _____

Name and Title: _____

Address: _____

_____

RETURN THIS BALLOT TO:

**ESJ TOWERS, INC.**
**Charles A. Cuprill, Esq.**
**CHARLES A. CUPRILL, PSC LAW OFFICES**
356 Fortaleza Street (2nd Floor)
San Juan, PR 00901

**EXHIBIT A-4**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 ESL**
**CLASS 7**
**Holders of Allowed General Unsecured Claims**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **IN RE:** | **CASE NO. 22-01676 (ESL)** |
| **ESJ TOWERS, INC.** | |
| | **CHAPTER 11** |
| **DEBTOR** | |

**CLASS [7] BALLOT FOR ACCEPTING OR REJECTING**
**PLAN OF REORGANIZATION OF**
**ESJ TOWERS, INC.**

**ESJ Towers, Inc. ("Debtor")**, filed its Amended Plan of Reorganization dated _____, 2023, (the "Plan") for the Debtor in this case. The Court has approved Debtor's Amended Disclosure Statement with respect to the Plan (the "Disclosure Statement"). The Disclosure Statement provides information to assist you in deciding how to vote your ballot. If you do not have a Disclosure Statement, you may obtain a copy from **Charles A. Cuprill, Esq., CHARLES A. CUPRILL, PSC LAW OFFICES, 356 Fortaleza Street (2nd Floor), San Juan, P.R. 00901**. Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in Class [7] under the Plan. If you hold claims in more than one class, you will receive a ballot for each class in which you are entitled to vote.

If your ballot is not received by Charles A. Cuprill, PSC Law Offices, at the address indicated above on or before _____, 2023 at 4:00 P.M. (EST.), and such deadline is not extended, your vote will not count as either an acceptance or rejection of the plan.

If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.

**EXHIBIT A-4**
**ESJ TOWERS, INC.**
**CASE NO. 22-01676 -ESL**
**CLASS 7**
**Holders of Allowed General Unsecured Claims**

ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned, the holder of a Class [7] claim against the Debtor, in the unpaid amount of $_____ ($_____).

☐ ACCEPTS THE PLAN          ☐          REJECTS THE PLAN

Dated: _____

Print or type name of creditor: _____

Signature: _____

Name and Title: _____

Address: _____

_____

RETURN THIS BALLOT TO:

**ESJ TOWERS, INC.**
**Charles A. Cuprill, Esq.**
**CHARLES A. CUPRILL, PSC LAW OFFICES**
356 Fortaleza Street (2nd Floor)
San Juan, PR 00901

**EXHIBIT B**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

IN RE:

ESJ TOWERS, INC.                     CASE NO.  22-01676 (ESL)

DEBTOR

                                     CHAPTER 11

## ORDER APPROVING AMENDED DISCLOSURE STATEMENT AND
## SETTING CONFIRMATION HEARING

For the reasons stated at hearing on the ___ day of_____2023, the Amended Disclosure Statement,

filed on_____, is approved.  The Court now GIVES NOTICE OF THE FOLLOWING:

1.      Within 7 days from the entry of this Order, Debtor shall notify its creditors and parties in

interest in its case, electronically through counsel of record if any or otherwise by regular mail:  (a) the

proposed Plan, (b) a copy of this Order; and to each holder of a claim in an impaired class, ballots as per Official

Form No. 30 as provided for in Bankruptcy Rule 3017(d).

2.      The HEARING ON CONFIRMATION of the Plan shall be held on _____, 2023 at _____.

3.      Acceptances or rejections of the Plan shall be filed not later than 7 days prior to the confirmation

hearing.

4.      Any objection to confirmation shall be filed not later than 7 days prior to the confirmation

hearing, served as required by Rule 3020 (b) (1) and shall be heard at the confirmation hearing scheduled above.

SO ORDERED.

San Juan, Puerto Rico, this___day of_____, 2023

_____
Hon. Enrique S. Lamoutte

Exhibit C

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made and entered into as of this 18th day of October 2023 (the "Effective Date"), by and among (i) **ESJ Towers, Inc.,** a corporation organized and existing under the Laws of the Commonwealth of Puerto Rico (the "Seller") and (ii) **Fortaleza Equity Partners 2 LLC** or its assignee, a corporation organized and existing under the Laws of the Commonwealth of Puerto Rico (the "Purchaser") (the Seller and the Purchaser, collectively referred to as the "Parties")**.**

## RECITALS

**WHEREAS**, the Seller owns and operates 55 studio apartments classified as hotel units, 71 studio apartments classified as vacation club units, one commercial unit classified as hospitality center and an estimated 1,343 deeded and unsold intervals in 147 vacation owner units (collectively, the "Realty"), the final number of the deeded intervals shall be determined upon the completion of a title search agreed upon with the Council of Homeowners of the ESJ Towers Condominium (the "Condominium").  Such Realty is further described in **Schedule A (**which shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement);

**WHEREAS**, the Seller and the Purchaser have been engaged in negotiations for the sale by the Seller to the Purchaser (the "Sale") of the Realty and certain other assets used in, associated with, related to, or required for the operation of the Realty including, but not limited to, Leases (as defined in Article XV hereof, as well as all other capitalized terms used herein);

**WHEREAS**, on June 10 2022, the Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Puerto Rico (the "Bankruptcy Court"), Case Number 22-01676 (the "Bankruptcy Case").

**WHEREAS**, upon the terms and subject to the conditions set forth herein and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, the Sale Assets (as defined herein), other than the Excluded Assets and the Excluded Liabilities (both as defined herein), and to assign the Leases set forth herein to the Purchaser, in exchange for the payment to the Seller of the Purchase Price (as defined herein); and

**WHEREAS**, the transactions contemplated by this Agreement (the "Transactions"), subject to the approval of the Bankruptcy Court to be consummated only pursuant to a Sale Order (as defined herein) to be entered in the Bankruptcy Case, in form and substance similar to the document attached hereto as **Schedule E**.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereto hereby agree as follows:

## I.   PURCHASE OF ASSETS

### 1.1.   Closing Date

Subject to the terms and conditions hereof, the purchase and sale of the Sale Assets, as the same may be modified by agreement between the Purchaser and Seller, and the assignment of the Leases (the "Closing") will take place  thirty (30) calendar days after the later to occur of  1) the entry of the Sale Order, or 2) the completion of the Purchaser's Due Diligence Period, or at any other time as may be agreed by the Seller and the Purchaser, and in any event no later than January 31, 2024, at the offices of the Seller, located at 6165 Isla Verde Ave. Carolina, Puerto Rico, or at such other time, date or place as the parties mutually may determine (the "Closing Date").

### 1.2.   Purchase and Sale of the Purchased Assets

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing the Seller shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and receive all of the Seller' right, title and interest in, to and under any and all of the assets, properties and rights of Seller (other than the Excluded Assets) related to or used or held for use in connection with the Realty as the same may exist as of the Closing (collectively, the "Sale Assets") free and clear of all Liens, mortgages, pledges, Encumbrances, liabilities, charges of every kind, and any interest or claim by any party thereto:

(a)    all owned furniture, signs, fixtures, appurtenances, improvements, equipment, located in, on or related to the Realty, which are property of the Seller;

(b)    the Leases and Contracts on **Schedule 1.2(a)** (the "Assumed Contracts"), being understood that the Purchaser shall not be required to assume any Lease or Contract and that any assignment of a Lease or Contract to the Purchaser by the Seller shall be at the sole discretion of the Purchaser and subject to approval of the Bankruptcy Court. Assumed Contracts shall include the Leases and the Contracts identified in **Schedule 1.2(a)**, and any Leases or Contracts the Purchaser later advises the Seller it wishes to have assigned to the Purchaser at least five (5) Business Days prior to the Closing, notwithstanding the Lease or Contracts' initial exclusion from **Schedule 1.2(a)** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement);

(c)    All personnel files (to the extent the Seller is permitted by Law to transfer and, to the extent permitted by Law, copies of any such files that the Seller are not permitted by Law to transfer), payroll information, and all other records relating to the Hired Employees (as defined hereafter);

2

(d) all other equipment, machinery, fixtures, furniture, and other tangible or intangible personal property that is owned by the Seller and utilized for operation of the Realty, including, without limitation, to the extent owned by the Seller, all attachments, appliances, fittings, lighting fixtures, doors, cabinets, partitions, mantels, electric motors, pumps, screens, all sprinkler, plumbing, air conditioning, electrical, ventilating, lighting, incinerating, vacuum cleaning, refrigerating, cooling and security systems, shelving, computers, trash compactor, fire prevention and extinguishing equipment, carpets, floor coverings, office equipment and furniture, (together with all parts and supplies pertaining thereto) and all facilities and equipment situated at the Realty that are owned by the Seller and used to provide any services, parking services, trash disposal services or any other services in connection with the Realty (collectively, the "Personal Property"), including, without limitation, that Personal Property identified on **Schedule 1.2(b)** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement);

(e) to the extent assignable and transferable to the Purchaser, all rights of the Seller to the warranties and licenses received from any manufacturers that relate or pertain to the Personal Property;

(f) to the extent assignable and transferable to the Purchaser, all computer hardware and software (including, without limitation, process control software and payroll software) owned by the Seller or licensed to the Seller pursuant to an Assumed Contracts and used in connection with the operation of the Realty, including, without limitation, the hardware and software identified on **Schedule 1.2(c)** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement);

(g) to the extent assignable and transferable to the Purchaser, all permits, certificates of occupancy, authorizations, consents, endorsements, orders, rulings, decrees, licenses and approvals (collectively the "Permits") related to the Realty and/or used in connection with the operation of the Realty, including, without limitation, those Permits set forth on **Schedule 1.2(d)** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement);

(h) copies or originals of all plans, data, studies, drawings, diagrams, engineering data, safety and environmental

3

reports and documents, maintenance schedules and operating and production records, inventory records, business plans, and marketing materials (collectively the "Records and Reports") that are related to the Realty and/or used in connection with its operation;

(i)      all plans and specifications relating to or for the Realty in the Seller's possession;

(j)      all books, files, documents and records owned by or in the control of the Seller (in whatever format they exist, whether in hard copy or electronic format), including, without limitation, all computer data bases, records and information, test results, product specifications, plans, data, studies, drawings, diagrams, engineering data, safety and environmental reports and documents, maintenance schedules and operating and production records, inventory records, business plans, and marketing materials (collectively, the "Books and Records") that are related to the Purchased Assets and/or used in connection with the operation of the Realty and the Purchased Assets, except for the Excluded Assets as defined below;

(k)      all communication equipment owned, leased or licensed (to the extent assignable and transferable) by the Seller used in the operation of the Purchased Assets, and connecting the Realty be it by telephone, internet or any other means;

(l)      all environmental reports, surveys, blueprints, drawings, building or site plans and specifications, and all other similar documents in the Seller's possession that relate to the Realty and the Purchased Assets;

(m)      to the extent assignable and transferable to the Purchaser, all nonproprietary operating software and MIS systems used or related to the operation of the Realty and Purchased Assets; and

(n)      to the extent assignable and transferable to the Purchaser, the Intellectual Property and technology owned by the Seller or licensed to the Seller that is used for the operation of the Purchased Assets.

(o)      to the extent assignable and transferable to the Purchaser, all remaining assets on the balance sheet of Seller except as otherwise specifically included in the Excluded Assets defined below.

4

## II.      EXCLUDED ASSETS

### 2.1.    Excluded Assets

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, or assign or convey, the "Excluded Assets" to the Purchaser, and the Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement the term "Excluded Assets" includes:

(a)      Any asset of the Seller that otherwise would constitute a Purchased Asset but for the fact that it is conveyed, leased or otherwise disposed of, in the Ordinary Course of Business, consistent with the terms of this Agreement, during the time from the date hereof until the Closing;

(b)      All Leases and Contracts that are not Assumed Contracts;

(c)      All Employee Benefit Plans currently or previously sponsored or maintained by the Seller or any of the Seller's ERISA Affiliates (collectively, the "Seller Controlled Group") or its respective predecessors or with respect to which the Seller Controlled Group or its respective predecessors have made or are required to make payments, transfers or contributions in respect of any present or former employees, directors, officers, shareholders, consultants or independent contractors of the Seller or any of the Seller's ERISA Affiliates or their respective predecessors (collectively, the "Seller's Benefit Plans"), and all insurance policies, fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating to any of the Seller's Benefit Plan;

(d)      All Avoidance Actions and any rights, defenses, cross claims or counterclaims with respect to any Avoidance Actions;

(e)      All of the Seller's corporate books, records (including corporate MIS records), including, without limitation, personnel records of the Seller's Employees, other than the books, records and files of the Hired Employees which are to be provided to the Purchaser pursuant to Section 12.2 and those records and files related to the Realty and the Purchased Assets;

(f)      The shares of capital stock of the Seller;

(g)      All of the Seller's rights relating to tax refunds;

5

(h)     Any amounts payable by any affiliate of the Seller to the Seller or any other receivable payable to the Seller by any affiliate thereof;

(i)     All insurance policies of the Seller and rights thereunder;

(j)

(k)     All Intellectual Property Rights owned by or licensed to the Seller that are not included as part of the Purchased Assets or Assumed Contracts being purchased, conveyed, transferred and/or otherwise assigned to the Purchaser pursuant to this Agreement.

### III.     ASSUMED AND EXCLUDED LIABILITIES

3.1.   **Assumption of Liabilities**

Upon the terms and subject to the conditions of this Agreement, the Purchaser agrees, effective at the time of Closing, to assume, pay, perform and/or discharge only the following liabilities (the "Assumed Liabilities") provided that prior to any assignment, the Seller shall pay all cure amounts due and owing under the Assumed Contracts:

(a)     all obligations and all liabilities of the Seller arising from and after the Closing Date under the Assumed Contracts, if any; and

(b)     all obligations of the Seller identified in **Schedule 2.1** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement).

3.2.   **Assignment of Contracts and Rights**

Subject to the approval of the Bankruptcy Court and pursuant to the Sale Order, the Assumed Contracts, if any, will be assumed by the Seller and assigned to the Purchaser on the Closing Date pursuant to section 365 of the Bankruptcy Code. To the extent assignable and transferable to the Purchaser, the Assumed Contracts shall be assigned by the Seller to the Purchaser.

3.3.   **Excluded Liabilities**

The Purchaser shall not assume or be liable for any liabilities and obligations of the Seller of any nature whatsoever, including without limiting the foregoing, to product liabilities, employee liabilities, workers' compensation claims, non-occupational disability claims, liabilities under or arising out of any employee benefit plans and liabilities arising from any and all claims or causes of action that any employee of the

Seller may have, known or unknown, contingent or otherwise, resulting from the operation by the Seller of the Realty or from any act or omission of the Seller.

(a)      It is further understood and agreed that except for the specific Assumed Liabilities, all of the Seller's liabilities and obligations shall be retained by and remain the obligations and liabilities of  the Seller, and the Purchaser other than for the specific Assumed Liabilities shall not assume, or be responsible or liable with respect to, any and all of the liabilities and obligations of the Seller, whether or not relating to the Purchased Assets, whether fixed, contingent or otherwise, and whether known or unknown, including without limitation, the following (collectively, the "Excluded Liabilities"):

(b)      Any liability, claim or obligation of the Seller for any federal, state or local Taxes due and/or payable prior to or after the Closing, including:

(i)      all income, sales and use, and municipal license Taxes of the Seller,

(ii)      any real property Taxes for periods prior to the Closing; and

(iii)      any personal property Taxes with respect to the Purchased Assets for the period prior to Closing.

(a)      Any liability, claim or obligation relating to, based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, the Sale Assets as used, owned or operated by the Seller prior to the Closing, including any liability or obligation in connection with any defaults or failure of performance by the Seller which have accrued or occurred prior to the Closing under or in respect of any purchase orders or sales orders or the ownership, possession, use or sale of the Sale Assets prior to the Closing.  Including any liability, claim, obligation or current or future litigation for any concessions or agreements made verbally or in writing by the Seller in connection with services performed or not performed by Seller in the operation of the Sale Assets prior to the Closing.

(b)      Any liability, claim or obligation with respect to any litigation or legal proceeding pending on the date of this Agreement, or instituted hereafter, in connection with, or arising out of, the Sale Assets as used, owned or operated by the Seller prior to the Closing.

7

(c)     Any liability, claim or obligation in connection with, or arising out of any claim or dispute for services rendered or products, systems or goods manufactured, distributed designed, configured, engineered, assembled, compiled, distributed or sold by the Seller prior to the Closing, including, without limitation, product liability claims.

(d)     Any liability, claim or obligation in connection with, or arising out of, any claims based on harm to the environment or the disposal of Hazardous Materials allegedly committed by the Seller prior to the Closing, whether or not in connection with its business, the operation at the Sale Assets, including the obligation to pay any and all fines, penalties, liabilities, consequential damages, whether foreseeable or unforeseeable, any other damages, costs and losses, including remedial, removal, response, abatement, clean-up, investigative and monitoring costs, and any other related costs, expenses, losses, damages and reasonable attorneys' fees arising from or in connection with:

(i)     any violation of requirements of any Laws (including rules and regulations thereunder) of federal, state and local governments (and all agencies thereof) concerning the environment, public health and safety and employee health and safety;

(ii)     environmental claims under any Environmental Law based on acts, omissions or occurrences prior to the Closing; or

(iii)     any release into the environment of any Hazardous Materials generated by the Seller from its facilities.

(e)     Any liability, claim or obligation in connection with, or arising out of, the Excluded Assets.

(f)     Any trade accounts and other payables of the Seller due to suppliers and vendors and others or other accounts payable.

(g)     Any liability, claim or obligation arising from or in connection with:

(i)     wages, benefits, bonuses or commissions due to any employee or independent contractor of the Seller;

(ii)     any Employee Plans;

(iii)     any other benefits due to or for the benefit of any employee or independent contractor of the Seller;

8

(iv)    workers' compensation or other occupational health or injury claims of the Seller on or prior to the date of this Agreement;

(v)    notices regarding plant closings, including without limitation, notices under the federal "WARN" Laws; and

(vi)    notices regarding continuation of health care coverage and rights of conversion for insured benefits.

(vii)    claims for unjust dismissal and for violation of antidiscrimination laws and regulations; and

(viii)    claims based on the Seller's obligation to make and/or remit employee withholdings and contributions.

(h)    Any sponsorship or responsibility for the maintenance of or termination of any Employee Plan maintained by the Seller.

(i)    Any liability, claim or obligation, with respect to sales tax or other Taxes, which the Purchaser may become subject to or as a result of or in connection with the failure of the Seller to comply with bulk sales or bulk transfer Laws.

(j)    Any Cure or Cure Amounts related to any Assumed Contracts.

(k)    Any liability, claim or obligation with respect to any Employee Claim, whether at Law or equity, asserted by any Employee against the Seller, or the Seller's agents, representatives, employees, successors, or assigns.  It being understood and agreed that under no circumstances shall the Purchaser assume or be obligated to pay, and neither the Realty nor the Purchased Assets shall be or become liable for or subject to any liability for any Employee Claims, which Employee Claims shall be and remain the liability, responsibility and obligation of the Seller. It being further understood and agreed that under no circumstances shall the Sale Assets be subject to attachment, contribution, indemnification, or any other liability whatsoever, as a result of any Employee Claims, which Employee Claims shall be and remain the liability, responsibility and obligation of the Seller, including, without limitation:

(i)    any and all liabilities or obligations (including without limitation any and all penalties, fines, settlements, interests, costs or expenses) arising out of or incurred in connection with any and all claims, litigation or Legal Proceedings associated with, arising out of or in connection with any and all claims, litigation or Legal Proceedings

(whether instituted prior to or after the Closing) of any Employees (whether hired by the Purchaser or not), for any negligent or willful acts, errors, omissions, breach of contract, misconduct, unjust dismissal, discrimination or discriminatory practices, asserted by or committed against any Employee, whether known or unknown, which occurred, or arise from events that occurred, prior to the Closing Date; and

(ii)     any and all liabilities or obligations, (including without limitation any and all penalties, fines, settlements, interests, costs or expenses) under any local, state, federal or Commonwealth of Puerto Rico labor and employment Laws (including without limitation any and all claims under the WARN Act, Title VII of the Civil Rights Act of 1964, as amended, 42 USC sec. 2000e *et seq*., Executive Order 11246, as amended, the Age Discrimination in Employment Act as amended 29 USC sec 621 *et seq*., the Employee Retirement Income Security Act of 1975, as amended, the Americans with Disabilities Act of 1991, the Federal Rehabilitation Act of 1973, as amended, and any other applicable federal, state of local, constitutional or statutory provision, order or regulation, arising out from any event or act of omission or commission, among others and such as Article 1802 of the Puerto Rico Civil Code, 31 LPRA sec. 5141, and/or any other Civil Code disposition relative to damages, torts, and/or contracts, the Fair Labor Standards Act of 1938, as amended, 29 USC sec. 201 *et seq*., any mandatory wage decree or provision of the Puerto Rico Minimum Wage Act, 84 of August 1, 1995 and Act 180 of July 27, 1998, unjust dismissal under Act 80 of May 30, 1976, 29 L.P.R.A. sec. 185a *et seq*., retaliation under Act 115 of December 20, 1991, 29 L.P.R.A. sec. 194(a); Working Hours and Days Act, Act 379 of May 15, 1948, 29 L.P.R.A. sec 271 *et seq*., Christmas Bonus Act, Act 148 of June 30, 1969, 29 L.P.R.A. sec. 501 *et seq.;* Sexual Discrimination in Employment Act, Act 69 of July 6, 1985, Sexual Harassment in Employment Act, 29 L.P.R.A. sec. 1321 *et seq.*, Act 17 of April 22, 1988, 29 L.P.R.A. sec. 155 *et seq*., discrimination claims by reason of age, sex, religion, race, political affiliation, social condition or origin,   national origin, marriage, for being a victim or perceived as a victim of domestic violence, sexual aggression or stalking, sexual orientation, gender identity under Act 100 of June 30, 1959, 29 L.P.R.A. sec. 146 *et seq*., discrimination by reason of disability under Puerto Rico Act 44 of June 2, 1985, 1 L.P.R.A. sec. 501 *et seq*., and Working Mothers Act, Act 3 of March 13, 1942, 29 L.P.R.A. sec. 467 *et seq.,* Constitution of the Commonwealth of Puerto Rico, the Constitution of the United States of America, Act 59 of August 7, 1997 (drug tests), Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA), Civil Rights Law of 1866, Civil Rights Law of 1871, Civil Rights Act of 1991, the Older Workers Benefit Protection Act (OWBPA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), the Family Medical Leave Act of 1993 (FMLA); the federal Rehabilitation Act of 1973; the Equal Pay Act of 1963; the federal Occupational Safety and Health Act (OSHA);

Law No. 16 of August 5, 1975 (OSHO); the National Labor Relations Act (Taft Hartley), as amended; as well as any claim under the slander and libel law; or for breach of contract; Law No. 289 of April 9, 1946, as amended; and/or any applicable mandatory decree or employment contract; or any claim for damages and/or requesting reinstatement under the Workers Accident Compensation Act; the Non-Occupational Disability Benefits Act (SINOT); and/or the Labor Relations Act of 1947, as amended; and/or any claim under the Bankruptcy Act, the Insurance Code and Civil Code of Puerto Rico, the Employment Retirement Income Security Act (ERISA) (including any cause of action related to any welfare benefit plan) and/or the Consolidated Omnibus Budget Reconciliation Act (COBRA) and/or the Health Insurance Portability and Accountability Act (HIPAA),which arise out of or as a result of such Employees employment with the Seller.

## IV.   CONSIDERATION FOR THE PURCHASED ASSETS

### 4.1.   Purchase Price of Purchased Assets

The purchase price (the "Purchase Price") to be paid by the Purchaser for the Purchased Assets shall be (i) the aggregate of (a) $13,500,000.00 and (b) as decreased by the deposit already paid pursuant to the Bidding Procedures ((a) and (b) collectively the "Cash Consideration") less (ii) the assumption of the Assumed Liabilities.  The Purchase Price shall be paid at the Closing as follows:

The Cash Consideration plus or minus the prorations and/or adjustments mentioned above, shall be paid to the Seller in immediately available U.S. dollars by certified check or wire transfer.

### 4.2.   Allocation of Purchase Price

The Purchase Price shall be allocated among the Purchased Assets in such manner as the parties hereto shall mutually agree. For all tax purposes, the Purchaser and the Seller shall report the Transactions contemplated in this Agreement in a manner consistent with the allocation agreed upon by the parties hereto, and no party will take any position inconsistent therewith in any tax return or in any refund claim.

### 4.3.   Prorations or Apportionments

The Seller and the Purchaser agree to adjust, as of the apportionment date, the following (collectively, the "Proration Items"):

(a)    Utility charges payable by the Seller, including, without limitation, electricity, water charges and assessments and sewer charges and assessments before the Closing Date.

(b)    Amounts due and payable by the Seller under the Assumed Contracts for any period before the Closing Date.

(c)      Real estate, sales and use, municipal license and personal property Taxes and special assessments due and payable for the calendar year in which the Closing occurs based on final tax bills for such period. At Closing, an estimate of such Taxes that corresponds to those to be paid by the Seller will be computed based on the information available related to the operations at the Realty during the Seller's ownership thereof and said amount will be reduced from the Purchase Price. If, subsequent to the Closing Date, such Taxes (by reason of change in either assessment or rate or for any other reason) for the Sale Assets should be determined to be higher or lower than those that are apportioned, a new computation shall be made, and the Seller agrees to pay the Purchaser any increase shown by such recomputation and vice versa. The Seller shall have the right to pursue any Tax appeals that relate to any tax fiscal year period prior to the Closing Date and that are pending at the time of Closing and shall pay the expense thereof. All proceeds derived therefrom shall belong to the Seller.

(d)      The estimated Closing prorations shall be set forth on a preliminary closing statement to be prepared by the Seller and submitted to the Purchaser prior to the Closing Date (the "Closing Statement"). The Closing Statement once agreed upon, shall be signed by the Purchaser and the Seller.  The proration shall be paid at Closing by the Purchaser to the Seller (if the prorations result in a net credit to the Seller) or by the Seller to the Purchaser (if the prorations result in a net credit to the Purchaser) by increasing or reducing the cash to be delivered by the Purchaser in payment of the Purchase Price at the Closing.  If the actual amounts of the Proration Items are not known as of the Closing Date, the prorations will be made at Closing on the basis of the best evidence then available; thereafter, when actual figures are received, re-prorations will be made on the basis of the actual figures, and a final cash settlement will be made between the Seller and the Purchaser.  No prorations will be made in relation to insurance premiums, and the Seller's insurance policies will not be assigned to the Purchaser. Final billings for utilities will be made if possible as of the Closing Date, in which event no proration will be made at the Closing with respect to utility bills. As soon as practicable following the Closing Date, the Purchaser shall undertake all actions necessary to put all utilities in its name. The Seller shall provide reasonable assistance to the Purchaser in order to effect such change. The Purchaser will retain any deposits paid by the Seller in connection with these utilities. The Seller shall be entitled to receive a credit against any amounts due to the Purchaser under the Agreement for the aggregate amount of said deposits.

(e)     The provisions of Section 4.3 will survive the Closing until all reconciliations referred to therein have been made and all amounts required to be paid thereunder have been paid.

## V.     ASSIGNMENT OF LEASES AND ASSUMED CONTRACTS

5.1.    Subject to the approval of the Bankruptcy Court and pursuant to the Sale Order, the Assumed Contracts, if any, will be assumed by the Seller and assigned to the Purchaser on the Closing Date pursuant to section 365 of the Bankruptcy Code.

5.2.    The Seller shall also provide the Purchaser with a certificate setting forth the present rent, CAM charges, insurance and real estate charges and any other amounts payable under the Leases included in the Assumed Contracts, and any conditions to which the Leases are subject, the dates of commencement of the Leases and the years remaining under the Leases.

## VI.     REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS OF THE SELLER

To induce the Purchaser to enter into this Agreement and to consummate the sale and purchase of the Purchased Assets in accordance with this Agreement, the Seller represents and warrants the following to the Purchaser, as of the date hereof and as of the Closing Date:

### 6.1.    Organization and Standing Authority

The Seller is duly organized, validly existing and in good standing under the Laws of the Commonwealth of Puerto Rico. Subject to the limitations imposed on the Seller under the Bankruptcy Code, the Seller has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

### 6.2.    Authorization of Agreement

Subject to entry of the Sale Order and authorization as is required by the Bankruptcy Court:

(a)     The Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform their respective obligations hereunder and thereunder; and

(b)     This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which the Seller is a party has been duly and validly executed and delivered by the Seller and (assuming the due authorization, execution and delivery by the other parties hereto) this

13

Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes a legal, valid and binding obligation the Seller enforceable against the Seller in accordance with its respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement thereof or relating to creditors' rights generally and subject to the availability of equitable remedies and the effect of general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

6.3.    **Conflicts; Consents of Third Parties**

(a)    The execution and delivery by the Seller of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the Transactions contemplated hereby and thereby, or compliance by the Seller with any of the provisions hereof do not conflict with, or result in any violation of or default (except for defaults of the type referred to in section 365(b)(2) of the Bankruptcy Code) (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of:

(i)    the certificate of incorporation and by-laws or comparable organizational documents of the Seller;

(ii)    subject to entry of the Sale Order, any Assumed Contract or Permit to which the Seller is a party or by which any Purchased Assets are bound;

(iii)    subject to entry of the Sale Order, any Order of any Governmental Authority applicable to the Seller or any of the Purchased Assets as of the date hereof; or

(iv)    subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (i), (ii), and (iii), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, a Material Adverse Change.

(b)    If the Sale Order is entered, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of the Seller in connection with the execution and delivery of this Agreement or any other

14

agreement, document or instrument contemplated hereby or thereby to which they are a party, the compliance by the Seller with any of the provisions hereof or thereof, the consummation of the Transactions contemplated hereby or thereby, the assignment or conveyance of the Sale Assets, or the taking by the Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Change.

6.4.    **Title to Sale Assets**

Subject to the Sale Order, the Seller either owns or has the right to transfer the Sale Assets, and the Purchaser will be vested with good title to such Sale Assets, free and clear of all Liens and Encumbrances, other than Liens for Taxes for the current tax year which are not yet due and payable.  No claims against the ownership, right to transfer or sell the Sale Assets exists or is threatened by any third party to the knowledge of Seller.

6.5.    **Leases**

The Leases are in full force and effect; all fees, rents or other payments, sums and amounts due and payable or required to be paid thereunder have been fully paid to the extent payable for all periods prior to or including the Closing Date or such amounts will be paid as Cure Amounts.

6.6.    **Permits and Licenses**

**Schedule 1.2(d)** sets forth a true, complete and correct list of all Permits and Licenses, including all material Permits and Licenses required under Environmental Laws, necessary for the ownership or operation of the Purchased Assets, held by Seller. All Permits and Licenses, which are necessary to permit the lawful use and operation of the Purchased Assets, as they presently exist, have been obtained (or will be obtained prior to the Closing Date), and are now, and will continue to be at all times before the Closing Date, in full force and effect, and, to the Seller's knowledge there is no pending threat of modification, cancellation, termination or expiration of any such certificate, permit, approval or license; no buildings or improvements located on the premises object of the Leases depend on any dedication, variance, subdivision, special exception or other special governmental approval for their continuing legality; all utilities required for the operation of the Purchased Assets either enter the Realty through adjoining public streets or if they pass through adjoining private land, do so in accordance with valid public easements or private easements; all of said public utilities are (or will be prior to the Closing) installed and operating and all installation and connection charges have been or will be paid in full prior to Closing.  All such Permits and Licenses subject to entry of the Sale Order, may be transferred or reissued to the Purchaser in accordance with this Agreement and without the approval of any third party (other than the Bankruptcy Court).

15

6.7. **Environmental Matters**

(a)     To the Seller's knowledge, it is in compliance with all applicable Environmental Laws. The Seller has not received written or oral notice of any pending or, threatened claim or investigation by any Governmental Authority or any other Person concerning material potential liability of the Seller under Environmental Laws in connection with the ownership or operation of the Purchased Assets. To the Seller's knowledge there has not been a Release of any Hazardous Substance at, upon, in, from or under the Sale Assets in quantities or under circumstances that would give rise to any liability or require remediation, investigation or clean up pursuant to any Environmental Law.

(b)     The Seller has provided or made available to the Purchaser written non-privileged reports, if any, in the possession or control thereof relating to the presence or migration of Hazardous Substances on, in or under the Purchased Assets.

(c)     No material capital or other expenditures are required to reach or maintain compliance with current Environmental Laws with respect to the operations of the Realty.

6.8. **Litigation**

There are no Legal Proceedings pending or to the Seller's knowledge threatened against the Seller before any Governmental Authority, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Change on the business of the Seller or the Sale Assets.

6.9. **Customers and Suppliers**

Except with respect to outstanding disputes regarding the Seller's failure to pay outstanding amounts, there are no outstanding material disputes between the Seller and any of the Seller's customers or suppliers and no material customer or supplier has notified any of the Seller in writing that it intends to terminate or materially reduce the amount of business it conducts with the Seller.

6.10. **Absence of Certain Changes**

Except for the commencement or pendency of the Bankruptcy Case, since the date thereof, there have been no events or conditions that could constitute a Material Adverse Change.

6.11. **Tangible Personal Property**

The items of Personal Property included in the Sale Assets are in normal operating condition and repair, subject to continued repair and replacement in accordance with past practice, and are suitable for their intended use. During the past 6 months there has not been any significant interruption of the operations of the Realty due to inadequate maintenance of such Personal Property.

6.12.   **Additional Representations, Warranties and Acknowledgments**

(a)   The Seller hereby acknowledges that, other than the obligations of the Purchaser set forth in this Agreement, the Purchaser does not have any obligation to bid or overbid for the Purchased Assets.

(b)   There is no action, suit, proceeding or claim relating to the ownership, occupancy, operation, use or maintenance of the Purchased Assets which is pending before any Governmental Authority nor, to the Seller's knowledge, is any such action, suit, proceeding or claim threatened, except such actions, suits, proceedings or claims that, if decided against the Seller, would not be a Material Adverse Change.

(c)   The Seller has not received any notice of violation of any ordinance, regulation, Law, or statute of any governmental agency pertaining to the Purchased Assets or any portion thereof or any zoning ordinances, building codes or parking requirements that would constitute a Material Adverse Change.

(d)   To the Seller's knowledge, there are no use restrictions affecting the Purchased Assets, except those set forth in the Leases and zoning requirements.

(e)   **Schedule 1.2(b)** sets forth a list of all Assumed Contracts. In the event the Purchaser identifies a Contract not listed on **Schedule 1.2(b)**, then the Seller shall amend **Schedule 1.2(b)** to include such Contracts. To the best of the Seller's knowledge all of the Assumed Contracts are valid, binding and enforceable in accordance with their terms, and are in full force and effect.

(f)   The Seller has not received written notice of any pending or threatened condemnation proceeding relating to the Purchased Assets.

(g)   Subject to the entry of the Sale Order, to the Seller's knowledge no consent, approval, waiver, permit, license or order of, or filing or registration with, any Governmental Authority or third party is required to be obtained by the Seller in

connection with the consummation by the Seller of the Transactions contemplated hereby.

(h)    There are no employment agreements, collective bargaining agreements, union contracts or similar agreements affecting the operations at the Sale Assets by which the Purchaser would be bound upon acquisition of the Sale Assets.

(i)    No party has any right of first refusal or right or option to acquire the Sale Assets or any part thereof or any interest therein.

(j)    **Schedule 4.1** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement) will be a correct and complete list of the types and amounts of insurance coverage maintained by the Seller and in force with respect to the Purchased Assets. The Seller shall be obligated to maintain this coverage until Closing.

(k)    Except as disclosed in **Schedule 4.2** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement), the Seller is not a party to any litigation, suit, action, investigation, grievance or arbitration proceedings, labor dispute, labor strike, unfair labor practice complaint or any other claim before any Governmental Authority related to the Hired Employees nor, to the Seller's knowledge, is any such litigation, suit, action, investigation, grievance, arbitration, dispute, strike, complaint or claim threatened, except such litigation, suits, actions, investigations, grievances, arbitrations, disputes, strikes, complaints or claims that, if decided against the Seller, would not reasonably be expected to have a material adverse effect on the Purchased Assets, or the ability of the Seller to consummate the Transactions contemplated by this Agreement.  To the Seller's knowledge, the Seller has not been threatened for slowdown or work stoppage by the Hired Employees.

(l)    Seller further warrants and represents that to the best of its knowledge:

(i)    is in compliance, in the conduct of its business, with all applicable laws, regulations, ordinances, rules, judgments, orders or decrees regarding employment and employment practices, terms and conditions of employment, wages and hours and occupational safety and health, and has all the statutory insurance, permits, licenses, certificates, orders, and approvals of, and has made all filings, applications, and registrations with, Governmental Authorities required thereunder.

(ii)     has received no notification or communication from any governmental entity (i) asserting that Seller is not in compliance with any statutes, regulations or ordinances, (ii) threatening to revoke any permit, license, and/or other governmental authorization related to (i) immediately above.

(iii)     there are no (a) actions or orders, writ, injunction, or decree pending or, to the knowledge of Seller, threatened, in each case relating to Seller's Employees or employment practices or asserting that Seller has committed an unfair labor practice or is seeking to compel to bargain with any union or labor organization, (b) pending or, to the knowledge of Seller, threatened labor strikes or other labor troubles affecting Seller, (c) labor strikes, disputes, walk-outs, work stoppages, slow-downs, lockouts, arbitrations or grievances involving Seller, (d) to the knowledge of Seller, campaigns conducted to solicit cards from Seller's Employees to authorize representation by a labor organization or (e) unfair labor practices committed by the Seller or their employees.

(m)     All Improvements, fixtures and personal property included in this sale at the closing of title will be owned by the Purchaser, free and clear of any conditional bills of sale, chattel mortgages, security agreements or financing statements or other security interests of any kind. All Improvements, fixtures and equipment will be in good order, normal wear and tear excepted.

(n)     All certificates, permits and licenses from any governmental authority having jurisdiction over the Sale Assets which are necessary to permit the lawful use and operation of the Realty as they presently exists, have been obtained (or will be obtained prior to the Closing Date), and are now, and will continue to be at all times before the Closing Date, in full force and effect, and, to the best of the Seller's knowledge, there is no pending threat of modification, cancellation, termination or expiration of any such certificate, permit, approval or license; no buildings or improvements located on the premises object of the Leases depend on any dedication, variance, subdivision, special exception or other special governmental approval for their continuing legality; all utilities required for the operation of the Realty either enter the Realty through adjoining public streets or if they pass through adjoining private land, do so in accordance with valid public easements or private easements; all of said public utilities are (or will be prior to the Closing) installed and operating and all installation and connection charges have been or will be paid in full prior to Closing.

(o)     True and complete copies of all of the written Assumed Contracts and Permits shall have been delivered or

made available to the Purchaser a reasonable period of time prior to the Closing to enable the Purchaser to review and approve the information set forth therein in a commercially prudent manner.

(o) Copies of the Sale Motion with all its exhibits, and the actual Sale Order, have been duly notified by mail to all current employees of the Seller and any ex-employee terminated within the last two (2) years.

## VII. REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller that:

### 7.1. Organization and Good Standing

The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of Puerto Rico, and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.

### 7.2. Authorization of Agreement

The Purchaser has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Purchaser. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which the Purchaser is a party has been duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which the Purchaser is a party constitutes legal, valid and binding obligations of the Purchaser enforceable against it in accordance with its respective terms, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement thereof or relating to creditors' rights generally and subject to the availability of equitable remedies and effect of general principles of equity.

### 7.3. Conflicts

The execution and delivery by the Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which the Purchaser is a party, the consummation of the Transactions contemplated hereby and thereby, or compliance by the Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any

provision of (i) its certificate of organization or by-laws; (ii) any Order of any Governmental Body applicable to the Purchaser or any of its properties or assets as of the date hereof; or (iii) any applicable Law, other than such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to cause, individually or in the aggregate, a material adverse effect on the Purchaser.

### 7.4. **Brokers**

The Purchaser will pay any and all obligations regarding fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person engaged directly by the Purchaser in connection with the Transactions.

### 7.5. **Adequate Assurance**

The Purchaser will timely provide such information to the Seller, as the Seller believes is reasonably necessary to provide "adequate assurance," as that term is used in the Bankruptcy Code, with respect to the Assumed Contracts.

### 7.6. **Defaults**

Neither the execution of this Agreement nor the consummation by the Purchaser of the Transactions contemplated hereby will conflict with or result in a breach of the terms, conditions or provisions of or constitute a default, or result in a termination of any material agreement or instrument to which the Purchaser is a party; or will violate any applicable local or federal Law, decree, ordinance, order, rule or regulation that is likely to adversely affect in any manner the performance by the Purchaser of this Agreement.

### 7.7. **Litigation**

There is no action, suit, proceeding or claim which is pending or, to the Purchaser's knowledge, threatened in any court or by or before any federal, state, or municipal department, commission, board, bureau or agency or other governmental instrumentality which would affect the Purchaser's ability to perform its obligations under this Agreement.

## VIII.   OPERATIONS PENDING CLOSING

From the date hereof through the Closing Date, the Seller agrees as follows:

### 8.1. **Operation**

Except for the requirements of the Bankruptcy Code and the Bankruptcy Court, the Seller will manage, operate, repair and maintain the Purchased Assets in the Ordinary Course of Business and will keep the Purchased Assets in their present states of repair, subject to normal wear and tear. The Seller shall not remove any Purchased Assets from the Realty, and shall maintain at all times inventory and supplies levels for operating the Realty for five (5) days.

### 8.2. **Insurance**

The Seller will keep in full force and effect all existing fire, casualty, liability and extended coverage and other insurance policies, if any, which are presently in effect for the Realty.

### 8.3. **No Sale; Nor Encumbrances**

Except in the Ordinary Course of Business, the Seller shall not sell, mortgage or otherwise encumber or dispose of any interest in the Sale Assets.

### 8.4. **No New Contracts**

The Seller shall not modify, extend, renew or cancel in writing (except as a result of a default by the other party thereunder) the Leases or any Assumed Contracts or enter into any Material Contract relating to the Sale Assets without the Purchaser's prior written consent.

### 8.5. **Reasonable Efforts**

The Seller shall use commercially reasonable efforts to keep the Permits in force and effect and to obtain any other licenses, permits, certificates, authorizations or approvals necessary for the ownership and operation of the Sale Assets.

### 8.6. **Compliance with Laws**

The Seller shall comply with all applicable Laws, rules and regulations and shall not engage in any practice, take any action or enter into any transaction outside the Ordinary Course of Business.

### 8.7. **Employment Agreements and Employee Compensation**

With respect to Hired Employees, the Seller shall not enter into any new employment agreements, collective bargaining agreements, union contracts or similar agreements, written or oral, after execution of this Agreement, without the Purchaser's prior written consent. The Seller further agrees not to increase the compensation of any of the Hired Employees except in accordance with policies currently in effect or pursuant to Law and without the Purchaser's prior written consent.

### 8.8. **Environmental**

From the date hereof through the Closing Date, the Seller shall not (i) increase the amount of any Hazardous Materials in, on, under or about the Realty as of the date hereof, except for De Minimus Amounts, and (ii) take any action or fail to take any action which would aggravate any environmental condition existing on date hereof, to the extent any of the foregoing would cause any violation of Environmental Laws.

### 8.9. **Alteration of Sale Assets**

Except in the Ordinary Course of Business, the Seller shall not alter the Sale Assets, or consent to such alteration except to complete any improvements or non-structural changes, installations, or decorations which may be required by Law.

### 8.10.   Cooperation

Seller agrees to allow Purchaser to direct the activities of Seller's employees and contractors with respect to operating activities during the period from acceptance of this agreement to the Closing.  Seller will have the right to refuse any action it deems is not in the best interest of the Seller, but cooperation not to be unreasonably withheld.

# IX.   BANKRUPTCY COURT MATTERS

**Sale Order**

The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by the Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under section 363(m), or any other section, of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n), or any other section, of the Bankruptcy Code. The Sale Order shall be made final upon entry of the Sale Order by the Bankruptcy Court.

In the event the entry of the Sale Order shall be appealed, the Seller and the Purchaser shall use their respective reasonable efforts to defend such appeal.

### 9.1.   Indemnification Obligations of the Seller

From and after the Closing, the Seller shall indemnify and hold harmless, the Purchaser and its officers, directors, affiliates, partners, advisors and agents (the "Purchaser Indemnified Parties") from and against any and all assessments, liabilities, losses, fines, penalties, costs, damages and expenses, including, without limitation, reasonable attorneys' fees, and reasonable out-of-pocket expenses in connection with the enforcement of any rights hereunder (collectively, "Damages"), as incurred, to the extent they relate to, arise out of or are the result of: (a) the breach in any material respect of any of the representations and warranties of the Seller contained in or made pursuant to this Agreement; (b) the breach or nonperformance of any covenant or agreement of the Seller contained in this Agreement; (c) third party claims against any Purchaser Indemnified Party arising out of events that occur prior to the Closing, or in connection with the noncompliance by the Seller of the bulk sales laws of Puerto Rico or in connection with the Transactions contemplated under this Agreement, excluding any Assumed Liabilities; and (d) any real estate, sales and use, municipal license or personal property Taxes assessed against or in connection with the Realty for any period prior to the Closing Date,

23

(e) Excluded Assets and (f) Excluded Liabilities. Notwithstanding anything to the contrary contained herein, (i) no claim or action for indemnity under Section 9.1(a) for any material breach of any representation or warranty contained in this Agreement or in any instruments or documents furnished in connection herewith may be asserted or maintained by any the Purchaser Indemnified Party except for claims made in writing prior to the expiration of the survival period of such representation or warranty set forth in this Agreement, by notice to the Seller specifying the precise nature of such claim; (ii) no claim or action for indemnity under Section 9.1(b) may be asserted or maintained by any of the Purchaser Indemnified Party except for claims made in writing on or before the first anniversary of the Closing Date, by notice to the Seller specifying the precise nature of such claim; (iii) no claim or action for indemnity under Section 9.1(c) may be asserted or maintained by any the Purchaser Indemnified Party except for claims made in writing prior to the date which is the first anniversary of the Closing Date, by notice to the Seller specifying the precise nature of such claim; (iv) no claim or action for indemnity under Section 9.1(d) may be asserted or maintained by any the Purchaser Indemnified Party except for claims made in writing prior to the date on which all Governmental Authorities would be barred by the applicable statute of limitations from retroactively assessing real estate taxes against the Realty for a period prior to the Closing Date, by notice to the Seller specifying the precise nature of such claim; and (v) no claim or action for indemnity under Section 9.1(e) may be asserted or maintained except for claims made in writing prior to the first anniversary of the Closing Date, by notice to the Seller specifying the precise nature of such claim. Notwithstanding anything herein or any provision in this Agreement to the contrary, in no event shall the Seller's aggregate liability under this Section 9.1 exceed the Purchase Price, including Assumed Liabilities. The provisions of this Section shall survive the Closing and shall run to, and be for the benefit of, any permitted assignee of the Purchaser.

9.2.    **Indemnification Obligations of the Purchaser**

From and after the Closing, the Purchaser shall indemnify and hold harmless the Seller and its officers, directors, affiliates, partners and agents (the "Seller Indemnified Parties"), from and against any Damages as incurred, to the extent they relate to, arise out of or are the result of: (a) the breach in any material respect of any of the representations and warranties of the Purchaser contained in or made pursuant to this Agreement; (b) the breach or nonperformance of any covenant or agreement of the Purchaser contained in this Agreement; (c) the Purchaser's inspections or tests permitted hereunder; (d) third party claims against any of the Seller Indemnified Parties arising out of events that occur after the Closing; and (e) Assumed Liabilities. Notwithstanding anything to the contrary contained herein, (i) no claim or action for indemnity under Section 9.2(a) any material breach or inaccuracy of any representation or warranty contained in this Agreement or in any instruments or documents furnished in connection herewith may be asserted or maintained by any of the Seller Indemnified Parties except for claims made in writing prior to the expiration of the survival period of such representation or warranty, by notice to the Purchaser specifying the precise nature of such claim; (ii) no claim or action for indemnity under Section 9.2(b) may be asserted or maintained by any of the Seller Indemnified Parties except for claims made in writing on or before the first anniversary of the Closing Date, by notice to the Purchaser specifying the precise nature of such

24

claim; (iii) no claim or action for indemnity under Section 9.2(c) or (d) may be asserted or maintained by any the Seller Indemnified Parties except for claims made in writing prior to the date which is the first anniversary of the Closing Date, by notice to the Purchaser specifying the precise nature of such claim; and (e) no claim or action for indemnity under Section 9.2(e) may be asserted or maintained except for claims made in writing prior to the first anniversary of the Closing Date, by notice to the Purchaser specifying the precise nature of such claim. Notwithstanding anything herein or any provision in this Agreement to the contrary, in no event shall the Purchaser's aggregate liability under this Section 9.2 exceed $10,000.00. The provisions of this Section shall survive the Closing and shall run to, and be for the benefit of, any permitted assignee of the Seller.

9.3.    **Procedure for Indemnification**

(a)    If the Seller Indemnified Parties or a Purchaser Indemnified Party (in each case, an "Indemnified Party") intends to seek indemnification pursuant to this Article IX, such Indemnified Party shall promptly notify the party(ies) obligated to indemnify such Indemnified Party (each such party shall be referred to as an "Indemnifying Party" in such capacity), in writing, of such claim describing such claim in reasonable detail, provided, that the failure to provide such notice shall not affect the obligations of the Indemnifying Party(ies) unless and only to the extent it is actually prejudiced thereby.  In the event that such claim involves a claim by a third party against the Indemnified Party which seeks Damages, the Indemnifying Party shall have ten (10) days after receipt of such notice to decide whether it will undertake, conduct and control, through counsel of its own choosing and at its own expense, the settlement or defense thereof, and if it so decides, the Indemnified Party shall cooperate with it in connection therewith; provided, that the Indemnified Party may participate in such settlement or defense through counsel chosen by it, and provided further, that the reasonable fees and expenses of such counsel shall be borne by the Indemnified Party.  The Indemnifying Party(ies) shall have the right to settle or compromise any action which it determines to undertake, conduct and control as aforesaid, provided, that it (they) first obtain the consent of the Indemnified Party(ies), which consent shall not be unreasonably withheld, conditioned or delayed.  The Indemnified Party shall have the right to settle any claim or action without the consent of the Indemnifying Party; but shall not thereby waive any right to indemnity therefor pursuant to this Agreement; provided that as long as the Indemnifying Party(ies) is contesting any such claim in good faith, the Indemnified Party shall not pay or settle any such claim without the consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

25

(b)     The Indemnifying Party(ies) and the Indemnified Party shall cooperate fully in all aspects of any investigation, defense, pretrial activities, trial, compromise, settlement or discharge of any claim in respect of which indemnity is sought pursuant to this Article IX, including, but not limited to, by providing the other party with reasonable access to employees and officers (including as witnesses) and other information.

(c)     The Purchaser and the Seller intend that any liability subject to indemnification or reimbursement pursuant to this Article IX will be net of insurance proceeds and recoveries from third parties that actually reduce the amount of the liability. Accordingly, the amount which any Indemnifying Party is required to pay to any Indemnified Party will be reduced by any insurance proceeds or recoveries from third parties theretofore actually recovered by or on behalf of the Indemnified Party in reduction of the related liability. If an Indemnified Party receives a payment (an "Indemnity Payment") required by this Agreement from an Indemnifying Party in respect of any liability and subsequently receives insurance proceeds or a recovery from a third party, then the Indemnified Party shall pay to the Indemnifying Party an amount equal to the excess of the Indemnity Payment received over the amount of the Indemnity Payment that would have been due if the insurance proceeds or recovery from third parties had been received, realized or recovered before the Indemnity Payment was made.

(d)     The provisions of this Section 9.3 shall survive the Closing.

## X.     EMPLOYEE AND EMPLOYEE BENEFITS

### 10.1.   No Successor Liability To the Seller's Employees

Under no circumstances shall the Purchaser assume or be obligated to pay, and the Sale Assets shall not be or become liable for or subject to, any claims of or liabilities of the Seller's Employees, including but not limited to, salaries, severance unjust dismissal indemnity, antidiscrimination law violations, vacations, sick pay, incentives, bonus, overtime, meal period, employee's day of rest, pension benefit, profit sharing, retirement benefit, welfare benefit (including health, dental, prescription drugs, severance, disability, life insurance and accidental death and dismemberment benefits), and/or deferred compensation and any other compensation or benefits (the "Employee Claims"), nor shall the Purchaser assume the sponsorship, maintenance or administration of the any such employee benefit plans currently or previously sponsored or maintained by the Seller. The Employee Claims shall be and remain the liability, responsibility and obligation of the Seller, including, without limitation:

26

(a)     any and all liabilities or obligations (including, without limitation, any and all penalties, fines, settlements, interests, costs or expenses) arising out of or incurred in connection with any and all claims, litigation or Legal Proceedings associated with, arising out of or in connection with any and all claims, litigation or Legal Proceedings (whether instituted prior to or after the Closing) of any Employee (whether hired by the Purchaser or not), for any negligent or willful acts, errors, omissions, breach of contract, misconduct, termination, employee seniority accrued while employed with the Seller and successorship liability, discrimination or discriminatory practices, asserted by or committed against any Employee, whether known or unknown, which occurred, or arise from events that occurred, prior to the Closing Date.

(b)     any and all liabilities or obligations, (including, without limitation, any and all penalties, fines, settlements, interests, costs or expenses) under any local, state, federal or Commonwealth of Puerto Rico labor and employment Laws (including, without limitation,) any and all claims under the WARN Act, Title VII of the Civil Rights Act of 1964, as amended, 42 USC sec. 2000e et seq., Executive Order 11246, as amended, the Age Discrimination in Employment Act as amended 29 USC sec 621 et seq., the Employee Retirement Income Security Act of 1975, as amended, the Americans with Disabilities Act of 1991, the Federal Rehabilitation Act of 1973, as amended, and any other applicable federal, state of local, constitutional or statutory provision, order or regulation, arising out from any event or act of omission or commission, among others and such as Articles 1802 and/or 1803 of the Puerto Rico Civil Code, 31 LPRA secs. 5141-5142, and/or any other Civil Code disposition relative to damages, torts, and/or contracts, the Fair Labor Standards Act of 1938, as amended, 29 USC sec. 201 et seq., any mandatory wage decree or provision of the Puerto Rico Minimum Wage Act, Act 96 of June 29, 1956, 29 L.P.R.A. sec. 245 et seq., as amended by Act 84 of August 1, 1995 and Act 180 of July 27, 1998, unjust dismissal under Act 80 of May 30, 1976, 29 L.P.R.A. sec. 185a et seq., retaliation under Act 115 of December 20, 1991;, 29 L.P.R.A. sec. 194(a); Working Hours and Days Act, Act 379 of May 15, 1948, 29 L.P.R.A. sec 271 et seq., Christmas Bonus Act, Act 148 of June 30, 1969, 29 L.P.R.A. sec. 501 et seq., Sexual Discrimination in Employment Act, Act 69 of July 6, 1985, 29 L.P.R.A. sec. 1321 et seq., Sexual Harassment in Employment Act, Act 17 of April 22, 1988, 29 L.P.R.A. sec. 155 et seq., discrimination claims by reason of age, sex, religion, race, political affiliation, social condition or origin, and national origin under Act 100 of June 30, 1959, 29 L.P.R.A.

sec. 146 et seq., discrimination by reason of disability under Puerto Rico Act 44 of June 2, 1985, and Act 115 pf December 20, 1991, 29 L.P.R.A. Sec. 194(a)), which arise out of or as a result of such Employees employment with the Seller., marriage, for being a victim or perceived as a victim of domestic violence, sexual aggression or stalking, sexual orientation, gender identity under Act 100 of June 30, 1959, 29 L.P.R.A. sec. 146 et seq., discrimination by reason of disability under Puerto Rico Act 44 of June 2, 1985, 1 L.P.R.A. sec. 501 et seq., and Working Mothers Act, Act 3 of March 13, 1942, 29 L.P.R.A. sec. 467 et seq., Constitution of the Commonwealth of Puerto Rico, the Constitution of the United States of America, Act 59 of August 7, 1997 (drug tests), Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA), Civil Rights Law of 1866, Civil Rights Law of 1871, Civil Rights Act of 1991, the Older Workers Benefit Protection Act (OWBPA), the Uniformed Services Employment and Reemployment Rights Act (USERRA), the Family Medical Leave Act of 1993 (FMLA); the federal Rehabilitation Act of 1973; the Equal Pay Act of 1963; the federal Occupational Safety and Health Act (OSHA); Law No. 16 of August 5, 1975 (OSHO); the National Labor Relations Act (Taft Hartley), as amended; as well as any claim under the slander and libel law; or for breach of contract; Law No. 289 of April 9, 1946, as amended; and/or any applicable mandatory decree or employment contract; or any claim for damages and/or requesting reinstatement under the Workers Accident Compensation Act; the Non-Occupational Disability Benefits Act (SINOT); and/or the Labor Relations Act of 1947, as amended; and/or any claim under the Bankruptcy Act, the Insurance Code and Civil Code of Puerto Rico, the Employment Retirement Income Security Act (ERISA) (including any cause of action related to any welfare benefit plan), and/or the Consolidated Omnibus Budget Reconciliation Act (COBRA) and/or the Health Insurance Portability and Accountability Act (HIPAA),which arise out of or as a result of such Employees employment with the Seller.

(c)     The Bankruptcy Court shall retain jurisdiction over those Employee Claims removed to the Bankruptcy Court. It being intended and expressly understood by the Seller and the Purchaser that the Purchaser is not assuming any, and will not be considered to assume any Employee Claims or the Seller's liabilities or obligations arising out of or in connection with an Employee Claim.

(d)     It being further intended and understood that the Purchaser has no successor liability to the Seller's Employees,

and that the Purchased Assets are being sold, transferred and conveyed to the Purchaser free and clear of any and all Employee Claims, Liens, Claims, Interests or Encumbrances of any of Seller's Employees, whether known or unknown, and whether "*in rem*" or otherwise.

10.2. **Hired Employees**

(a)     The Seller and the Purchaser recognize that the continued employment of a substantial number of the personnel of the Seller is significant to the business interests of both the Purchaser and the Seller. Both the Purchaser and the Seller shall use their best efforts to accomplish the transition with as little disruption to the operations at the Realty as possible. In that regard, the Purchaser agrees, subject to prior review of the employee records and files, to offer employment to any of the Seller's Employees working at the Realty on the Closing Date who are willing to accept the terms and conditions to be offered by the Purchaser in its sole discretion (the "Hired Employees"), provided the Seller shall terminate all Hired Employees  and satisfy or provide for payment or discharge of all their employment related obligations, including the statutory severance indemnity, toward all such Hired Employees, except as may otherwise be allowed under the Laws of the Commonwealth of Puerto Rico.

(b)     All books, files and records owned by the Seller that relate to Hired Employees including, without limitation, books, files and records that are related to workers' compensation, non-occupational disability and to the evaluation, appraisal or performance of Hired Employees and those medical records for such of the Hired Employees that have given written authorization for the Seller to release same to the Purchaser will be released thereto;

10.3. **No Obligations**

Nothing contained in this Agreement shall be construed to require, or prevent the termination of employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Hired Employee. No provision of this Agreement shall create any third-party beneficiary rights in any employee or former employee of the Seller or any other persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

# XI.   CONDITIONS TO CLOSING

## 11.1.   Conditions to the Purchaser Obligations

The obligations of the Purchaser to consummate the Transactions contemplated hereby are subject to the reasonable satisfaction, as of the Closing, of all of the conditions contained in this Agreement, including each of the following conditions (any of which may be waived in whole or in part in writing by the Purchaser at or prior to the Closing):

(a)     The results of the due diligence are satisfactory to the Purchaser in its reasonable discretion.

(b)     The representations and warranties of the Seller set forth herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if such representations and warranties had been made on and as of the Closing Date.

(c)     The Seller shall have performed, observed, and complied in material respects with the covenants, agreements, obligations and conditions required by this Agreement to be performed, observed and complied with by the Seller prior to or as of the Closing.

(d)     The counterparties to the Leases included in the Assumed Contracts shall have agreed to amend them at the Closing to the reasonable satisfaction of the Purchaser.

(e)     The Sale Hearing shall commence by no later than ninety (90) days from the date hereof.

(f)     The Assumed Contracts and the Contracts designated hereunder for rejection shall be so assumed or rejected, as the case may be, by Final Order of the Bankruptcy Court reasonably satisfactory to the Purchaser.

(g)     The Seller shall have executed any and all documents and instruments necessary to convey good and marketable title to the Purchased Assets to the Purchaser.

(h)     The Seller shall have delivered the items set forth in Section 11.4.

(i)     Upon Closing, the Seller shall have paid off and satisfied of record any mortgage, judgment, Lien or other Encumbrance on the Purchased Assets or any portion thereof or such mortgage judgement, Lien or other Encumbrance shall have attached to the proceeds of the sale pursuant to the Sale Order in accordance with this Agreement, and no Liens, Claims or

30

Encumbrances shall affect the Purchased Assets as of the Closing Date.

(j)      No Order or other Legal Requirement preventing the consummation of the Transactions contemplated by this Agreement shall be in effect.

(k)      On or prior to the Closing Date, the Seller shall not have applied for or consented to the appointment of a receiver, trustee or liquidator for itself or any of its assets unless the same shall have been discharged (with no right of appeal) prior to the Closing Date.

(l)      At Closing, the Seller shall have obtained each and every other consent, approval, waiver, permit, license or order of, and made each filing or registration with, any Governmental Authority or third party required in connection with the consummation by the Seller of the Transactions contemplated hereby.

(m)      In the event that any of the foregoing conditions are not satisfied as of the Closing Date, the Purchaser shall have the right at its option to terminate this Agreement as provided in Article XIII of this Agreement.

(n)      The Bankruptcy Court shall have issued the Sale Order and the Sale Order shall not be subject to any stay.

### 11.2.   **The Purchaser's Obligations at the Closing**

The Purchaser shall deliver or cause to be delivered to the Seller the following items at the Closing:

(a)      The Purchase Price required by Section 4.1 above, as adjusted by Section 4.3 above, by certified or cashier's check or by wire transfer of immediately available U.S. Dollars.

(b)      Executed signature pages to the final Asset Purchase Agreement, Assignment Agreement and the Bill of Sale.

### 11.3.   **Conditions to the Seller's Obligations**

The obligations of the Seller to consummate the Transactions contemplated hereby are subject to the satisfaction, as of the Closing, of all of the conditions contained in this Agreement, including each of the following conditions (any of which may be waived in whole or in part in writing by the Seller at or prior to the Closing):

(a)     The representations and warranties of the Purchaser set forth herein shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if such representations and warranties had been made on and as of the Closing Date.

(b)     The Purchaser shall have performed, observed, and complied in all material respects with all of the covenants, agreements, obligations and conditions required by this Agreement to be performed, observed and complied with by the Purchaser prior to or as of the Closing.

(c)     No Order or other Legal Requirement preventing the consummation of the Transactions contemplated by this Agreement shall be in effect.

(d)     The Purchaser shall have paid the Purchase Price to the Seller as set forth in Section 4.1, as adjusted by Section 4.3 above.

(e)     The Assumed Contracts and the Contracts designated hereunder for rejection shall be so assumed or rejected, as the case may be, by Final Order of the Bankruptcy Court satisfactory to the Purchaser.

(f)     The consummation of the Transactions contemplated hereby shall not violate or conflict with state or federal Laws, or the Laws of the Commonwealth of Puerto Rico or any other legal requirements.

(g)     No action, suit or proceeding shall be pending, nor shall any order, judgment or decree have been issued, in each case at the time of the Closing Date, that questions the validity or enforceability of this Agreement or the Transactions contemplated by this Agreement.

(h)     All consents and approvals of Governmental Authorities and parties to agreements to which either the Purchaser is a party or by which the Purchaser is bound that are required with respect to the consummation of the Transactions contemplated by this Agreement shall have been obtained and copies thereof shall have been delivered to the Seller at or prior to the Closing.

(i)     On or prior to Closing Date, the Purchaser shall not have applied for or consented to the appointment of a receiver, trustee or liquidator for itself or any of its assets unless the same shall have been discharged (with no right of appeal)

32

prior to the Closing Date, and no such receiver, liquidator or trustee shall have otherwise been appointed by the Bankruptcy Court, unless same shall have been discharged (with no right of appeal) prior to the Closing Date.

(j)     The Bankruptcy Court shall have issued the Sale Order and the Sale Order shall not be subject to any stay.

### 11.4.   **The Seller's Obligations at the Closing**

The Seller shall deliver or cause to be delivered to the Purchaser the following items at the Closing:

(a)     Executed signature pages to the final Asset Purchase Agreement, Assignment Agreement and the Bill of Sale.

(b)     All keys to the Purchased Assets and combinations to any safes thereon, passwords for all computers thereon and any security devices therein.

(c)     The Closing Statement executed by the Seller and the Purchaser.

### 11.5.   **Closing Costs**

The Seller shall bear the costs relating to the Transactions, including but not limited to: costs associated with the cancellation of any Liens affecting the Realty, issuance of a title policy benefiting the Purchaser covering the Sale Assets, and all typical recording charges, which costs shall be derived from the proceeds of the Transactions or any other sources; provided, however, that the Purchaser shall select the notary public who will be authorizing any public instrument executed in connection hereof, Seller will pay any internal revenue stamps to be cancelled in the certified copy of the public instruments, the corresponding notarial tariff and the applicable filing and recording fees thereof, if necessary.  Purchaser and Seller agree to work together to minimize the costs related to closing.  Seller agrees to endorse or convey assets at the direction of the Purchaser into affiliated entities, successors, and assigns at the time of closing or as mutually agreed by Purchaser and Seller; however, Seller shall not be liable for any additional costs for the recording of assets into multiple entities.

### 11.6.   **Break-up Fee**

To the extent that the Bankruptcy Court requires the Seller to solicit competing and/or alternative proposals for the sale of the Purchased Assets, the Seller shall (at the Purchaser's election) designate the Purchaser as a stalking-horse bidder, with protections including, but not limited to, a Break-up Fee (as defined below) and reimbursement of

out of pocket costs and expenses incurred by the Purchaser in connection with the Transactions, including legal fees as may be authorized by the Bankruptcy Court up to $100,000.00. In such event, the parties hereby agree that should the Seller consummate a Transaction for the sale of part or all of the Sale Assets on or before the Closing Date to a buyer other than the Purchaser (the "Alternative Transaction"), the Seller covenant and agree to, pay the Purchaser a break-up fee consisting of 3% of the Purchase Price (the "Break-up Fee") or such other amount as may be finally authorized by the Bankruptcy Court, as liquidated damages for Purchaser's time, expenses and lost opportunities. In the event the Bankruptcy Court orders and auction of the Purchased Assets in the Bankruptcy Case, the Seller shall ensure that any bidding procedures expressly provide that the Break-up Fee and expense reimbursement be considered a credit in favor of the Purchaser in any such auction. The Seller shall request that the Bankruptcy Court approves the Break-up Fee, and expense reimbursement of up to $100,000.00, as fair and reasonable, taking into account the significant time, effort and expenses of the Purchaser in conducting its due diligence and negotiating the definitive terms of the Transactions.

## XII.    CLOSING

If the Sale Order is entered, the consummation of the Transactions contemplated by this Agreement (the "Closing") shall take place at 10:00 a.m. on the thirtieth (30th) day after the later to occur of 1) the entry of the Sale Order, or 2) the completion of the Purchaser's Due Diligence Period or such other date as the Purchaser and the Seller shall agree in writing (the "Closing Date"),

## XIII.    TERMINATION

### 13.1.    Grounds for Termination

This Agreement may be terminated at any time prior to the Closing:

(a)    By the Purchaser or by the Seller, if (i) the Closing shall not have occurred for any reason by the Closing Date; or (ii) an Alternate Transaction is consummated.

(b)    By the Purchaser, if one or more of the conditions specified or waived in this Agreement is not satisfied on the Closing Date or at any time before the expiration of the Due Diligence Period.

(c)    By the Seller, if one or more of the conditions specified or waived in this Agreement is not satisfied on the Closing Date.

(d)    By the Purchaser, if the Sale Order has not been entered by the Bankruptcy Court by December 15, 2023.

(e)    By the mutual written agreement of the Purchaser and the Seller.

(f)    By the Seller or the Purchaser if the other materially breaches any of its obligations under this Agreement.

## 13.2.   **Effect of Termination**

If this Agreement is terminated as permitted herein, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, advisor, consultant or representative of such party) to the other party to this Agreement; provided that if such termination shall result from the willful failure of any party to fulfill a condition to the performance of the obligations of another party, failure to perform a covenant of this Agreement or breach by any party to this Agreement of any representation or warranty or agreement contained in this Agreement, such failing or breaching party shall be fully liable for any and all losses incurred or suffered by the other party as a result of such failure or breach.

## XIV.        MISCELLANEOUS

### 14.1.   **Notices**

All notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand, sent by confirmed facsimile or sent**,** postage prepaid, by registered, certified or express mail or reputable overnight courier service and shall be deemed given when so delivered by hand, confirmed faxed or if mailed, three Business Days after mailing (one Business Day in the case of express mail or overnight courier service), as follows (or to such other address or telecopy number as the applicable party shall have notified the other party in writing in accordance with this Section**.**  If given by certified or registered mail, the notice shall be deemed to have been given two days after such certified or registered letter containing such notice, properly addressed, with postage prepaid, is deposited in the United States mail; and if given otherwise than by certified or registered mail, the notice shall be deemed to have been given when delivered to and received by the party to whom it is addressed.  Such notices shall be given to the parties hereto at the following addresses or, if given by facsimile transmission at the following facsimile numbers:

|  |  |
|---|---|
| **If to Seller, to:** | **ESJ Towers, Inc.** |
|  | Attention: Stephen Nalley |
|  | Tel.: 386-290-0599 |
|  | E-Mail: Snalley@blackbriarus.com |

|                     |                                                          |
|---------------------|----------------------------------------------------------|
| **With a copy to:** | **Charles A. Cuprill, P.S.C., Law Offices**              |
|                     | Attention: Charles A. Cuprill-Hernández, Esq.            |
|                     | 356 Fortaleza Street                                     |
|                     | Second Floor                                             |
|                     | San Juan, PR 00901                                       |
|                     | Tel.: (787) 977-0515                                     |
|                     | Fax: (787) 977-0518                                      |
|                     | E-Mail: ccuprill@cuprill.com                             |

|                         |                                                      |
|-------------------------|------------------------------------------------------|
| **If to Purchaser, to:**| **Fortaleza Equity Partners 2 LLC**                  |
|                         | Attention: Thomas Axon                               |
|                         | Tel. : (347) 243-8013                                |
|                         | Fax:  (  )                                           |
|                         | E-Mail: taxon@fortalezahomespr.com                   |

|                     |                                                      |
|---------------------|------------------------------------------------------|
| **With a copy to:** | **Fortaleza Equity Partners 2 LLC**                  |
|                     | Attention:  Shane Brown                              |
|                     | Tel.: (201) 390-5290                                 |
|                     | Fax:  (  )                                           |
|                     | E-Mail: sbrown@fortalezahomespr.com                  |

### 14.2.   Amendments and Waivers

(a)     Any provision of this Agreement may be amended or waived prior to the Closing Date if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies provided in this Agreement shall be cumulative and not exclusive of any rights or remedies provided by Law.

### 14.3.   Successors and Assigns

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assign; provided, however, that neither the Purchaser nor the Seller may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the other; provided further, however that the Purchaser may assign some or all of its rights and obligations hereunder

to one or more of its subsidiaries or affiliates prior to the Closing without the consent from the Seller. Upon any such assignment, the references in this Agreement to the Seller or the Purchaser shall also apply to any such assignee unless the context otherwise requires.

### 14.4. Bulk Sales Laws

The Purchaser and the Seller each waive compliance by the Seller with the provisions of the "bulk sales", "bulk transfer" or similar Laws of Commonwealth of Puerto Rico.

### 14.5. Captions

The captions in this Agreement are included for convenience of reference only and shall be ignored in the construction or interpretation of this Agreement.

### 14.6. Incorporation by Reference

The Preamble and WHEREAS clauses set forth above and the Schedules referred to above are incorporated into this Agreement as if the same were fully set forth in this Agreement.

### 14.7. No Survival of Representations and Warranties

The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder and no Person shall have any liability for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

### 14.8. Expenses

Except as otherwise provided in this Agreement, the Seller and the Purchaser shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions.

### 14.9. Bankruptcy Court Jurisdiction

Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 14.1 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive

37

jurisdiction of the United States District Court for the District of Puerto Rico and any appellate court thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute maybe enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

### 14.10.  **Injunctive Relief**

Damages at Law may be inadequate remedy for the breach of any of the covenants, promises or agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.

### 14.11.  **Third Party Beneficiaries**

Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement.

### 14.12.  **Entire Agreement**

This Agreement and its Schedules embodies and constitutes the entire understanding between the parties hereto with respect to the Transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are superseded by this Agreement.

### 14.13.  **Modification**

Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except as provided herein or by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

### 14.14.  **Applicable Law**

This Agreement shall be governed by and construed in accordance with the Laws of the Commonwealth of Puerto Rico.

### 14.15.  **Timing**

If the final date of any period which is set out in any provision of this Agreement or the Closing Date falls on a Saturday, Sunday or legal holiday under the Laws of the Commonwealth of Puerto Rico, then the time of such period or the Closing Date, as the

case may be, shall be extended to the next date which is not a Saturday, Sunday or legal holiday.

### 14.16.  Invalid Provision

If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid or unenforceable provision or by its severance from this Agreement.

### 14.17.  Multiple Counterparts

This Agreement may be executed in a number of identical counterparts, each of which for all purposes is deemed an original, and all of which constitute collectively one agreement.

### 14.18.  Further Assurances

On and after the Closing Date, each party shall take such other actions and execute such other documents and instruments of conveyance and transfer as may be reasonable requested by the other party from time to time to fully effectuate the transfer of the Realty and the Purchased Assets to the Purchaser in accordance with the terms of this Agreement.

## XV.     DEFINITIONS

### 15.1.  Defined Terms

Defined Terms used in this Agreement shall, unless the context otherwise requires, have the following meaning:

"Agreement" means this Asset Purchase Agreement by and between the Seller and the Purchaser and all Schedules attached to this Agreement, as amended, consolidated, supplemented, novated or replaced by the parties from time to time, as the same may be amended from time to time.

"Assignment" has the meaning given such term in section 365 of the Bankruptcy Code.

"Assignment Agreement" means that certain Contract Assignment and Assumption Agreement to be executed by the Seller and the Purchaser at the Closing in form acceptable to the Parties hereto as **Exhibit A**.

"Assumed Contracts" means those Contracts and Leases identified on **Schedule 1.2(b)** to be attached to the final Agreement, it being understood that the Purchaser shall not be required to assume any Contract or Lease and that any assignment of a Contract or Lease to Purchaser by the Seller shall be at the sole discretion of the Purchaser and subject to approval of the Bankruptcy Court.  Assumed Contracts shall include the Leases, and any Contracts the Purchaser later advises the Seller it wishes to have assigned to the Purchaser [and the Purchaser accepts them], notwithstanding the Contracts initial exclusion from **Schedule 1.2(b)**.

"Assumed Liabilities" has the meaning given such term in Section 3.1

"Avoidance Actions" means any avoidance cause of action of the Seller against a third party other than the Purchaser arising under subchapters II and III of chapter 5 of title 11 of the Bankruptcy Code, and causes of action under sections 550 and 551 of the Bankruptcy Code to recover any such avoided transfers; provided that the Seller may not bring any avoidance action with respect to any payment that would constitute a Cure Amount under an Assumed Contract.

"Bankruptcy Case" has the meaning given to such term in the Recitals.

"Bankruptcy Code" has the meaning given to such term in the Recitals.

"Bankruptcy Court" has the meaning given to such term in the Recitals.

"Bill of Sale" means that certain Bill of Sale to be executed by the Seller and the Purchaser at the Closing in form acceptable to the Parties hereto as **Exhibit B**.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to be closed in the Commonwealth of Puerto Rico.

"Claims" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" shall mean the consummation of the sale and purchase of the Purchased Assets and all other Transactions contemplated in this Agreement.

"Closing Date" means the date on or as of which the Closing occurs by, in no event later than thirty (30) calendar days after the later to occur of 1) entry of the Sale Order, or 2) the completion of the Purchaser's Due Diligence Period or such other time as mutually agreed to by and between the Purchaser and the Seller.

"Contract" means any Executory Contract to which the Seller is a party relating to the Realty or Purchased Assets (i) as of the date hereof or (ii) which is entered into by the Seller between the date hereof and the Closing Date that concerns or is related to the Realty or the Purchased Assets, including, but not limited to, agreements, warranties and guaranties relating to the Realty, and the Sale Assets or the operations carried out at the Realty, and any amendments, modifications or supplements thereto.

"Cure" or "Cure Amounts" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Assumed Contracts. To avoid any doubt, the Seller shall be liable for all Cure or Cure Amounts.

"Damages" has the meaning given such term in Section 9.1 hereof.

"De Minimis Amounts" means cleaning and maintenance materials and office supplies containing Hazardous Materials of the types and quantities customarily used and stored at properties similar to the Realty, provided that same are used, stored and maintained in accordance with Environmental Laws.  For purposes of this definition, De Minimis Amounts shall include any inventory of materials and supplies of the Seller.

"Due Diligence Period" means sixty (60) days from the filing of the Sale Motion.

"Employees" means all individuals, as of the date hereof, who are employed by the Seller and who are identified on **Exhibit C**, to be attached to the final Agreement.

"Employee Benefit Plans" means any employee benefit plans, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and any "multi-employer plan" as defined in Section 3(37) of ERISA or each deferred compensation and each bonus or other incentive compensation, stock purchase, stock option and other equity related compensation plan, program, agreement or arrangement; each medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, termination, change in control, retention or agreement or arrangement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to, or required to be contributed to, by the Seller or an ERISA Affiliate or to which the Seller or an ERISA Affiliate is party, whether written or oral, for the benefit of any director or employee or former director or employee of the Seller or any former subsidiary of the Seller.

"Employee Claims" has the meaning given such term in Section 12.1.

"Employee Plan" has the same meaning as Employee Benefits Plan.

"Encumbrances" means any security interest, Lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, transfer restriction, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, charge, claim, easement, encroachment, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral.

41

"Environmental Law" means the following: (i) any federal, state or local Law (including, without limitation, the Commonwealth of Puerto Rico), statute, ordinance, rule, regulation, guideline, code, license, permit, authorization, approval, consent, legal doctrine, order, judgment, decree, injunction, requirement or agreement with any governmental entity, relating to (x) the protection, preservation or restoration of the environment (including, without limitation, air, water, vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, or (y) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Materials. The term Environmental Law includes, without limitation, (i) the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act, the federal Water Pollution Control Act of 1972, the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the federal Solid Waste Disposal Act and the federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Atomic Energy Act, the Nuclear Waste Policy Act of 1982, the federal Occupational Safety and Health Act of 1970, the Puerto Rico Public Policy Environmental Act and regulations promulgated thereunder, each as amended and as now in effect, and (ii) any common law or equitable doctrine (including, without limitation, injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that with the Seller is:

(a)  member of a controlled group of corporations within the meaning of Section 414(b) of the IRC Code;

(b)  a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the IRC Code;

(c)  a member of an affiliated service group within the meaning of Section 414(m) of the IRC Code; or

(d)  a member of a group of organizations required to be aggregated under Section 414(o) of the IRC Code.

"Excluded Assets" shall have the meaning given to such term in Section 2.1.

"Excluded Contracts" is any Contract or Lease that is not an Assumed Contract.

42

"Excluded Liabilities" has the meaning given such term in Section 3.3.

"Executory Contract" means any Contract that is executory as that term is used in section 365 of the Bankruptcy Code.

"Final Order" means an Order of the Bankruptcy Court the operation of which has not been modified or amended without the consent of the Purchaser, reversed or stayed, as to which Order no appeal or motion, application, petition or writ seeking reversal, reconsideration, reargument, rehearing, certiorari, amendment, modification, a stay or similar relief is pending, and the time to file any such appeal or motion, application, petition or writ has expired

"Governmental Authority" means any federal, state, local or Commonwealth of Puerto Rico court, tribunal, governmental department, agency, board or commission, regulatory authority, or other governmental body, subdivision or instrumentality.

"Hazardous Materials" or "Hazardous Substance" means any substance presently defined, designated or classified as hazardous, toxic, radioactive or dangerous, or otherwise presently regulated under any Environmental Law, whether by type or by quantity, including any substance containing any such substance as a component. Hazardous Materials includes, without limitation, any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, industrial hazardous or toxic substance or petroleum or any derivative or by-product thereof, radon, radioactive material, asbestos, asbestos containing material, urea formaldehyde foam insulation, lead and polychlorinated biphenyl, and any and all of the following, including mixtures thereof:  any hazardous substance, pollutant, contaminant, waste, by-product or constituent presently regulated under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 *et seq.*; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas and synthetic gas usable for fuel; pesticides presently regulated under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Section 136 *et seq.*; asbestos and asbestos-containing materials, PCBs and other substances presently regulated under the federal Solid Waste Disposal Act and the federal Toxic Substances Control Act, 15 U.S.C. Section 2601 *et seq.*; source material, special nuclear material, by-product material and any other radioactive materials or radioactive wastes, however produced, presently regulated under the Atomic Energy Act or the Nuclear Waste Policy Act of 1982; chemicals subject to the OSHA Hazard Communication Standard, 29 C.F.R. ''1910.1200 *et seq.*; and industrial process and pollution control wastes, whether or not hazardous within the meaning of the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*

"Hired Employees" means the Seller's Employees to be hired by the Purchaser on the Closing Date pursuant to Section 12.2 of this Agreement.

"Intellectual Property" means all intellectual property arising from or in respect of the following:

43

(i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon;

(ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof;

(iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights; and

(iv) all software owned by the Seller.

"Intellectual Property Rights" means (i) copyrights, patents, database rights and rights in business names, trademarks, trade names, designs (whether registered or unregistered) and rights in know-how; (ii) applications for registration, and the right to apply for registration, for any of these rights; (iii) rights to use any of the rights referred to in (i) and (ii); and (iv) all other intellectual property rights and equivalent or similar rights or forms of protection existing anywhere in the world.

Interest" shall mean an "interest in property" as such phrase is used in section 363(f) of the Bankruptcy Code.

"IRC" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury regulations promulgated and the rulings issued thereunder.

"Law" means any federal, state, commonwealth, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

"Leases" has the meaning given to such term in Section 1.2(b).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"Legal Requirements" means any and all judicial decisions, orders, injunctions, judgments, decrees and writs, and any and all Laws, statutes, rules, regulations, permits, certificates or ordinances of any governmental or municipal authority that are applicable to the Realty.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

44

"License" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Authority.

"Lien" means, with respect to any of the Purchased Assets, regardless of whether created or incurred pre- or post- Petition Date, any lien, pledge, charge, option, right of first refusal, license to a third party, leases to a third party, security agreement, security interest, Encumbrance or other adverse claim, restriction, interest or limitation of any kind in respect of any of the Purchased Assets or irregularities in title thereto.  For the purposes of this Agreement, without limiting the definition of the term "Lien," Lien shall also have the meaning set forth in section 101(37) of the Bankruptcy Code and the Seller will be deemed to own subject to a Lien any asset which the Seller has acquired or held subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"Material Adverse Change" means any event, occurrence or effect (regardless of whether such event, occurrence or effect constitutes a breach of any representation, warranty or covenant of the Seller hereunder) that has had or would be reasonably likely to have, individually or when considered together with any other events, occurrences or effects (i) a material adverse change in the Realty or Purchased Assets, taken as a whole or (ii) a material adverse change in or to the ability of the Seller to consummate the Transactions or perform its obligations under this Agreement; other than to the extent such effect or change results from or relates to a matter not included in this Agreement; provided, however, that the act of filing a case under chapter 11 of the Bankruptcy Code by the Seller does not and shall not constitute a Material Adverse Change. A reduction in sales in the Realty from prior years shall not be considered a Material Adverse Change.

"Material Contract" means any contract in excess of $10,000.00.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"Ordinary Course of Business" means, except as otherwise specifically ordered by the Bankruptcy Court, the ordinary course of business consistent with past prudent custom and practices of the Seller with respect to the ownership, maintenance and operation of the Realty and Purchased Assets, provided the same is consistent with industry standard for similar properties, in the Commonwealth of Puerto Rico.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Authority.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Personal Property" has the meaning given such term in Section 1.2(c).

"Petition" means the voluntary Petition for relief filed by the Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

45

"Petition Date" means the date on which the Seller filed the Petition.

"Proration Items" has the meaning given such term in Section 4.3.

"Purchase Price" has the meaning given such term in Section 4.1.

"Purchased Assets" has the meaning given such term in Section 1.2.

"Purchaser" has the meaning given such term in the Preamble.

"Purchaser Indemnified Parties" has the meaning given such term in Section 9.1.

"Sale Hearing" means the hearing in front of the Bankruptcy Court at which the sale of the Purchased Assets is approved by entry of the Sale Order in a form acceptable to the Purchaser.

"Sale Motion" means the motion of the Seller for an order pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Sale Order" means an order entered by the Bankruptcy Court in form and substance similar to the document attached as **Exhibit D** hereto.

"Seller Indemnified Parties" has the meaning given such term in Section 9.1.

"Seller" has the meaning provided therefore in the Preamble.

"Sale Assets" are those listed on **Exhibit E** (which schedule shall be agreed upon by both Purchaser and Seller prior to Closing and attached to the final Agreement).

"Tax" or "Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges including, without limitation, all federal, state, local, foreign and other net or gross income, gross receipts, alternative or add-on minimum tax, franchise, profits, capital gains, capital, transfer, sales, use, *ad valorem,* occupation, premium, property, excise, severance, environmental (including taxes under IRC §59A) or windfall profits tax, stamp, license, payroll, employment, withholding and other taxes, assessments, charges, customs, duties, fees, levies or other governmental assessments or charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest, whether disputed or not.

"Termination" has the meaning given to such term in Article XIII.

"Transactions" has the meaning given to such term in the Recitals.

### 15.2.   Use Of Singular Or Plural

As used in this Agreement, the singular shall include the plural and the masculine gender shall include the feminine and neuter and vice versa, as the context requires.

### 15.3.   **Reference To Agreement**

Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

### 15.4.   **Recitals and Schedules**

The Recitals and Schedules annexed hereto, and the capitalized terms defined therein, are hereby incorporated by reference into the body of this Agreement as if the same were fully set forth herein.

### 15.5.   **Including**

The term "including" shall be construed to mean "including without limitation."

## XVI.   DUE DILIGENCE

Purchaser and Seller each acknowledge Purchaser shall be afforded reasonable and customary due diligence access with respect to the Purchased Assets for a period of sixty (60) days from the filing of the Sale Motion (the "Due Diligence Period") and that neither Seller nor its representatives are obligated to furnish any information of any kind whatsoever relating to the Purchased Assets at any time prior to or after the Due Diligence Period.   Due diligence access includes management presentations, onsite inspections of the Purchased Assets and other requested matters as to which the Purchaser, in its sole discretion may request. The Purchaser will exercise its own discretion before relying on any information regarding the Purchased Assets provided by anyone other than the Seller or its representatives.   During the Due Diligence Period, Seller shall (i) provide true, factual and complete information regarding matters requested by the Purchaser, and (ii) reasonably extend the Due Diligence Period for any delay in providing or receiving due diligence material from third party vendors.   Seller expressly acknowledges and agrees that legal review of this Agreement by Purchaser's counsel shall be considered part of the due diligence process and both parties acknowledge that Purchaser reserves its right to reasonable and customary legal review and comment on to this Agreement.

The Purchaser and Seller acknowledge and represent that the Purchaser has not had an opportunity to inspect or examine the Purchased Assets nor has the Purchaser had the opportunity to conduct any due diligence regarding the Purchased Assets prior to executing this Agreement, that it will rely solely upon its own independent review, investigation and/or inspection of any documents, and that it will not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets.

The Purchaser and Seller further acknowledge that results of the due diligence under this Article XVI may have an impact on the nature of these Transactions and composition of the Purchased Assets which may result in changes to the schedule of

Purchased Assets and/or the Realty and that these changes may result in changes to the Purchase Price.  Purchaser and Seller further acknowledge that either or both entities' interest in closing these Transactions will be dependent upon the results of the due diligence and impact to the terms under which they are willing close these Transactions. Any changes required to be documented in these Transactions will be incorporated into the final Agreement.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the Seller and the Purchaser have executed this Agreement as of the date set forth above.

Seller:

**ESJ Towers, Inc.**
a Puerto Rico corporation

By:  _Stephen Nalley_
Name: Stephen Nalley
Title: President of Black Briar Advisors, LLC

Purchaser:

**Fortaleza Equity Partners 2, LLC**

a Puerto Rico entity

By:  _Thomas Axon Jr_
Name:  Thomas Axon
Title:   President

## SCHEDULES

**Schedule**                                                                   **Page**

Schedule A – Sale Assets.................................................................................1, 45
Schedule B – Sale Order................................................................................1, 45
Schedule C – Employees.....................................................................................40
Schedule 1.2(b) – Assumed Contracts....................................................2, 17, 38
Schedule 1.2(c) – Personal Property.......................................................................3
Schedule 1.2(d) – Hardware and Software.............................................................3
Schedule 1.2(e) – Permits...............................................................................4, 15
Schedule 3.1 – Assumed Liabilities........................................................................6
Schedule 4.1 – Insurance.......................................................................................17
Schedule 4.2 – List of Litigation...........................................................................17

## EXHIBITS

**Exhibits**                                                                                    **Page**

Exhibit A – Assignment Agreement...............................................................................38
Exhibit B – Bill of Sale………………………………………………………………..39

**EXHIBIT D**

# ESJ TOWER, INC.
## SUMMARY OF CLAIMS AND PLAN PAYMENTS
## REVISED AS OF 9/25/2023
## CASE NO. 22-01676 (ESL)

| | PROOF OF CLAIM AMOUNTS | CLASS | SCHEDULED CLAIMS | RECLASS. | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | AMOUNT PAID DURING REORG. | PAYMENTS ON/OR BEFORE EFFECTIVE DATE |
|---|---|---|---|---|---|---|---|---|
| SECURED CLAIMS | $ 32,500,652 | 1 to 6 | $ 21,148,499 | $ - | $ (10,490,224) | $ 10,658,275 | $ - | $ 10,328,321 |
| PRIORITY TAX CLAIMS | 1,546,438 | N/A | 1,828,967 | - | (846,355) | 982,612 | - | 982,612 |
| ADM. EXPENSE CLAIMS | - | N/A | - | - | 2,689,825 | 2,689,825 | 591,971 | 2,097,854 |
| UNSECURED CLAIMS | 56,864,786 | 7 | 15,737,074 | - | 11,161,308 | 26,898,382 | - | 750,000 |
| EXECUTORY CONTRACTS | - | N/A | - | - | - | - | - | - |
| TOTAL | $ 90,911,875.57 | | $ 38,714,540 | $ - | $ 2,514,554 | $ 41,229,094 | $ 591,971 | $ 14,158,787 |

**ESJ TOWER, INC.**
**ADMINISTRATIVE EXPENSE CLAIMS**
**REVISED AS OF 9/25/2023**

| CREDITOR | SCHEDULED CLAIMS | ADJUSTMENTS AND TRANSFERS | AMOUNT EXPECTED TO BE ALLOWED | PAYMENTS DURING THE REORGANIZATION PERIOD | ON OR BEFORE EFFECTIVE DATE |
|---|---|---|---|---|---|
| CHARLES CUPRILL, ESQ. | $ - | $ 675,000.00 | $ 675,000.00 | $ 463,971.00 | $ 211,029.00 |
| SPECIAL COUNSEL | - | 20,000.00 | 20,000.00 | 10,000.00 | 10,000.00 |
| DE ANGEL & CO. | - | 45,000.00 | 45,000.00 | - | 45,000.00 |
| POST PETITION ACCOUNTS PAYABLE | - | 337,259.37 | 337,259.37 | - | 337,259.37 |
| CPA LUIS R CARRASQUILLO & CO. PSC | - | 155,000.00 | 155,000.00 | 98,000.00 | 57,000.00 |
| UCC PROFESSIONALS | - | 170,000.00 | 170,000.00 | - | 170,000.00 |
| ORIENTAL BANK - INSURANCE | | 245,266.00 | 245,266.00 | - | 245,266.00 |
| LUMA | - | 79,786.64 | 79,786.64 | - | 79,786.64 |
| ACCUMULATED HOA FEES | - | 910,312.96 | 910,312.96 | - | 910,312.96 |
| US TRUSTEE QUARTERLY FEES | - | 52,200.00 | 52,200.00 | 20,000.00 | 32,200.00 |
| | $ - | $ 2,689,824.97 | $ 2,689,824.97 | $ 591,971.00 | $ 2,097,853.97 |

**ESJ TOWER, INC.**
**CASE NO. 22-01676**
**PRIORITY CLAIMS - PAYMENT PLANS**
**REVISED AS OF 9/25/2023**

| CREDITOR | | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | PAYMENT AT EFFECTIVE DATE |
|---|---|---|---|---|---|---|---|---|
| COMPAÑIA DE TURISMO | | $ 34,847.86 | POC-08 | Allowed | $ 40,228.00 | $ (5,380.14) | $ 34,847.86 | $ 34,847.86 |
| CRIM | U | 14,620.15 | POC-214 | Allowed | - | 14,620.15 | 14,620.15 | 14,620.15 |
| CRIM | S | 17,857.74 | POC-215 | Allowed | - | 17,857.74 | 17,857.74 | 17,857.74 |
| CRIM | S | 20,314.01 | POC-216 | Allowed | - | 20,314.01 | 20,314.01 | 20,314.01 |
| CRIM | S | 23,455.16 | POC-217 | Allowed | - | 23,455.16 | 23,455.16 | 23,455.16 |
| CRIM | S | 23,733.58 | POC-218 | Allowed | - | 23,733.58 | 23,733.58 | 23,733.58 |
| CRIM | S | 226,258.63 | POC-219 | Allowed | 278,351.16 | (52,092.53) | 226,258.63 | 226,258.63 |
| TREASURY DEPARTMENT OF PR | | 980,860.76 | POC-09 | Objected - Docket 740 | 964,960.73 | (500,776.37) | 464,184.36 | 464,184.36 |
| TREASURY DEPARTMENT OF PR | | 156,636.31 | POC-10 | Allowed | 125,473.58 | 31,162.73 | 156,636.31 | 156,636.31 |
| TREASURY DEPARTMENT OF PR | | - | | Duplicated at Schedules | 419,953.71 | (419,953.71) | | |
| IRS | | 704.51 | POC-251 | Allowed | - | 704.51 | 704.51 | 704.51 |
| NICOLE LAUREN GOLDBERG | | 3,635.00 | POC-20 | Objection Granted Dck 860 | - | - | - | - |
| JOHN ROZSA & IVY BELOFF ROZSA | | 4,076.00 | POC-25 | Objected - Granted Docket 861 | - | - | - | - |
| ROBERT MARTIN CHAZIN | | 3,350.00 | POC-53 | Objection Granted Dck 862 | - | - | - | - |
| JOAN BOROKOWSKY | | 3,500.00 | POC-181 | Objection Granted Dck 792 | - | - | - | - |
| DARRELL SWEENEY | | 6,219.09 | POC-64 | Objection Granted Dck 862 | - | - | - | - |
| RAUL VAZQUEZ | | 3,350.00 | POC-119 | Objected - Docket 733 | - | - | - | - |
| EILEEN R. REYES | | 3,350.00 | POC-120 | Objected - Granted Docket 867 | - | - | - | - |
| FLORENCE PALEY | | 3,350.00 | POC-79 | Objected - Doc 253 | - | - | - | - |
| JOAN BOROKOWSKY | | 3,447.00 | POC-182 | Objection Granted Dck 792 | - | - | - | - |
| LAURA MARIE MARIEL & MILAGROS LORA | | 3,350.00 | POC-200 | Objected - Granted Dkt 627 | - | - | - | - |
| MAXIMINO MORALES | | 3,350.00 | POC-188 | Objected - Granted Dkt 627 | - | - | - | - |
| MILAGROS LORA | | 3,350.00 | POC-201 | Objected - Granted Dkt 627 | - | - | - | - |
| ROBERT A SOMERVILLE | | 2,822.00 | POC-24 | Objected - Granted Dkt 870 | - | - | - | - |
| TOTAL | | $ 1,546,437.80 | | | $ 1,828,967.18 | $ (846,354.87) | $ 982,612.31 | $ 982,612.31 |

**ESJ TOWER, INC.**
**CASE NO. 22-01676**
**SECURED CLAIMS - PAYMENT PLANS**
**REVISED AS OF 9/25/2023**

| CREDITOR | CLASS | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | TRANSFERRED TO UNSECURED CLAIMS | FINAL AMOUNTS TO BE ALLOWED | PAYMENT AT EFFECTIVE DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| ACRECENT FINANCIAL | 2 | $ 329,953.85 | POC-72 | Allowed But Will Not Receive Payments Form Proceeds of Sale | $ 340,002.00 | $ (10,048.15) | $ 329,953.85 | $ - | $ 329,953.85 | $ - |
| US SMALL BUSINESS ADMINISTRATION | 3 | 517,368.15 | POC-44 | Allowed | - | 517,368.15 | 517,368.15 | - | 517,368.15 | 517,368.15 |
| POPULAR AUTO | 4 | 9,997.23 | POC-03 | Allowed | - | 9,997.23 | 9,997.23 | - | 9,997.23 | 9,997.23 |
| PARLIAMENT HIGH YIELD FUND, LLC | | 6,649,250.76 | POC-170 | Allowed but Transferred to Unsecured | - | - | - | - | - | - |
| ORIENTAL BANK | 1 | 10,077,334.25 | POC-127 | Allowed | 11,521,648.84 | (1,444,314.59) | 10,077,334.25 | (477,334.25) | 9,600,000.00 | 9,600,000.00 |
| ORIENTAL BANK | 1 | 5,882,595.22 | POC-130 | Allowed | 5,876,298.76 | 6,296.46 | 5,882,595.22 | (5,882,595.22) | - | - |
| COLEBROOK FINANCIAL COMPANY, LLC | 5 | 2,693,427.08 | POC-86 | Allowed But Will Not Receive Payments Form Proceeds of Sale | 3,199,898.56 | (506,471.48) | 2,693,427.08 | (2,693,427.08) | - | - |
| COLEBROOK FINANCIAL COMPANY, LLC | 5 | 108,593.15 | POC-87 | Allowed But Will Not Receive Payments Form Proceeds of Sale | - | 108,593.15 | 108,593.15 | (108,593.15) | - | - |
| ACRECENT FINANCIAL | 6 | 200,955.69 | POC-71 | Allowed | 210,651.08 | (9,695.39) | 200,955.69 | - | 200,955.69 | 200,955.69 |
| ESJ TOWERS CONDOMINIUM HOMEOWNERS' ASSOC | | 4,364,980.60 | POC-98 | To be Objected | - | - | - | - | - | - |
| BMF CAPITAL, LLC | | 369,500.00 | POC-174 | Transferred to Unsecured | - | 369,500.00 | 369,500.00 | (369,500.00) | - | - |
| GREEN CAPITAL FUNDING AND HIGH SPEED CAPITAL | | 1,165,401.23 | POC-175 | Transferred to Unsecured | - | 1,165,401.23 | 1,165,401.23 | (1,165,401.23) | - | - |
| ALMA M. FLORAN | N/A | 26,475.00 | POC-238 | Objected - Granted Dkt 629 | - | - | - | - | - | - |
| JOSE A ROSADO VAZQUEZ | N/A | 14,500.00 | POC-240 | Objected - Granted Dkt 571 | - | - | - | - | - | - |
| NANCY DIAZ | N/A | 22,320.00 | POC - 245 | Objected - Granted Dkt 668 | - | - | - | - | - | - |
| PIERRE ALFRED MERZIUS | N/A | 28,000.00 | POC-187 | Objected - Granted Dkt 627 | - | - | - | - | - | - |
| RICKY ADAMS & LIZETTE ADAMS | N/A | 40,000.00 | POC-34 | Objected - Granted Dkt 809 | - | - | - | - | - | - |
| TOTAL | | $ 32,500,652.21 | | | $ 21,148,499.24 | $ 206,626.61 | $ 21,355,125.85 | $ (10,696,850.93) | $ 10,658,274.92 | $10,328,321.07 |

**ESJ TOWER, INC.**
CASE NO. 22-01676
UNSECURED CLAIMS - PAYMENT PLANS
REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | CARVE OUT $ 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| PARLIAMENT HIGH YIELD FUND, LLC | $ - | POC-170 | Allowed | $ 6,572,379.81 | $ 76,870.95 | $ 6,649,250.76 | $ 185,399.18 |
| ORIENTAL BANK CREDIT CARD | - | POC-130 | | - | 6,359,929.47 | 6,359,929.47 | 177,332.12 |
| ESJ TOWERS CONDOMINIUM ASSOC | 3,945,024.50 | POC-101 | To be Objected | 3,397,771.68 | 547,252.82 | 3,945,024.50 | 109,998.01 |
| ESJ TOWERS CONDOMINIUM ASSOC | 84,332.00 | POC-102 | Allowed | - | 84,332.00 | 84,332.00 | 2,351.41 |
| ESJ TOWERS CONDOMINIUM ASSOC | - | POC-222 | | - | - | - | - |
| COLEBROOK FINANCIAL COMPANY, LLC | 0.00 | POC-86 | - | - | - | - | - |
| COLEBROOK FINANCIAL COMPANY, LLC | 0.00 | POC-87 | - | - | - | - | - |
| IRS | 404.71 | POC-251 | Allowed | - | 404.71 | 404.71 | 11.28 |
| LUMA | 1,819,648.35 | POC-12 | Allowed | 811,054.77 | 1,008,593.58 | 1,819,648.35 | 50,736.74 |
| ESJ TOWERS CONDOMINIUM ASSOC | 1,262,918.00 | POC-99 | Allowed | 1,202,670.00 | 60,248.00 | 1,262,918.00 | 35,213.59 |
| KEITH ST. CLAIR | 588,462.20 | POC-165 | Allowed | 547,846.87 | 40,615.33 | 588,462.20 | 16,407.93 |
| ATWH, LLC | | | - | 367,276.00 | - | 367,276.00 | 10,240.65 |
| McCONELL VALDES | 354,210.38 | POC-14 | Allowed | 146,784.06 | 207,426.32 | 354,210.38 | 9,876.35 |
| ACRECENT FINANCIAL | - | | Allowed | - | - | - | - |
| AMERICAN EXPRESS | | | - | 318,819.26 | - | 318,819.26 | 8,889.55 |
| BMF CAPITAL, LLC | | POC-174 | Allowed | | 369,500.00 | 369,500.00 | 10,302.66 |
| GREEN CAPITAL FUNDING AND HIGH SPEED CAPITAL | | POC-175 | Allowed | - | 1,165,401.23 | 1,165,401.23 | 32,494.55 |
| LAKE FOREST BANK & TRUST COMPANY, N.A. | 149,993.13 | POC-80 | Allowed | | 149,993.13 | 149,993.13 | 4,182.22 |
| DEPARTMENT OF TREASURY | 680,522.56 | POC-09 | Objected - Docket 740 | 148,847.35 | 352,274.61 | 501,121.96 | 13,972.64 |
| AMERICAN EXPRESS | | | - | 139,078.00 | - | 139,078.00 | 3,877.87 |
| REGION CAPITAL | - | | - | 100,000.00 | - | 100,000.00 | 2,788.27 |
| DEPARTMENT OF TREASURY | 105,349.97 | POC-10 | Allowed | 95,103.24 | 10,246.73 | 105,349.97 | 2,937.44 |
| BALLESTER HERMANOS | 80,040.44 | POC-01 | Allowed | 80,215.76 | (175.32) | 80,040.44 | 2,231.75 |
| ORIENTAL BANK CREDIT CARD | - | POC-127 | | - | 477,334.25 | 477,334.25 | 13,309.38 |
| PUERTO RICO DEPARTMENT OF LABOR | 74,063.08 | POC-05 | Allowed | | 74,063.08 | 74,063.08 | 2,065.08 |
| EDWARD AND NICOLE KENNEY | 73,737.50 | POC-76 | Allowed | | 73,737.50 | 73,737.50 | 2,056.00 |
| BANCO POPULAR | 72,125.59 | POC-57 | Allowed | 71,555.40 | 570.19 | 72,125.59 | 2,011.06 |
| STORM KING WINDOWS & DOORS, INC | 170,000.95 | POC-250 | Allowed | - | 170,000.95 | 170,000.95 | 4,740.09 |
| RCCR PR | 69,138.28 | POC-171 | Allowed | 57,200.00 | 11,938.28 | 69,138.28 | 1,927.76 |
| MELLADO  & MELLADO-VILLAREAL | $ - | | - | $ 57,403.66 | $ - | $ 57,403.66 | 1,600.57 |
| ESJ TOWERS CONDOMINIUM ASSOC | 2,726.00 | POC-109 | Allowed | - | 2,726.00 | 2,726.00 | 76.01 |
| RL LEGAL & CONSULTING SERVICES, LLC | - | | - | 49,318.10 | - | 49,318.10 | 1,375.12 |
| CACCIAMANI AND ROVER, LLC | | | - | 48,880.00 | - | 48,880.00 | 1,362.91 |
| FONDO DEL SEGURO DEL ESTADO | | | - | 43,954.56 | - | 43,954.56 | 1,225.57 |
| DE ANGEL & COMPAÑIA, CPA, LLC | | | - | 41,643.30 | - | 41,643.30 | 1,161.13 |
| ORIENTAL BANK CREDIT CARD | 38,435.20 | POC-82 | Allowed | 54,266.91 | (15,831.71) | 38,435.20 | 1,071.68 |
| LATITUDE SALES & MARKETING | - | | - | 36,456.94 | - | 36,456.94 | 1,016.52 |
| BRIGHT CLIENTS COMMUNICATION, INC. | | | - | 35,287.50 | - | 35,287.50 | 983.91 |
| CREATEK SOLUTIONS | | | - | 34,500.00 | - | 34,500.00 | 961.95 |

**ESJ TOWER, INC.**
CASE NO. 22-01676
UNSECURED CLAIMS - PAYMENT PLANS
REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | CARVE OUT $ 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| O'NEILL & BORGES, LLC | 32,521.84 | POC-29 | Allowed | 20,234.10 | 12,287.74 | 32,521.84 | 906.80 |
| CARIBBEAN AIRPORT FACILITIES | | | - | 31,853.85 | - | 31,853.85 | 888.17 |
| DEPARTMENT OF TREASURY | | | | 30,143.70 | - | 30,143.70 | 840.49 |
| AMOS AND BEVERLY BROWN | 29,330.37 | POC-177 | Allowed | - | 29,330.37 | 29,330.37 | 817.81 |
| KALAMATA CAPITAL GROUP, LLC | | | | 28,882.71 | - | 28,882.71 | 805.33 |
| MILTON CHUNG | 28,069.07 | POC-68 | Allowed | | 28,069.07 | 28,069.07 | 782.64 |
| DEBORAH C. BLUE | 27,116.00 | POC-178 | Allowed | | 27,116.00 | 27,116.00 | 756.07 |
| BANCO POPULAR | | | - | 26,638.84 | - | 26,638.84 | 742.76 |
| ALM ENGINEERING, PSC | 25,168.00 | POC-126 | Allowed | 16,016.00 | 9,152.00 | 25,168.00 | 701.75 |
| DAVID JOHN FONTANESE JR. POPOVICH | 24,130.38 | POC-55 | Allowed | | 24,130.38 | 24,130.38 | 672.82 |
| RAFAEL OLIVO | 24,940.76 | POC-13 | Allowed | 24,076.00 | - | 24,076.00 | 671.30 |
| PETER J. SZULEWSKI, JULIA E. SZULEWSKI | 22,890.00 | POC-77 | Allowed | | 22,890.00 | 22,890.00 | 638.24 |
| CRIM | 21,368.14 | POC-219 | Allowed | | 21,368.14 | 21,368.14 | 595.80 |
| YAO HONG ZHOU | 20,256.56 | POC-157 | Allowed | | 20,256.56 | 20,256.56 | 564.81 |
| LETICIA HERNANDEZ CARDONA | 20,000.00 | POC-173 | Allowed | | 20,000.00 | 20,000.00 | 557.65 |
| JOSIANE HAYAT & PETER GOTTESFELD | 16,923.73 | POC-78 | Allowed | | 16,923.73 | 16,923.73 | 471.88 |
| AGM GROUP ENGINEERING, CORP. | - | | - | 16,000.00 | - | 16,000.00 | 446.12 |
| RICOH PUERTO RICO, INC. | | | - | 15,635.64 | - | 15,635.64 | 435.96 |
| VIVALDI SERVICIOS DE SEGURIDAD | 15,618.44 | POC-06 | Allowed | 17,591.68 | (1,973.24) | 15,618.44 | 435.48 |
| REAL BUSINESS PERSONNEL CORP. | - | | - | 15,599.79 | - | 15,599.79 | 434.96 |
| FIRST BANK | 15,010.74 | POC-02 | Allowed | 29,497.85 | (14,487.11) | 15,010.74 | 418.54 |
| HSK INDUSTRIES, INC. | | | - | 13,000.00 | - | 13,000.00 | 362.48 |
| PURCHASNG POWER HOUSE, LLC | | | | 12,581.25 | - | 12,581.25 | 350.80 |
| ADVANCE CONSTRUCTION | - | | | 11,185.99 | - | 11,185.99 | 311.90 |
| PURCHASE POWER/PITNEY BOWES | 11,119.89 | POC-04 | Allowed | 11,209.86 | (89.97) | 11,119.89 | 310.05 |
| ROBERT J. ZUZWORSKY | 10,961.31 | POC-183 | Allowed | | 10,961.31 | 10,961.31 | 305.63 |
| MOVIE BEAM/VALUABLE TECHNOLOGIES, INC. | | | | 10,890.00 | - | 10,890.00 | 303.64 |
| MARSHALL MOREYNE | 10,826.74 | POC-73 | Allowed | | 10,826.74 | 10,826.74 | 301.88 |
| FLORENCE PALEY | 10,333.00 | POC-79 | Objected Granted Dk 844 | - | - | - | - |
| THE STAR GROUP & COMPANY, INC. | - | | - | 10,000.00 | - | 10,000.00 | 278.83 |
| PALM TREE RENTAL & DISTRIBUTION, INC. | | | - | 9,692.11 | - | 9,692.11 | 270.24 |
| EILEEN R. REYES | 9,644.00 | POC-120 | Allowed | | 9,644.00 | 9,644.00 | 268.90 |
| RAUL VAZQUEZ | 9,644.00 | POC-119 | Allowed | | 9,644.00 | 9,644.00 | 268.90 |
| JOSE AND VIOLET GRUNY | 9,495.00 | POC-45 | Allowed | | 9,495.00 | 9,495.00 | 264.75 |
| FIRE SAFE, INC. | | | | 9,380.30 | - | 9,380.30 | 261.55 |
| MARK GEORGE DAVIS | 9,283.00 | POC-54 | Allowed | | 9,283.00 | 9,283.00 | 258.84 |
| AARON KAPLAN | 8,094.44 | POC-35 | Allowed | - | 8,094.44 | 8,094.44 | 225.69 |
| CARIBBEAN HOTEL SUPPLIES | | | - | 8,000.00 | - | 8,000.00 | 223.06 |
| LEDESMA & VARGAS, LLC | - | | - | 7,961.00 | - | 7,961.00 | 221.97 |
| TRAVELCLICK | - | | - | 7,951.48 | - | 7,951.48 | 221.71 |

**ESJ TOWER, INC.**
CASE NO. 22-01676
UNSECURED CLAIMS - PAYMENT PLANS
REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | CARVE OUT $ 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| LEWIS R BASKERVILLE | 7,631.17 | POC-69 | Allowed | | 7,631.17 | 7,631.17 | 212.78 |
| ROLAND B BRUSSWAU | 7,393.92 | POC-46 | Allowed | | 7,393.92 | 7,393.92 | 206.16 |
| MICHAEL E. AND MIMI KATES | 6,995.00 | POC-155 | Allowed | | 6,995.00 | 6,995.00 | 195.04 |
| FRANK A LUCCARELLI | 6,917.98 | POC-19 | Allowed | | 6,917.98 | 6,917.98 | 192.89 |
| RUTH GARCIA AND STEVEN VEGA | 6,831.90 | POC-49 | Allowed | | 6,831.90 | 6,831.90 | 190.49 |
| TRIPADVISOR | - | | | - | 6,385.05 | 6,385.05 | 178.03 |
| CRAIG GANGLOFF | | | | - | 6,297.03 | 6,297.03 | 175.58 |
| K-R IMPORTS, INC. | | | | - | 6,169.39 | 6,169.39 | 172.02 |
| RUTH GARCIA AND STEVEN VEGA | 6,831.90 | POC-244 | Allowed | - | 6,831.90 | 6,831.90 | 190.49 |
| MICHAEL C PETTIT | 6,117.00 | POC-36 | Allowed | | 6,117.00 | 6,117.00 | 170.56 |
| JAMES RODRIGUEZ | 6,072.37 | POC-26 | Allowed | | 6,072.37 | 6,072.37 | 169.31 |
| LOUISA RIVERA | 6,010.00 | POC-180 | Allowed | - | 6,010.00 | 6,010.00 | 167.58 |
| DONALD RESNICK | 5,963.05 | POC-30 | Allowed | | 5,963.05 | 5,963.05 | 166.27 |
| IRVING ROSA | | | | - | 5,925.00 | 5,925.00 | 165.21 |
| IPFS CORPORATION # 36678 | 5,617.43 | POC-32 | Allowed | - | 5,617.43 | 5,617.43 | 156.63 |
| GRAVIEL PICHARDO | | | | - | 5,320.00 | 5,320.00 | 148.34 |
| CARIBBEAN CONCRETE SOLUTIONS | | | | - | 5,316.00 | 5,316.00 | 148.22 |
| CATHY PALMIERI | 5,164.82 | POC-128 | Allowed | | 5,164.82 | 5,164.82 | 144.01 |
| STUART AND DENISE CHASE | 5,060.00 | POC-136 | Allowed | | 5,060.00 | 5,060.00 | 141.09 |
| MARIA SANDRA ROLDOS | 5,000.00 | POC-161 | Allowed | | 5,000.00 | 5,000.00 | 139.41 |
| FINE LINE TOURS | | | | - | 4,900.00 | 4,900.00 | 136.63 |
| LABORATORIO CLINICO PASEOS | - | | | - | 4,715.00 | 4,715.00 | 131.47 |
| ROSANNE NICEFORO | 4,708.23 | POC-95 | Allowed | | 4,708.23 | 4,708.23 | 131.28 |
| STEVEN KAUFMAN | 4,555.83 | POC-56 | Allowed | | 4,555.83 | 4,555.83 | 127.03 |
| ANGEL CARRASQUILLO FERNANDEZ | | | | - | 4,495.00 | 4,495.00 | 125.33 |
| AMERICAN EXPRESS | | | | - | 4,350.13 | 4,350.13 | 121.29 |
| AVIVA ZIGELMAN | 4,026.69 | POC-75 | Allowed | - | 4,026.69 | 4,026.69 | 112.28 |
| ICE AGE REFRIGERATION | | | | - | 3,982.80 | 3,982.80 | 111.05 |
| OLDACH | | | | - | 3,975.00 | 3,975.00 | 110.83 |
| SALVATORE & MARYANN CHIACCHERE | 3,956.00 | POC-16 | Allowed | | 3,956.00 | 3,956.00 | 110.30 |
| CONSOLIDATED WASTE SERVICES, CORP. | - | POC-233 | Allowed | 3,899.41 | - | 3,899.41 | 108.73 |
| BRIAN HOSTELLER | | | | - | 3,695.00 | 3,695.00 | 103.03 |
| LAI HA LEUNG HO | 3,545.05 | POC-81 | Allowed | | 3,545.05 | 3,545.05 | 98.85 |
| ERIKA DONAHUE | 3,530.22 | POC-43 | Allowed | | 3,530.22 | 3,530.22 | 98.43 |
| JOAN TREISTMAN | 3,495.46 | POC-162 | Allowed | | 3,495.46 | 3,495.46 | 97.46 |
| MERCEDES TIPIANI | | | | - | 3,375.00 | 3,375.00 | 94.10 |
| MONA YOUSSEF | 3,314.63 | POC-153 | Allowed | | 3,314.63 | 3,314.63 | 92.42 |
| CARL JANSEN | | | | - | 3,290.50 | 3,290.50 | 91.75 |
| ACQUISITION, LLC | 3,174.76 | POC-108 | Allowed | 19,066.86 | (15,892.10) | 3,174.76 | 88.52 |
| ROSANNE NICEFORO | 3,142.23 | POC-42 | Allowed | | 3,142.23 | 3,142.23 | 87.61 |
| INNOVATIVE HOSPITALITY CONCEPTS | | | | - | 2,997.50 | 2,997.50 | 83.58 |

**ESJ TOWER, INC.**
CASE NO. 22-01676
UNSECURED CLAIMS - PAYMENT PLANS
REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | CARVE OUT 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| LILLIAN MILLER | 2,969.31 | POC - 23 | Allowed | | 2,969.31 | 2,969.31 | 82.79 |
| ALLAN PEARLMAN | 2,933.00 | POC-22 | Allowed | | 2,933.00 | 2,933.00 | 81.78 |
| SUSAN T. FROST | 2,830.37 | POC-147 | Allowed | | 2,830.37 | 2,830.37 | 78.92 |
| THE NEW YORK TIMES/TIMES DIGEST | - | | | 2,760.00 | - | 2,760.00 | 76.96 |
| LINDA S. LITZENBERG | 2,711.40 | POC-97 | Allowed | | 2,711.40 | 2,711.40 | 75.60 |
| LITANIA COLON | 2,646.97 | POC-123 | Allowed | | 2,646.97 | 2,646.97 | 73.80 |
| ASCAP | | | | 2,637.93 | - | 2,637.93 | 73.55 |
| TROPIGAS | - | | | 2,625.38 | - | 2,625.38 | 73.20 |
| JOANNE PICCIONE | 2,611.56 | POC-151 | Allowed | | 2,611.56 | 2,611.56 | 72.82 |
| LITANIA COLON | 2,570.76 | POC-124 | Allowed | | 2,570.76 | 2,570.76 | 71.68 |
| REYNOLD AND HELENE MANGONES | 2,495.47 | POC-31 | Allowed | | 2,495.47 | 2,495.47 | 69.58 |
| IO PR ECO TOURS | | | | 2,430.00 | - | 2,430.00 | 67.76 |
| BENITEZ AVIATION, INC. | | | | 2,418.01 | - | 2,418.01 | 67.42 |
| ELAINE BUANO | 2,414.00 | POC-113 | Allowed | - | 2,414.00 | 2,414.00 | 67.31 |
| CLARO | | | | 2,344.83 | - | 2,344.83 | 65.38 |
| WORLD INTERDATA SOLUTIONS, INC. | - | | | 2,316.08 | - | 2,316.08 | 64.58 |
| CONCEPCION PRODUCE, INC. | | | | 2,307.95 | - | 2,307.95 | 64.35 |
| CRIM | 2,075.68 | POC-218 | Allowed | | 2,075.68 | 2,075.68 | 57.88 |
| CRIM | 2,056.98 | POC-217 | Allowed | | 2,056.98 | 2,056.98 | 57.35 |
| MINERVA RAMOS | 1,998.54 | POC-50 | Allowed | | 1,998.54 | 1,998.54 | 55.72 |
| CRIM | 1,996.14 | POC-214 | Allowed | | 1,996.14 | 1,996.14 | 55.66 |
| ECOLAB MANUFACTURING, INC. | | | | 1,986.32 | - | 1,986.32 | 55.38 |
| JUAN RAMIREZ MIRANDA | | | | 1,875.00 | - | 1,875.00 | 52.28 |
| IRON MOUNTAIN | | | | 1,835.24 | - | 1,835.24 | 51.17 |
| CRIM | 1,777.28 | POC-216 | Allowed | - | 1,777.28 | 1,777.28 | 49.56 |
| WALKING ON WATER SURFING | - | | | 1,705.60 | - | 1,705.60 | 47.56 |
| IONA NIEVES | | | | 1,700.00 | - | 1,700.00 | 47.40 |
| MONTEQUIN DISTRIBUTORS INC. | | | | 1,699.00 | - | 1,699.00 | 47.37 |
| COLLEEN AND MICHAEL SCHWIND | 1,689.89 | POC-66 | Allowed | | 1,689.89 | 1,689.89 | 47.12 |
| RICHARD COSGROVE | - | | | 1,689.00 | - | 1,689.00 | 47.09 |
| DESTILERIA NACIONAL, INC. | | | | 1,676.91 | - | 1,676.91 | 46.76 |
| ACQUISITION, LLC | 1,650.00 | POC-143 | Allowed | - | 1,650.00 | 1,650.00 | 46.01 |
| CAMPO RICO ADVENTURES, LLC | | | | 1,646.73 | - | 1,646.73 | 45.92 |
| JOSEPH ISHERWOOD | 1,590.00 | POC-48 | Allowed | - | 1,590.00 | 1,590.00 | 44.33 |
| CRIM | 1,560.48 | POC-215 | Allowed | - | 1,560.48 | 1,560.48 | 43.51 |
| IMPRINT PLUS | | | | 1,558.33 | - | 1,558.33 | 43.45 |
| SHARI FOLEY | 1,558.12 | POC-37 | Allowed | - | 1,558.12 | 1,558.12 | 43.44 |
| CHRISTINA WILLIAMS | 1,480.00 | POC-139 | Allowed | - | 1,480.00 | 1,480.00 | 41.27 |
| INTERNATIONAL COFFEE VENDORS, INC. | | | | 1,457.54 | - | 1,457.54 | 40.64 |
| HENRY LOWY | | | | 1,360.00 | - | 1,360.00 | 37.92 |

# ESJ TOWER, INC.
## CASE NO. 22-01676
## UNSECURED CLAIMS - PAYMENT PLANS
### REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | CARVE OUT $ 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| HELMS BRISCOE CORP. | | | - | 1,355.90 | - | 1,355.90 | 37.81 |
| ENVISION TECHNOLOGIES, INC. | | | - | 1,300.00 | - | 1,300.00 | 36.25 |
| ROBERT LEVOW | - | | - | 1,275.00 | - | 1,275.00 | 35.55 |
| SIMON JOHNSON | - | | - | 1,275.00 | - | 1,275.00 | 35.55 |
| TEN APPLIANCES | - | | - | 1,266.00 | - | 1,266.00 | 35.30 |
| SCANNER OVERSEAS OF PR, INC. | - | | - | 1,243.00 | - | 1,243.00 | 34.66 |
| HVP FOODS (HIJOLE) | | | - | 1,200.00 | - | 1,200.00 | 33.46 |
| FERRETERIA GOMEZ RENTAS | | | - | 1,192.00 | - | 1,192.00 | 33.24 |
| PATRICIA SEVER | | | - | 1,190.00 | - | 1,190.00 | 33.18 |
| CARRIER CREDIT SERVICES, INC. | 1,100.00 | POC-15 | Allowed | - | 1,100.00 | 1,100.00 | 30.67 |
| DANIEL J. AND ROXANNE M. GIOSEFFI | 1,078.46 | POC-166 | Allowed | - | 1,078.46 | 1,078.46 | 30.07 |
| AGUA SUPREMA | - | | - | 1,039.50 | - | 1,039.50 | 28.98 |
| GREGORY J KARLE | | | - | 1,020.00 | - | 1,020.00 | 28.44 |
| DARRELL SWEENEY | | | - | 1,000.00 | - | 1,000.00 | 27.88 |
| VENTURE TRANSPORTATION NETWORK | - | | - | 1,000.00 | - | 1,000.00 | 27.88 |
| JEFFREY GALM | | | - | 975.00 | - | 975.00 | 27.19 |
| T.H. DISTRIBUTOR | - | | - | 952.00 | - | 952.00 | 26.54 |
| EDD PRODUCTIONS & PROFESSIONALS DJS | | | - | 936.00 | - | 936.00 | 26.10 |
| KENETHN MOSCATELLI | - | | - | 935.00 | - | 935.00 | 26.07 |
| APOLINAR CRUZ | | | - | 910.00 | - | 910.00 | 25.37 |
| GLADYS RODRIGUEZ | | | - | 910.00 | - | 910.00 | 25.37 |
| COMMTRAK | | | - | 908.10 | - | 908.10 | 25.32 |
| RESTAURANTE BARRACHINA | - | | - | 900.00 | - | 900.00 | 25.09 |
| ROGER ALGER | - | | - | 894.50 | - | 894.50 | 24.94 |
| MASTER TOWELS LINEN & MORE | | | - | 891.20 | - | 891.20 | 24.85 |
| DAVID DANIEL RODRIGUEZ VARGAS | | | - | 840.00 | - | 840.00 | 23.42 |
| UNIGUEST | - | | - | 823.41 | - | 823.41 | 22.96 |
| JENNIFER MEDINA | 783.00 | POC-134 | Allowed | - | 783.00 | 783.00 | 21.83 |
| SPECTRIO | - | | - | 774.00 | - | 774.00 | 21.58 |
| ANTHONY J. GIORDANO | | | - | 715.00 | - | 715.00 | 19.94 |
| PACKERS PROVISION CO. | | | - | 702.85 | - | 702.85 | 19.60 |
| CARIBBEAN CLIMBER CORP. | | | - | 683.81 | - | 683.81 | 19.07 |
| HOFFA MEDICAL CENTER | | | - | 657.00 | - | 657.00 | 18.32 |
| PLATOS RESTAURANT & BAR | | | - | 650.00 | - | 650.00 | 18.12 |
| COSVI | | | - | 646.80 | - | 646.80 | 18.03 |
| DISTRIBUIDORA BLANCO | | | - | 635.25 | - | 635.25 | 17.71 |
| RONALD INGEMIE | - | | - | 625.00 | - | 625.00 | 17.43 |
| HENRY & BARBARA GODDARD | | | - | 600.00 | - | 600.00 | 16.73 |
| VINCENT MARTINEZ | - | | - | 591.00 | - | 591.00 | 16.48 |
| IMPRESOS DE LA TORRE | | | - | 555.00 | - | 555.00 | 15.47 |

## ESJ TOWER, INC.
### CASE NO. 22-01676
### UNSECURED CLAIMS - PAYMENT PLANS
### REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | CARVE OUT $ 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| FRANCISCO J. MARRERO GUINOT | | | - | 541.49 | - | 541.49 | 15.10 |
| MENACO CORPORATION | | | - | 518.55 | - | 518.55 | 14.46 |
| JONATHAN PORRATA & LIZ NAVARRO | | | - | 518.00 | - | 518.00 | 14.44 |
| JOHN GURAL | | | - | 510.00 | - | 510.00 | 14.22 |
| AMILCAR RAMIREZ | | | - | 500.00 | - | 500.00 | 13.94 |
| CHARLIE ROSCOE | | | - | 500.00 | - | 500.00 | 13.94 |
| LUIS OLIVERO | | | - | 500.00 | - | 500.00 | 13.94 |
| PEDRO L. CARMONA, INC. | | | - | 500.00 | - | 500.00 | 13.94 |
| BALLHER CORP. | | | - | 495.24 | - | 495.24 | 13.81 |
| DEBRA VENEY | | | - | 495.00 | - | 495.00 | 13.80 |
| GLENN BOWEN | | | - | 495.00 | - | 495.00 | 13.80 |
| GWEN E. GLAUBACH | | | - | 495.00 | - | 495.00 | 13.80 |
| RICKY ADAMS & LIZETTE ADAMS | 495.00 | POC-34 | Allowed | - | 495.00 | 495.00 | 13.80 |
| GRAYBAR INTERNATIONAL P.R. | | | - | 486.16 | - | 486.16 | 13.56 |
| CLAIRE HOLT | | | - | 478.00 | - | 478.00 | 13.33 |
| DONNA PIRICH | | | - | 473.00 | - | 473.00 | 13.19 |
| MICHAEL FIORETTI | | | - | 455.00 | - | 455.00 | 12.69 |
| ANDREW POLITO | | | - | 450.29 | - | 450.29 | 12.56 |
| J & M DEPOT, INC. | | | - | 431.12 | - | 431.12 | 12.02 |
| AIG INSURANCE COMPANY | | | - | 427.00 | - | 427.00 | 11.91 |
| CARIBBEAN FOOD PRODUCTS, CORP. | | | - | 391.40 | - | 391.40 | 10.91 |
| HERIBERTO BERRIOS | | | - | 390.00 | - | 390.00 | 10.87 |
| STATE INDUSTRIAL PRODUCTS CORP. | - | | - | 350.00 | - | 350.00 | 9.76 |
| FABRIXS | | | - | 337.10 | - | 337.10 | 9.40 |
| EQUIFAX INFO SVCS PUERTO RICO | | | - | 327.74 | - | 327.74 | 9.14 |
| JEANINE V. WAHRHEIT | | | - | 321.00 | - | 321.00 | 8.95 |
| APPLIANCE PARTS IMPORTS | | | - | 317.78 | - | 317.78 | 8.86 |
| ALEXANDER MAYS | - | | - | 287.86 | - | 287.86 | 8.03 |
| EDWARD KORAB | | | - | 255.00 | - | 255.00 | 7.11 |
| PUERTO RICO FOOD & PAPER, INC. | | | - | 244.80 | - | 244.80 | 6.83 |
| CARLOS VERA & LILLIAM MORALES | | | - | 200.00 | - | 200.00 | 5.58 |
| DANIEL AGOSTO | | | - | 200.00 | - | 200.00 | 5.58 |
| KATHY OLTAIN | | | - | 200.00 | - | 200.00 | 5.58 |
| FEDERAL EXPRESS | | | - | 192.76 | - | 192.76 | 5.37 |
| BETH MARGOLIN | | | - | 185.94 | - | 185.94 | 5.18 |
| MULTINATIONAL LIFE INSURANCE CO. | | | - | 164.45 | - | 164.45 | 4.59 |
| GUEST SUPPLY | | | - | 129.09 | - | 129.09 | 3.60 |
| IGM CORP. | | | - | 106.91 | - | 106.91 | 2.98 |
| PRINCESA GASTRO BAR, INC. | | | - | 75.00 | - | 75.00 | 2.09 |

**ESJ TOWER, INC.**
CASE NO. 22-01676
UNSECURED CLAIMS - PAYMENT PLANS
REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | CARVE OUT $ 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| RICARDO PEREZ SANCHEZ | - | | - | 75.00 | - | 75.00 | 2.09 |
| AMERICAN EXPRESS | | | - | 64.17 | - | 64.17 | 1.79 |
| EVELYN YANCHIK | | | - | 49.00 | - | 49.00 | 1.37 |
| MICHAEL SCHWIND | | | - | 43.00 | - | 43.00 | 1.20 |
| JOSEPH KERSTEIN | | | - | 31.00 | - | 31.00 | 0.86 |
| LOOMIS PUERTO RICO, INC. | | | - | 27.39 | - | 27.39 | 0.76 |
| VICTOR OLAZAGASTI | - | | - | 4.00 | - | 4.00 | 0.11 |
| HIGH SPEED CAPITAL, LLC | | | - | 1.00 | - | 1.00 | 0.03 |
| ATTENURE HOLDINGS TRUST 1 | - | POC-160 | Allowed | - | - | - | - |
| NORMAN NOAH WEINIGER & SANDRA GILLIAN WEINIC | - | POC-17 | Allowed | - | - | - | - |
| US SMALL BUSINESS ADMINISTRATION | - | | - | 500,000.00 | (500,000.00) | - | - |
| AERONET | | | | 799.00 | - | 799.00 | 22.28 |
| BOOKING. COM B.V. | | | | 54,299.95 | - | 54,299.95 | 1,514.03 |
| EXPEDIA GROUP | | | | 11,395.27 | - | 11,395.27 | 317.73 |
| LIBERTY | 72,268.97 | POC-176 | Allowed | 74,396.22 | (2,127.25) | 72,268.97 | 2,015.06 |
| RCI | | | | 62,623.03 | - | 62,623.03 | 1,746.10 |
| WHITE RHINO, INC. | | | | 4,733.00 | - | 4,733.00 | 131.97 |
| CHUBB INSURANCE COMPANY OF PUERTO RICO | 350,000.00 | POC-169 | Allowed But Contingent | - | - | - | - |
| JOSEPHINE DORIGUZZI | 64,765.97 | POC-148 | Objected - Granted Docket 864 | - | - | - | - |
| ACQUISITION, LLC | 2,200.00 | POC-241 | Objected - Granted Docket 668 | - | - | - | - |
| ALBERT AND MICHELLE SUAREZ | 4,505.00 | POC-249 | Objected - Granted Docket 768 | - | - | - | - |
| MARIA SANDRA ROLDOS | 8,259.77 | POC-253 | Objected | | | | |
| MIRNA I RODRIGUEZ | 28,107.30 | POC-252 | Objected | | | | |
| LOUIS-JACK POZNER | 62,358.00 | POC-84 | Objected - Docket 732 | - | - | - | - |
| LUIS OTERO CRUZ | 50,000.00 | POC-11 | Objected - Granted 859 | - | - | - | - |
| VICTOR M SUAREZ | 129,000.00 | POC-59 | Objected - Granted 865 | - | - | - | - |
| ALFRED PAGAN | 11,900.00 | POC-28 | Objected - Granted Docket 870 | - | - | - | - |
| ANTHONY GUERRIERI | 5,287.00 | POC-60 | Objected - Granted Docket 870 | - | - | - | - |
| DAVID AND JANET ROSENZWEIG | 4,341.00 | POC-62 | Objected - Granted Docket 870 | - | - | - | - |
| DEBRA NEGRON | 5,000.00 | POC-41 | Objected - Granted Docket 870 | - | - | - | - |
| ESJ TOWERS CONDOMINIUM ASSOC | 44,900,462.85 | POC-100 | To be Objected | - | - | - | - |
| GERALD FREY | 2,000.00 | POC-70 | Objected - Granted Docket 870 | - | - | - | - |

# ESJ TOWER, INC.
## CASE NO. 22-01676
## UNSECURED CLAIMS - PAYMENT PLANS
### REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | $ CARVE OUT 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| JAMES WESTFALL | 2,495.00 | POC-67 | Objected - Granted Docket 870 | - | - | - | - |
| JAYCE STEVENS PUZZO | - | POC-47 | Objected - Granted Docket 870 | - | - | - | - |
| JEANNETTE PALLISTER | 1,300.00 | POC-38 | Objected - Granted Docket 870 | - | - | - | - |
| JEANNETTE PALLISTER | 1,300.00 | POC-39 | Objected - Granted Docket 870 | - | - | - | - |
| JIMMIE I HAYES | - | POC-18 | Objected - Granted Docket 870 | - | - | - | - |
| JIMMY ROLDOS | 35,000.00 | POC-61 | Objected - Granted Dkt 605 | - | - | - | - |
| JOSHUA SCHONBRUN | 6,500.00 | POC-33 | Objected - Granted Docket 870 | - | - | - | - |
| KAREN E.K. SWANN | 5,261.46 | POC-63 | Objected - Granted Docket 870 | - | - | - | - |
| LELIO & SYLVIA CAPITANI | 2,400.00 | POC-58 | Objected - Granted Docket 870 | - | - | - | - |
| MAGALY DIAZ | 3,230.00 | POC-27 | Objected - Granted Docket 870 | - | - | - | - |
| MANUEL SANTIAGO MENDEZ | 15,000.00 | POC-246 | Objected - Granted Dkt 668 | - | - | - | - |
| MARIA SANDRA ROLDOS | 6,000.00 | POC-225 | Objected - Granted Dkt 604 | - | - | - | - |
| SEAN MCSHERRY | 1,300.00 | POC-40 | Objected - Granted Docket 870 | - | - | - | - |
| SHELDON GOLDSMITH | 5,500.00 | POC-21 | Objected - Granted Docket 870 | - | - | - | - |
| WILLIAM GEFFKEN | 46,000.00 | POC-65 | Objected - Granted Docket 870 | - | - | - | - |
| WILLIAM VON HEGEL | 2,400.00 | POC-51 | Objected - Granted Docket 870 | - | - | - | - |
| YEVGENIA TSYGANOVSKY | 9,000.00 | POC-52 | Objected - Granted Docket 870 | - | - | - | - |
| DINA  CRISCO | 4,000.00 | POC-194 | Objected - Granted Dkt 627 | - | - | - | - |
| DINA  CRISCO | 3,801.75 | POC-196 | Objected - Granted Dkt 627 | - | - | - | - |
| FRANK RIZZOLO | 1,989.00 | POC-190 | Objected - Granted Dkt 627 | - | - | - | - |

# ESJ TOWER, INC.
## CASE NO. 22-01676
## UNSECURED CLAIMS - PAYMENT PLANS
## REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | $ | CARVE OUT 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|---|
| GEORGE & JEAN MCGIBBON | 10,534.00 | POC-184 | Objected - Granted Dkt 627 | - | - | - | | - |
| JAMES J. MOLINARO JR | 5,151.41 | POC-203 | Objected - Granted Dkt 627 | - | - | - | | - |
| JERANNE MUSE | 3,205.00 | POC-197 | Objected - Granted Dkt 627 | - | - | - | | - |
| JULIO AND LOIS RESTREPO | 1,292.00 | POC-199 | Objected - Granted Dkt 627 | - | - | - | | - |
| LAURA MARIE MARIEL & MILAGROS LORA | 27,150.00 | POC-200 | Objected - Granted Dkt 627 | - | - | - | | - |
| LINDA MELENDEZ | 2,135.00 | POC-189 | Objected - Granted Dkt 627 | - | - | - | | - |
| LINDA MELENDEZ | 2,135.00 | POC-191 | Objected - Granted Dkt 627 | - | - | - | | - |
| LOUIS & STEPHANIE KENNER | 2,092.00 | POC-192 | Objected - Granted Dkt 627 | - | - | - | | - |
| LOUIS & STEPHANIE KENNER | 2,092.00 | POC-193 | Objected - Granted Dkt 627 | - | - | - | | - |
| MARY ANN DOBLER | 6,280.07 | POC-195 | Objected - Granted Dkt 627 | - | - | - | | - |
| MAXIMINO MORALES | 24,862.00 | POC-188 | Objected - Granted Dkt 627 | - | - | - | | - |
| MILAGROS LORA | 19,475.00 | POC-201 | Objected - Granted Dkt 627 | - | - | - | | - |
| RICHARD & DARLENE CACCIOLA | 12,861.12 | POC-185 | Objected - Granted Dkt 627 | - | - | - | | - |
| SHARI LEE COPE DEMBOWSKI | 5,000.00 | POC-186 | Objected - Granted Dkt 627 | - | - | - | | - |
| THOMAS SANTOLO | 2,100.00 | POC-202 | Objected - Granted Dkt 627 | - | - | - | | - |
| VICKY AND PAUL GALITSIS | 3,500.00 | POC-204 | Objected - Granted Dkt 627 | - | - | - | | - |
| ALIDA SEIDEL | 8,500.00 | POC-208 | Objected - Granted Dkt 628 | - | - | - | | - |
| BETH WELCH | 18,500.00 | POC-230 | Objected - Granted Dkt 628 | - | - | - | | - |
| GEORGE PAGAN | 2,284.00 | POC-227 | Objected - Granted Dkt 628 | - | - | - | | - |
| IRIS SOTO VALENTIN | 2,564.48 | POC-209 | Objected - Granted Dkt 628 | - | - | - | | - |
| IRVING RIVERA | 15,000.00 | POC-223 | Objected - Granted Dkt 628 | - | - | - | | - |
| JAVIER LOPEZ & MINERVA REYES | 12,000.00 | POC-232 | Objected - Granted Dkt 628 | - | - | - | | - |
| JIMMY ROLDOS | 35,000.00 | POC-224 | Objected - Granted Dkt 628 | - | - | - | | - |
| JOSEPH MCINTIRE | 1,233.80 | POC-211 | Objected - Granted Dkt 628 | - | - | - | | - |
| JOSEPH MCINTIRE | 2,500.00 | POC-231 | Objected - Granted Dkt 628 | - | - | - | | - |
| PATRICIA A. CAVANAUGH & LYLE BATTLESON | 5,495.00 | POC-207 | Objected - Granted Dkt 628 | - | - | - | | - |
| PATRICIA E. SZALA | 2,147.79 | POC-213 | Objected - Granted Dkt 628 | - | - | - | | - |
| RANDOLPH GREENE | 8,500.00 | POC-220 | Objected - Granted Dkt 628 | - | - | - | | - |
| RENE ROMERO | 1,050.00 | POC-221 | Objected - Granted Dkt 628 | - | - | - | | - |

## ESJ TOWER, INC.
### CASE NO. 22-01676
### UNSECURED CLAIMS - PAYMENT PLANS
### REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | $ | CARVE OUT 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|---|
| ROBERT MALDONADO | 7,799.00 | POC-228 | Objected - Granted Dkt 628 | - | - | - | | - |
| STEVEN KESSLER | 3,000.00 | POC-205 | Objected - Granted Dkt 628 | - | - | - | | - |
| VITTINA PERRONE | 4,752.00 | POC-210 | Objected - Granted Dkt 628 | - | - | - | | - |
| GAIL CONKLIN | 10,292.80 | POC-207 | Objected - Granted Dkt 628 | - | - | - | | - |
| JENINE FERRER | 11,945.00 | POC-226 | Objected - Granted Dkt 628 | - | - | - | | - |
| REINENA DAVIS | 1,397.00 | POC-229 | Objected - Granted Dkt 628 | - | - | - | | - |
| RICHARD AND CHRISTINE KANE | 2,840.00 | POC-212 | Objected - Granted Dkt 628 | - | - | - | | - |
| DAVID DI SOMMA-LUZ DI SOMMA | 49,827.00 | POC-235 | Objected - Granted Dkt 629 | - | - | - | | - |
| GERARDO CABALLERO VAZQUEZ | 12,998.35 | POC- 243 | Objected - Granted Dkt 629 | - | - | - | | - |
| GERARDO CAMACHO | 36,000.00 | POC-242 | Objected - Granted Dkt 629 | - | - | - | | - |
| MARTA NIEVES | 19,000.00 | POC-239 | Objected - Granted Dkt 629 | - | - | - | | - |
| MIGUEL MONTALVO DEL TORO | 33,407.00 | POC-237 | Objected - Granted Dkt 629 | - | - | - | | - |
| REINALDO BONES MERLE | 8,247.29 | POC-234 | Objected - Granted Dkt 629 | - | - | - | | - |
| ROBERT K. FIXMER, JR. | 15,000.00 | POC-236 | Objected - Granted Dkt 629 | - | - | - | | - |
| DALILA CHRISTOFORIDIS | 800.00 | POC-164 | Objection Granted Dck 792 | - | - | - | | - |
| DIANA AND PHILIP RACOBALDO | 110,800.00 | POC-150 | Objected - Doc 624 | - | - | - | | - |
| GENEVIEVE BENSON | 2,500.00 | POC-167 | Objection Granted Dck 792 | - | - | - | | - |
| ALAIN & GLENDA LOPEZ | 2,536.00 | POC-92 | Objected - Granted Dkt 791 | - | - | - | | - |
| CAROL KERCADO | 2,100.00 | POC-88 | Objection Granted Dck 791 | - | - | - | | - |
| DAVID WELLON | 5,100.00 | POC-105 | Objected - Granted Dkt 791 | - | - | - | | - |
| DIANA AND PHILIP RACOBALDO | 16,190.00 | POC-110 | Objected- Doc 623 | - | - | - | | - |
| GARY GILBERT | 2,710.00 | POC-91 | Objected - Granted Dkt 791 | - | - | - | | - |
| HERMAN ROMAN | 765.83 | POC-103 | Objected - Granted Dkt 791 | - | - | - | | - |
| JOSEPH DIMAURO | 1,992.22 | POC-112 | Objected - Granted Dkt 791 | - | - | - | | - |
| LILIAN RODRIGUEZ RIZZOLO | 2,071.65 | POC-106 | Objected - Granted Dkt 791 | - | - | - | | - |
| MAGALY M MENDOZA | 7,332.00 | POC-90 | Objected - Granted Dkt 791 | - | - | - | | - |
| NELSON TORRES AND NELLIE GONZALEZ | - | POC104 | Objected - Granted Dkt 791 | - | - | - | | - |
| SONIA CAPPAS | 3,945.00 | POC-94 | Objected - Granted Dkt 791 | - | - | - | | - |
| SUSAN FAIR | 5,557.20 | POC-111 | Objected - Granted Dkt 915 | - | - | - | | - |

# ESJ TOWER, INC.
## CASE NO. 22-01676
## UNSECURED CLAIMS - PAYMENT PLANS
## REVISED AS OF 9/25/2023

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | $ CARVE OUT 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|
| WILFREDO LUQUIS | 1,608.52 | POC-107 | Objected - Granted Dkt 791 | - | - | - | - |
| YVETTE SEGARRA | 3,480 | POC-96 | Objected - Granted Dkt 791 | - | - | - | - |
| CELSO QUINONES | 10,000.00 | POC-149 | Objection Granted Dck 792 | - | - | - | - |
| CHARLES & CAROL BRUNO | 3,700.00 | POC-156 | Objection Granted Dck 792 | - | - | - | - |
| DANIEL J DREVES | 50,536.45 | POC-152 | Objection Granted Dck 792 | - | - | - | - |
| GENARO J COLON | 1,575.00 | POC-158 | Objection Granted Dck 792 | - | - | - | - |
| JAMES AND MARY MARTINO | 4,704.12 | POC-168 | Objection Granted Dck 792 | - | - | - | - |
| JAMES HULLINGER | 5,035.00 | POC-159 | Objection Granted Dck 792 | - | - | - | - |
| JOAN BOROKOWSKY | 755.00 | POC-181 | Objected- Doc 624 | - | - | - | - |
| LISA BERRITTELLA | 8,295.74 | POC-163 | Objection Granted Dck 792 | - | - | - | - |
| LORENZO MALDONADO | 6,000.00 | POC-179 | Objection Granted Dck 792 | - | - | - | - |
| LYNETTE ANN DISDIER-FARBER | 1,465.65 | POC-154 | Objection Granted Dck 792 | - | - | - | - |
| MICAR/LYNCH | 2,200.00 | POC-172 | Objection Granted Dck 792 | - | - | - | - |
| BELINDA FERNANDEZ | 3,600.00 | POC-140 | Objected - Granted Dkt 700 | - | - | - | - |
| BENJAMIN AND FRANCES NAVARRETE | 12,600.00 | POC-137 | Objected - Granted Dkt 700 | - | - | - | - |
| GARY ZOLTAN MILAK | 8,947.04 | POC-121 | Objected - Granted Dkt 700 | - | - | - | - |
| GENARO COLON | 2,198.80 | POC-133 | Objected - Granted Dkt 700 | - | - | - | - |
| JAVIER L TASCON | 1,800.00 | POC-141 | Objected - Granted Dkt 700 | - | - | - | - |
| JERRY SALTZMAN | 2,442.09 | POC-118 | Objected - Granted Dkt 700 | - | - | - | - |
| JOHN AND LORA BOWLING | 1,320.00 | POC-138 | Objected - Granted Dkt 700 | - | - | - | - |
| JOSE F. ROMAN | 25,000 | POC-142 | Objected - Granted Dkt 700 | - | - | - | - |
| LOTHAR HERBERT REIMANN | 8,770.00 | POC-146 | Objected - Granted Dkt 700 | - | - | - | - |
| LOUISA RIVERA | 6,010.00 | POC-129 | Objected - Granted Dkt 700 | - | - | - | - |
| MARGARET CLEARY AND BARBARA CLEARY | 3,050.00 | POC-144 | Objected - Granted Dkt 700 | - | - | - | - |
| MARIE I SMITH | 4,204.00 | POC-122 | Objected - Granted Dkt 700 | - | - | - | - |
| MARY CLEARY | 1,650.00 | POC-145 | Objected - Granted Dkt 700 | - | - | - | - |
| MARY JANE BURCH-MACHERONE | 3,615.00 | POC-125 | Objected - Granted Dkt 700 | - | - | - | - |
| MIGUEL A PABON | 6,000.00 | POC-135 | Objected - Granted Dkt 700 | - | - | - | - |

**ESJ TOWER, INC.**
**CASE NO. 22-01676**
**UNSECURED CLAIMS - PAYMENT PLANS**
**REVISED AS OF 9/25/2023**

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | $ | CARVE OUT 750,000.00 DIVIDENDS |
|---|---|---|---|---|---|---|---|---|
| RANDALL AND MARY WRIGTH | - | POC-131 | Objected - Granted Dkt 700 | - | - | - | | - |
| RICHARD C CARLSON | 1,850.00 | POC-115 | Objected - Granted Dkt 700 | - | - | - | | - |
| RICHARD JOHN RIMER JR. | 5,952.00 | POC-116 | Objected - Granted Dkt 700 | - | - | - | | - |
| SONIA E SALTZMAN | 1,534.05 | POC-117 | Objected - Granted Dkt 700 | - | - | - | | - |
| WILLIAM VON HEGEL | 3,040.00 | POC-132 | Objected - Granted Dkt 700 | - | - | - | | - |
| ALICE HERNANDEZ | 5,000.00 | POC-83 | Objected - Granted Dkt 791 | - | - | - | | - |
| EDWARD J. WHEALON | 2,000.00 | POC-85 | Objected - Granted Dkt 791 | - | - | - | | - |
| JANICE FORRESTAL | 7,000.00 | POC-89 | Objected - Granted Dkt 791 | - | - | - | | - |
| JEFFREY MILLE | 728.00 | POC-114 | Objected - Granted Dkt 791 | - | - | - | | - |
| JOSEPH GIGLIO | 9,500.00 | POC-74 | Objected - Granted Dkt 791 | - | - | - | | - |
| MARTHA KIPYBIDA | 3,134.72 | POC-93 | Objected - Granted Dkt 791 | - | - | - | | - |
| **CLASS 9** | **$ 56,864,785.56** | | | **$ 15,737,073.87** | **$ 11,161,308.20** | **$ 26,898,382.07** | **$** | **750,000.00** |

EXHIBIT E

**ESJ TOWER, INC.**
**CASE NO. 22-01676**
**PRIORITY CLAIMS - PAYMENT PLANS**
**REVISED AS OF 9/25/2023**

Exhibit E

| CREDITOR | PROOF OF CLAIM AMOUNT | CLAIM NO. | STATUS | SCHEDULED CLAIMS | ADJUSTMENTS | AMOUNT EXPECTED TO BE ALLOWED | PAYMENT AT EFFECTIVE DATE |
|---|---|---|---|---|---|---|---|
| COMPAÑIA DE TURISMO | $ 34,847.86 | POC-08 | Allowed | $ 40,228.00 | $ (5,380.14) | $ 34,847.86 | $ 34,847.86 |
| CRIM | 14,620.15 | POC-214 | Allowed | - | 14,620.15 | 14,620.15 | 14,620.15 |
| CRIM | 17,857.74 | POC-215 | Allowed | - | 17,857.74 | 17,857.74 | 17,857.74 |
| CRIM | 20,314.01 | POC-216 | Allowed | - | 20,314.01 | 20,314.01 | 20,314.01 |
| CRIM | 23,455.16 | POC-217 | Allowed | - | 23,455.16 | 23,455.16 | 23,455.16 |
| CRIM | 23,733.58 | POC-218 | Allowed | - | 23,733.58 | 23,733.58 | 23,733.58 |
| CRIM | 226,258.63 | POC-219 | Allowed | 278,351.16 | (52,092.53) | 226,258.63 | 226,258.63 |
| TREASURY DEPARTMENT OF PR | 980,860.76 | POC-09 | Objected - Docket 740 | 964,960.73 | (500,776.37) | 464,184.36 | 464,184.36 |
| TREASURY DEPARTMENT OF PR | 156,636.31 | POC-10 | Allowed | 125,473.58 | 31,162.73 | 156,636.31 | 156,636.31 |
| TREASURY DEPARTMENT OF PR | - | | Duplicated at Schedules | 419,953.71 | (419,953.71) | - | - |
| IRS | 704.51 | POC-231 | Allowed | - | 704.51 | 704.51 | 704.51 |
| TOTAL | $ 1,499,288.71 | | | $ 1,828,967.18 | $ (846,354.87) | $ 982,612.31 | $ 982,612.31 |

**ESJ TOWER, INC.**                                                    **EXHIBIT F**
**SALE PROCEEDS DISTRIBUTION**

| | | | | Allowed Claims | |
|---|---|---|---|---|---|
| Sales Price | $ | 13,500,000 | | | |
| Estimated Cash Balance | | 665,000 | | | |
|     Sources | $ | 14,165,000 | | | |
| Administrative Expense Claims | $ | (2,097,854) | $ | 1,997,854 | 105% |
| Oriental Bank Secured Claims | | (9,600,000) | | 15,959,929 | 60% |
| SBA Secured Loan | | (517,368) | | 517,368 | 100% |
| Acrecent Claim - Telecom Equipment | | (200,956) | | 200,956 | 100% |
| Popular Auto | | (9,997) | | 9,997 | 100% |
| Priority Tax Claims - Including CRIM | | (982,612) | | 982,612 | 100% |
| Cure Claims | | - | | - | 0% |
| Carve Out for General Unsecured Claims | | (750,000) | | 26,898,382 | 2.8% |
|     Payments | | (14,158,787) | $ | 46,567,099 | 30% |
| Balance | $ | 6,213 | | | |

EXHIBIT G

| Fill in this information to identify the case: |
|---|
| Debtor name **ESJ Towers, Inc.** |
| United States Bankruptcy Court for the:    DISTRICT OF PUERTO RICO |
| Case number (if known) |

☐ Check if this is an amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases                    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1.   **Does the debtor have any executory contracts or unexpired leases?**
     ☐ No. Check this box and file this form with the debtor's other schedules.  There is nothing else to report on this form.
     ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal      Property* (Official Form 206A/B).

**2. List all contracts and unexpired leases**

**State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease**

| 2.1. | State what the contract or lease is for and the nature of the debtor's interest | **Unit Lease and Management Agreement** | |
|---|---|---|---|
| | State the term remaining | | |
| | List the contract number of any government contract | | **124 LLC's**<br>**6165 Isla Verde Ave.**<br>**Carolina, PR 00979** |

| 2.2. | State what the contract or lease is for and the nature of the debtor's interest | **computer equipment capital lease** | |
|---|---|---|---|
| | State the term remaining | | |
| | List the contract number of any government contract | | **Acrecent Financial Corporation**<br>**PO Box 363372**<br>**San Juan, PR 00936** |

| 2.3. | State what the contract or lease is for and the nature of the debtor's interest | **Internet Service** | |
|---|---|---|---|
| | State the term remaining | | |
| | List the contract number of any government contract | | **Aeronet**<br>**PO Box 270013**<br>**San Juan, PR 00928** |

| 2.4. | State what the contract or lease is for and the nature of the debtor's interest | **Online Hotel Reservations** | |
|---|---|---|---|
| | State the term remaining | | |
| | List the contract number of any government contract | | **Booking.Com B.V.**<br>**Herengracht 597**<br>**1017 CE Amsterdam**<br>**Netherlands** |

Debtor 1 **ESJ Towers, Inc.**

First Name            Middle Name            Last Name

Case number *(if known)* _____

**Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with
whom the debtor has an executory contract or unexpired
lease

| | | |
|---|---|---|
| 2.5. | State what the contract or lease is for and the nature of the debtor's interest | **Satellite TV & music service** |
| | State the term remaining | |
| | List the contract number of any government contract | **Dish Network**<br>**PO Box 7203**<br>**Pasadena, Ca 91109-7303** |
| 2.6. | State what the contract or lease is for and the nature of the debtor's interest | **POS system** |
| | State the term remaining | |
| | List the contract number of any government contract | **Dynamic Payments (Clover)**<br>**3100 Road 199**<br>**Suite 101**<br>**San Juan, PR 00926** |
| 2.7. | State what the contract or lease is for and the nature of the debtor's interest | **FB area lease agreement** |
| | State the term remaining | |
| | List the contract number of any government contract | **ESJ Homeowners Association**<br>**6165 Isla Verde Ave.**<br>**Carolina, PR 00979** |
| 2.8. | State what the contract or lease is for and the nature of the debtor's interest | **Online Hotel Reservations** |
| | State the term remaining | |
| | List the contract number of any government contract | **Expedia Group**<br>**1111 Expedia Group Way**<br>**W. Seattle, WA 98119** |
| 2.9. | State what the contract or lease is for and the nature of the debtor's interest | **webhosting services** |
| | State the term remaining | |
| | List the contract number of any government contract | **Go Daddy**<br>**14455 N. Hayden Rd.**<br>**Suite 226**<br>**Scottsdale, Arizona 85260-6947** |
| 2.10. | State what the contract or lease is for and the nature of the debtor's interest | **Cable TV, telephone and cellular** |
| | State the term remaining | **Liberty**<br>**PO Box 71496**<br>**San Juan, PR 00936** |

Official Form 206G                  Schedule G: Executory Contracts and Unexpired Leases                  Page 2 of 3

Debtor 1  **ESJ Towers, Inc.**

First Name        Middle Name            Last Name

Case number *(if known)*

▮ **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

List the contract number of any
government contract

| | | |
|---|---|---|
| 2.11. | State what the contract or lease is for and the nature of the debtor's interest | **Timeshare exchange program** |
| | State the term remaining | |
| | List the contract number of any government contract | **RCI**<br>**9998 Michigan Road**<br>**Carmel, IN 46032** |
| 2.12. | State what the contract or lease is for and the nature of the debtor's interest | **PMS System** |
| | State the term remaining | |
| | List the contract number of any government contract | **Resort Data Processing, Inc (RDP)**<br>**PO Box 1170**<br>**Vail, CO 81658** |
| 2.13. | State what the contract or lease is for and the nature of the debtor's interest | **Accounting Software Support Services & License** |
| | State the term remaining | |
| | List the contract number of any government contract | **White Rhino, Inc.**<br>**Suite 112 MSC-208**<br>**100 Grand Boulevard Paseos**<br>**San Juan, PR 00926** |

**EXHIBIT H**

# ESJ TOWERS, INC.
### UPDATED LIQUIDATION ANALYSIS
### Estimated as of August 31, 2023

## ESJ TOWERS, INC.
### UPDATED LIQUIDATION ANALYSIS
**Estimated as of August 31, 2023**

| | ASSETS ESTIMATED VALUES | ADJUSTMENT FOR LIQUIDATION | ESTIMATED RECOVERY VALUE | |
|---|---|---|---|---|
| Cash in Banks (7/31/2023) | $ 665,000 | 100% | $ 665,000 | |
| Deposits - Utility Companies    (As of Filing Date) | 1,632 | 0% | - | |
| Deposits - Acrecent Financial    (As of Filing Date) | 190,050 | 100% | 190,050 | |
| Account Receivable - 3/31/2023 | 17,537,020 | 19% | 3,387,014 | |
| Time Share Intervals -  Acquisition Cost | 10,302,749 | 40% | 4,121,100 | |
| Food and Beverage Inventory | 10,050 | 20% | 2,010 | |
| Housekeeping Supplies Inventory | 3,472 | 20% | 694 | |
| Office Supplies | 6,116 | 20% | 1,223 | |
| Insurance Claim | - | 0% | - | |
| ESJ Tower - Acquisition Cost | 11,800,000 | 70% | 8,260,000 | |
| **TOTAL ASSETS** | $ 40,516,089 | | $ 16,627,091 | |
| **AMOUNT AVAILABLE FOR PAYMENTS TO CREDITORS** | | | $ 16,627,091 | |
| SECURED CREDITORS ALLOWED CLAIMS | | | | |
| Oriental Bank                       Secured Claim | $ 15,959,929 | | $ 12,734,480 | 80% |
| CRIM                                Secured Claim | 311,619 | | 311,619 | 100% |
| Small Business Administration | 517,368 | | 517,368 | 100% |
| Acrecent Financials | 329,954 | | 329,954 | 100% |
| Parliament Capital | 6,649,251 | | - | 100% |
| BMF CAPITAL, LLC | 369,500 | | - | 100% |
| GREEN CAPITAL FUNDING AND HIGH SPEED CAPITAL | 1,165,401 | | - | 100% |
| Colebrook Financial Company, LLC | 2,802,020 | | 1,932,448 | 100% |
| Recovery Rate | $ 28,105,043 | | $ 15,825,870 | 56% |
| **AMOUNT AVAILABLE FOR  LIQUIDATION EXPENSES** | | | $ 801,222 | |
| **   AND OTHER CREDITORS** | | | | |
| ADMINISTRATIVE CLAIMS UNDER CHAPTER 7 | | | | |
| LEGAL FEES - CHAPTER 7 | $ 150,000 | | $ 69,534 | |
| TRUSTEE FEES | 834,355 | | 386,774 | |
| ACCOUNTING AND TAXES | 75,000 | | 34,767 | |
| REAL ESTATE - BROKER COMMISSIONS (3%) | 371,433 | | 172,182 | |
| LEGAL AND CLOSING COSTS - REALTY (2%) | 247,622 | | 114,788 | |
| AUCTION, APPRAISAL, OTHER LIQUIDATION COSTS (5%) | 50,000 | | 23,178 | |
| **TOTAL ADMINISTRATIVE CLAIMS ESTIMATED FOR CH 7** | $ 1,728,410 | | $ 801,222 | 46% |
| **AMOUNT AVAILABLE FOR PAYMENTS TO ADMINISTRATIVE** | | | $ - | |
| **   CHAPTER 11 AND OTHER CREDITORS** | | | | |
| ADMINISTRATIVE CLAIMS - CHAPTER 11 | | | | |
| LEGAL SERVICES | $ 161,029 | | $ - | |
| ACCOUNTING AND CONSULTING | 102,000 | | - | |
| HOA FEES | 910,313 | | - | |
| US TRUSTEE FEES | 32,200 | | - | |
| OTHER ADMINISTRATIVE CLAIMS | 792,312 | | - | |
| TOTAL ADMINISTRATION CHAPTER 11 EXPENSES | $ 1,997,854 | | $ - | 0% |
| **Recovery Rate** | | | | |
| **AMOUNT AVAILABLE FOR PAYMENTS TO PRIORITY** | | | $ - | |
| **   AND UNSECURED CREDITORS** | | | | |
| PRIORITY  TAX CLAIMS | $ 982,612 | | $ - | |
| OTHER PRIORITY  CLAIMS | - | | | |
| **Recovery Rate** | $ 982,612 | | $ - | 0% |
| **AMOUNTS AVAILABLE FOR PAYMENTS** | | | | |
| **   OF UNSECURED CREDITORS** | | | $ - | |
| SECURED CREDITORS' DEFICIENCY CLAIMS | $ 12,279,173 | | $ - | |
| GENERAL UNSECURED CREDITORS | 26,693,649 | | - | |
| | $ 38,972,822 | | $ (43,681,698) | |

3

# ESJ TOWERS, INC.
## ACCOUNTS RECEIVABLE ANALYSIS
## AS OF MARCH 31, 2023

| | Book Value | Recovery Rate | Liquidation Value |
|---|---|---|---|
| NOTES RECEIVABLE-GENERAL | $ 234,153.60 | 75% | $ 175,615.20 |
| NOTES RECEIVABLE-MEMBERS | 24,666.10 | 0% | - |
| NOTES RECEIVABLE-ACRECENT | 1,543,689.84 | 50% | 771,844.92 |
| NOTES COLEBROOK/EQUIANTS | 3,864,895.80 | 50% | 1,932,447.90 |
| ESJ NOTES IN HOUSE-EQUIANT | 232,538.31 | 50% | 116,269.16 |
| ESJ NOTES IN HOUSE-815 | 1,059,009.36 | 0% | - |
| NOTES ESJ NOTES EQUIANT 50% | 573,963.24 | 50% | 286,981.62 |
| Account Receivable Others | 1,184,371.61 | 0% | - |
| A/R IN HOUSE 100-100 EQUIANT | 207,710.81 | 50% | 103,855.41 |
| ISLA VERDE GROUP | 80,793.31 | 0% | - |
| RETURNED CHECKS | 677,668.88 | 0% | - |
| ESJ869,LLC | 165,196.62 | 0% | - |
| HEALTH & WELLNESS | 13,238.96 | 0% | - |
| LODGES AT CAYEY | 195,061.79 | 0% | - |
| TICKET2PUERTORICO | 52,651.50 | 0% | - |
| A/R COLLECTIONS- CHINA | 25,000.00 | 0% | - |
| A/R815ACRECENT | 103,685.45 | 0% | - |
| MEMBER DUES RECEIVABLE | 1,778,462.73 | 0% | - |
| MANAGEMENT INTERCO CONDO | (118,462.20) | 0% | - |
| A/R Employee | (4,609.61) | 0% | - |
| OTHERS | 4,394.69 | 0% | - |
| A/R MONTE REY | 1,850,534.00 | 0% | - |
| ACCOUNT RECEIVABLE CONEXUS | 2,818,414.22 | 0% | - |
| A/R K.St.Clair | (544,846.87) | 0% | - |
| INTEREST RECEIVABLE | 243,505.46 | 0% | - |
| VERDE LLC- JADE | 1,126,436.66 | 0% | - |
| NOIR LLC | 141,845.33 | 0% | - |
| DUE FROM OFFICERS | 3,050.40 | 0% | - |
| | $ 17,537,019.99 | | $ 3,387,014.20 |

*Exhibit 1*

# ESJ TOWERS, INC.

Audited Financial Statements

May 31, 2021

# **TABLE OF CONTENTS**

<u>Page</u>

Independent Auditors' Report ...................................................................................................................... 1

Audited Financial Statements:

    Balance Sheet ................................................................................................................... 3

    Statement of Operations ..................................................................................................... 5

    Statement of Changes in Stockholder's Equity… ............................................................... 6

    Statement of Cash Flows .................................................................................................... 7

    Notes to Financial Statements ............................................................................................ 9

Independent Auditors' Peer Review Report:

    Letter to the User ............................................................................................................... 20

    Peer Review Report ........................................................................................................... 21





COMPAÑÍA DE RESPONSABILIDAD LIMITADA
CONTADORES PÚBLICOS AUTORIZADOS

PO Box 5460
Caguas, Puerto Rico 00726-5460

Glasgow 1890 College Park IV
San Juan, Puerto Rico 00921-4813
www.deangel.cpa
(787) 758-4428 • Fax 763-9386

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors of
**ESJ Towers, Inc.**
Carolina, Puerto Rico

**Report on the Financial Statements**

We have audited the accompanying financial statements of **ESJ Towers, Inc.** (the Company), which comprise of the balance sheet as of May 31, 2021, and the related statements of operations, changes in stockholder's equity, and cash flows for the year then ended and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.  Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Basis for Qualified Opinion**

Detailed records have not been maintained and supporting data was not available for our audit.  Therefore, we were unable to obtain sufficient appropriate audit evidence about the existence and occurrence of the Notes Receivable Timeshare and related interest income stated at $10,226,871 and $1,101,074.  Also, we were unable to obtain sufficient appropriate audit evidence about the Due to Homeowners' Association included in the accompanying balance sheet on May 31, 2021, and stated at $3,537,077.

**Qualified Opinion**

In our opinion, except for the possible effects of the matter discussed in the Basis for Qualified Opinion paragraph, the financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of **ESJ Towers, Inc.** as of May 31, 2021, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 13, to the financial statements, the Company's significant operating losses raise substantial doubt about the ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to that matter.

License No. LLC-317
Expires December 1, 2023

San Juan, Puerto Rico
September 13, 2023
2023-09-106

Stamp No.
**E-538698**
was affixed
to original





**ESJ TOWERS, INC.**

Balance Sheet

May 31, 2021

## ASSETS

| | | |
|---|---|---:|
| Current Assets: | | |
| Cash | $ | 399,592 |
| Cash Restricted - Debt Reserve | | 2,353,815 |
| | | 2,753,407 |
| Accounts Receivable: | | |
| Notes Receivable - Timeshare | | 2,316,459 |
| Member Dues | | 2,347,362 |
| PR Treasury Department Tax Credit | | 948,053 |
| Others | | 784 |
| | | 5,612,658 |
| Inventories: | | |
| Timeshare Intervals, at Cost | | 11,101,229 |
| Prepaid Expenses: | | |
| Deposits | | 191,682 |
| Total Current Assets | | 19,658,976 |
| Notes Receivable - Timeshare, Net of Current Portion | | 7,910,412 |
| Property, Plant and Equipment: | | |
| Rental Property | | 5,577,607 |
| Building Improvements | | 6,054,002 |
| Furniture, Fixtures and Equipment | | 3,487,284 |
| Equipments and Vehicles, under Capital Leases | | 888,203 |
| | | 16,007,096 |
| Less: Accumulated Depreciation | | (7,804,529) |
| | | 8,202,567 |
| Total Assets | $ | 35,771,955 |

The Notes to Financial Statements are an integral part of this Statement.

## ESJ TOWERS, INC.

Balance Sheet

May 31, 2021

### LIABILITIES AND STOCKHOLDER'S EQUITY

| | | |
|---|---|---:|
| Current Liabilities: | | |
| Accounts Payable Trade | $ | 2,387,843 |
| Accrued Expenses: | | |
| Club Members' Rentals | | 335,979 |
| Salaries and Benefits | | 218,605 |
| Others | | 299,173 |
| | | 3,241,600 |
| Taxes Payable and Accrued Payroll Taxes: | | |
| Payroll Taxes and Withholdings | | 544,861 |
| Income Tax Payable | | 359,918 |
| Other Taxes | | 223,049 |
| | | 1,127,828 |
| Current Portion of Term-Loans | | 1,074,879 |
| Current Portion of Capital Leases Obligations | | 157,281 |
| Total Current Liabilities | | 5,601,588 |
| Due to Homeowners' Association | | 3,537,077 |
| Deferred Members Dues | | 1,253,336 |
| Capital Lease Obligations, Net of Current Portion | | 236,679 |
| Term Loans, Net of Current Portion | | 16,022,880 |
| Loans Payable | | 5,728,707 |
| Other Liabilities | | 229,920 |
| Total Liabilities | | 32,610,187 |
| Stockholder's Equity: | | |
| Common Stock, Class D, 5,000 shares authorized, issued and outstanding at $.10 each | | 500 |
| Common Stock, Class E, 95,000 shares authorized, issued and outstanding at $.10 each | | 9,500 |
| Additional Paid in Capital | | 1,632,698 |
| Retained Earnings | | 1,519,070 |
| Total Stockholder's Equity | | 3,161,768 |
| Total Liabilities and Stockholder's Equity | $ | 35,771,955 |

The Notes to Financial Statements are an integral part of this Statement.

-4-

## ESJ TOWERS, INC.

Statement of Operations

For the Year Ended May 31, 2021

**REVENUES**

| | | |
|---|---|---:|
| Room Income | $ | 287,014 |
| Members Dues Income | | 1,862,827 |
| Timeshare Sales, Net | | 44,636 |
| Charter Club Sales | | 740 |
| Interest Income | | 1,101,074 |
| Resort Fee Income | | 48,812 |
| Government Incentives - Tourism Company | | 600,000 |
| Coronavirus Aid Relief - PPP Loan Forgiveness | | 734,300 |
| Other Income | | 912,559 |
| | | 5,591,962 |

**COSTS AND OPERATING DEPARTMENTAL EXPENSES**

| | |
|---|---:|
| Room Department | 440,524 |
| Timeshare Cost | - |
| Sales Department | 1,502,868 |
| | 1,943,392 |
| Gross Operating Income | 3,648,570 |

**UNALLOCATED DEPARTMENTAL EXPENSES**

| | |
|---|---:|
| Administrative and General | 2,760,134 |
| Communal Expenses | 1,678,809 |
| Interests Expense | 589,422 |
| Depreciation | 894,291 |
| Other Taxes | 71,110 |
| Loss on Intercompany Loans | 4,444,371 |
| Other Expenses | 100,299 |
| | 10,538,436 |
| Net Loss | $ (6,889,866) |

The Notes to Financial Statements are an integral part of this Statement.

**ESJ TOWERS, INC.**

Statement of Changes in Stockholder's Equity

For the Year Ended May 31, 2021

| | Common Stock | | Additional Paid in Capital | | Retained Earnings | | Total | |
|---|---|---|---|---|---|---|---|---|
| Balance at May 31, 2020 | $ | 10,000 | $ | 1,632,698 | $ | 8,408,936 | $ | 10,051,634 |
| Net Loss | | - | | - | | (6,889,866) | | (6,889,866) |
| Balance at May 31, 2021 | $ | 10,000 | $ | 1,632,698 | $ | 1,519,070 | $ | 3,161,768 |

The Notes to Financial Statements are an integral part of this Statement.

**ESJ TOWERS, INC.**

Statement of Cash Flows

For the Year Ended May 31, 2021

**CASH FLOWS FROM OPERATING ACTIVITIES**

| | | |
|---|---|---:|
| Cash Received: | | |
| Collections from Customers | $ | 2,949,686 |
| Interests | | 2,868,612 |
| Other | | 1,675,535 |
| Cash Paid: | | |
| Payments to Suppliers | | (2,193,463) |
| Interests and Bank Charges | | (589,422) |
| Administrative and General | | (9,412,899) |
| Net Cash Used in Operating Activities | | (4,701,951) |

**CASH FLOWS FROM INVESTING ACTIVITIES**

| | |
|---|---:|
| Purchases of Equipment | (33,947) |
| Building Improvements | (1,121,758) |
| Net Cash Used in Investing Activities | (1,155,705) |

**CASH FLOWS FROM FINANCING ACTIVITIES**

| | |
|---|---:|
| Proceeds of Term Loans | 5,850,000 |
| Repayments of Term Loans | (1,135,522) |
| Payments of Capital Leases | (165,504) |
| Net Advances to Affiliates | 3,895,337 |
| Net Cash Provided by Financing Activities | 8,444,311 |
| Net Change in Cash | 2,586,655 |
| Cash at Beginning of Year | 166,752 |
| Cash at End of Year | $   2,753,407 |

The Notes to Financial Statements are an integral part of this Statement.

## ESJ TOWERS, INC.

Statement of Cash Flows

For the Year Ended May 31, 2021

**RECONCILIATION OF NET LOSS TO NET CASH
USED IN OPERATING ACTIVITIES**

| | |
|---|---:|
| Net Loss | $  (6,889,866) |
| | |
| Adjustments to Reconcile Net Loss to Net Cash | |
| Used in Operating Activities: | |
| Depreciation | 894,291 |
| Loss on Disposition of Assets | 868,597 |
| | |
| (Increase) Decrease in Assets: | |
| Notes Receivable - Timeshare | 1,687,691 |
| Members Dues | (393,546) |
| Other Receivables | 236,172 |
| Inventories | (787,914) |
| Prepaid Expenses | 117,621 |
| Note Receivable - Affiliates (ATWH) | 1,767,538 |
| | |
| Increase (Decrease) in Liabilities: | |
| Accounts Payable | (1,274,239) |
| Accrued Expenses | 113,968 |
| Income Tax Payable | 42,411 |
| Taxes Payable and Accrued Payroll Taxes | (401,637) |
| Deferred Members Dues | (662,559) |
| Other Liabilities | (20,479) |
| | |
| Total Adjustments | 2,187,915 |
| | |
| Net Cash Used in Operating Activities | $  (4,701,951) |

The Notes to Financial Statements are an integral part of this Statement.

### ESJ TOWERS, INC.

Notes to Financial Statements

May 31, 2021

1.  **ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

General

On May 31, 1996, **ESJ Towers, Inc.** (the Company) was organized under the laws of the Commonwealth of Puerto Rico. The Company is the sponsor of a time-sharing program in Isla Verde, Puerto Rico, as well as the operator of a "Condo-Hotel".  This vacation club concept involves the long-term leasing of fifteen (15) nights "intervals" per annum of various apartments on said facilities.  On June 10, 2015, the Company capital stocks was acquired by Conexus ESJ, LLC for selling price of $8.8 million.

Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures.  Accordingly, actual results could differ from those estimates.

Concentration of Credit Risk

The Company maintains its cash balances with a financial institution insured by the Federal Deposit Insurance Corporation ("FDIC") for aggregate customer deposits up to $250,000.  As of May 31, 2021, the Company had cash in excess of the amount insured by the FDIC, amounted to approximately $25,000.

Notes Receivable - Timeshare (Vacation Clubs)

As part of the timeshare selling activities, the Company offers financing facilities to its clients. These instruments, bearing from 3% to 15.90% interest, have maturity dates not exceeding ten (10) years and are for amounts not exceeding 80% of the purchase price of the timeshare intervals. The carrying amounts of the notes receivable approximate their net present value.

Member Dues

On a yearly basis, the Company bills maintenance dues for the upcoming year to vacation club members for the use of common areas of the Condo-Hotel. A deferred credit is recorded and recognized as income when earned under a straight-line method over the period of twelve (12) months.

Inventories

The inventories are valued at cost or market, whichever is lower, based on the "First-In; First-Out" flow method.  Amounts are adjusted based on physical counts performed at the end of each month.  The Company values timeshare segment interval, fractional, and whole ownership products at the lower of costs or net realizable value. During the year 2016, timeshare intervals increased by approximately $7 million as a result of the Company's repurchase of common stocks transaction.  Timeshare segment interval, fractional, and whole ownership products inventory, which has an operating cycle that exceeds twelve months, is classified as a current asset consistent with recognized industry practice.

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

1.  **ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, (Continued)**

Property, Plant and Equipment

The property, plant and equipment are accounted at cost.  Expenditures for repairs and maintenance are expensed when incurred; major additions and improvements are capitalized. These capitalized costs may include structural costs, equipment, fixtures floor, wall coverings and building improvements based on.

Depreciation expense amounted to $894,291 for the year ended May 31, 2021.  Depreciation is taken on the straight-line method based on the useful lives of the assets, which varies from five (5) to forty (40) years.

Time-Sharing of Apartments

The Company leases timeshares under the "right-to-use" method.  The lessee obtains the right to use a specific apartment during a fifteen-night interval each year for a period of thirty (30) years.

Loans to Timeshare Owners

In conjunction with the adoption of SOP 04-2, the Company records an estimate of expected uncollectibility on notes receivable from timeshare purchasers as a reduction of revenue at the time the profit is recognized on a timeshare sale. The Company assesses uncollectibility based on pools of receivables, because they hold large numbers of homogenous timeshare notes receivable. The Company estimates uncollectible based on historical data for similar timeshare notes receivable over the past years.  Based on the Company's estimation there was no allowance for loan losses recorded as of May 31, 2021.

Revenue Recognition and Costs

The Company's revenues include: 1) revenues from lodging of rental properties; 2) timeshare intervals, fractional and whole ownership sales and services, and 3) other income, which includes interest income associated with the Company's loans to timeshare owners.

The Company recognizes room sales and revenues from other guests' services for its owned and leased units when rooms are occupied, and services have been rendered.  The timeshare sales are recognized when: 1) the Company have received a minimum of twenty (20) percent of the purchase price from the timeshare interval; 2) the purchaser's period to cancel for a refund has expired; and 3) the Company deem the receivables to be collectible.  The Company defers all revenue using the deposit method for sales that do not meet these criteria.

In December 2004, the Financial Accounting Standards Board ("FASB") issued ASC 978, "*Real Estate Time-Sharing Activities*", and the American Institute of Certified Public Accountants issued SOP 04-2.  The Company adopted SOP 04-2 at the beginning of the 2007 fiscal year.  Under SOP 04-2, the Company charge the majority of sales and marketing costs incur to sell timeshares to expense when incurred.  The Company also account for rental and other operations during holding periods as incidental operations, which requires recording any excess of revenues over costs as a reduction of inventory costs.

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

2.  **NOTES RECEIVABLE-TIMESHARE**

At May 31, 2021, the notes receivable consisted of the following:

| | |
|---|---:|
| Notes Receivable Acrecent | $   2,445,737 |
| Notes Receivable Held by the Company | 458,390 |
| Notes Receivable Colebroock | 6,861,814 |
| Deferred Notes | 460,930 |
| | 10,226,871 |
| Less: Current Portion | 2,316,459 |
| Notes Receivable, Net of Current Portion | $   7,910,412 |

Notes receivable due within one year are classified as current assets in the accompanying balance sheet, related to "*Loans to Timeshare Owners*". Future maturities of notes receivable are as follows:

| | |
|---|---:|
| 2022 | $   2,316,459 |
| 2023 | 2,242,610 |
| 2024 | 1,464,891 |
| 2025 | 2,539,145 |
| 2026 and Thereafter | 1,663,766 |
| | $  10,226,871 |

3.  **TAX CREDITS**

During fiscal year 2018, the Company recognized income tax credits in the amount of $2,041,621 representing 50% of credits earned as a result of an investment in capital improvements of approximately $14.2 million. As of May 31, 2021, the Puerto Rico Treasury Department Tax Credit receivable amounted to $948,053.

4.  **NOTE RECEIVABLE - AFFILIATE**

During fiscal year 2016, the Company signed a promissory note agreement in the amount of $1,352,808 with Around the World Holdings (ATWH), LLC at an interest rate of 4% annually.  The principal and interest of the note will be payable semi-annually, beginning on November 30, 2016.  The total outstanding balance of this note receivable at May 31, 2021 is $1,767,538, including accrued interest; however, the Company's management decided to write off this balance as a consequence of the Company's reorganization under the Bankruptcy Chapter as fully described in note 14 of the accompanying financial statements.

5.  **DUE FROM (TO) AFFILIATES**

The Company is a member of a group of companies affiliated through common ownership and management. The Company has significant transactions with its affiliates at terms and conditions arranged by management of the affiliated group. As of May 31, 2021, the Company has various net intercompany payables amounting to $2.7 million approximately, which were written down as per the Company's decision due to the Bankruptcy case, as fully described in Note 14 of the accompanying financial statements.

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

6.   <u>**TERM LOANS**</u>

On May 4, 2018, the Company entered into a new credit agreement amounted to $12,500,000. The proceeds of this term loan was used to paid loans and notes payable balances, cover costs related to repairs and improvements of the rental property and, make distribution to stockholder to further used the distributed amount to partially finance the acquisition of the shares of the stockholders owned by Summit@ Isla Verde, LLC.

At May 31, 2021, the term-loans consisted of the followings:

| | | |
|---|---|---:|
| 10.50% | Term Loan payable to Acrecent Financial Corporation. The monthly repayments of $3,194 represents interest only until maturity date, which is February 1, 2023. Then, the outstanding principal amount shall be repaid in full plus accrued interest. | $    320,000 |
| 6.30% | Term Loan payable to Oriental Bank in sixty (60) consecutive installments and a final payment in the sum of the outstanding principal balance plus accrued interest, due on May 31, 2023. | 10,357,083 |
| 90-day Libor rate plus 300 basis points | Credit agreement payable to Oriental Bank with a maximum principal amount of $5,700,000 plus capitalized interest due on December 2, 2025. Interest accruing on the loan during the period from the origination date to January 1, 2022 shall be capitalized on the first anniversary date. | 5,700,000 |
| 10.25% | Term Loan payable to Acrecent Financial Corporation in sixty (60) consecutive monthly principal payments of $31,250, plus accrued interest at Prime Rate plus 5.00% due on February 1, 2023. | 720,676 |
| | Total Term-Loans | 17,097,759 |
| | Less: Current Portion of Term-Loans | 1,074,879 |
| | Term-Loans, Net of Current Portion | $ 16,022,880 |

All loans described above are guaranteed by the Company, Company's stockholder and cross-guaranteed by the affiliated group.

Maturities of the term-loans for the next years are as follow:

| | |
|---|---:|
| 2022 | $   1,074,879 |
| 2023 | 1,410,943 |
| 2024 | 2,130,502 |
| 2025 and Thereafter | 12,481,435 |
| | $ 17,097,759 |

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

6.  **TERM LOANS, (Continued)**

Among other terms and conditions, the loan terms agreements require certain reporting requirements, payment of insurance and taxes, dividends and advance limitations, as well as bank approvals for certain transactions, including assets disposition, additional liens and transactions with affiliates.

7.  **CAPITAL LEASE OBLIGATIONS**

In November 2017, the Company acquired a vehicle in the amount of $42,900 and it was financed through a lease agreement with Reliable Financial Services, Inc. for a six (6) year period. The amount financed is payable in monthly installments of $556.  As of May 31, 2021, the outstanding balance of this capital lease obligation amounted to $15,578.

On February 5, 2019, the Company acquired a vehicle in the amount of $146,514 and it was financed through a lease agreement with Popular Auto for a five (5) year period payable in monthly installments of $2,442. As of May 31, 2021, the outstanding balance of this capital lease obligation amounted to $84,101.

On June 1, 2016, the Company acquired a vehicle in the amount of $116,194 and it was financed through a lease agreement with Popular Auto for a six (6) year period.  Payable in monthly instalments of $1,613. As of May 31, 2021, the outstanding balance of this capital lease obligation amounted to $41,688.

On July 11, 2017, the Company acquired an IT Equipment in the amount of $501,679 and it was financed through a lease agreement with Acrecent Financial Corporation for a five (5) year period. Payable in monthly instalments of $10,325. As of May 31, 2021, the outstanding balance of this capital lease obligation amounted to $252,592.

Minimum future lease payments, under capital leases as of May 31, 2021, are:

Maturities of the capital leases for the next years are as follow:

| | | |
|---|---|---:|
| 2022 | $ | 179,282 |
| 2023 | | 179,282 |
| 2024 and Thereafter | | 68,340 |
| Total Minimum Lease Payments | | 426,904 |
| Less: Imputed Interest | | (32,944) |
| Present Value of Net Minimum Lease Payments | | 393,960 |
| Less: Current Portion of Capital Lease Obligations | | (157,281) |
| Capital Lease Obligations, Net of Current Portion | $ | 236,679 |

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

8.  **LOANS PAYABLE**

On April 28, 2017, the Company entered into a limited revolving loan and security agreement with a maximum principal amount of $10,000,000, payable to Colebrook Financial Company, LLC. The collateral to this loan is against the security of the hypothecation by the Company to the lender of ESJ Towers Vacation Club Membership agreements originated in conjunction with the credit sale of such intervals.

Among other terms and conditions, the credit facility agreement requires certain reporting requirements, payment of insurance and taxes, dividends and advance limitations, as well as bank approvals for certain transactions, including assets disposition, additional liens and transactions with affiliates.

The Company's note shall bear interest on unpaid balance at a variable interest rate equal to the "Prime Rate" plus 3.00% per annum, with a floor of 7.50%.  Any unpaid balance shall be paid on or before April 28, 2022.  As of May 31, 2021, the outstanding balance amounted to $4,027,310.

On November 4, 2019, the Company entered into a demand promissory note with a principal amount of $90,000 and a fixed fee of $1,000, payable to Inversiones Islas del Caribe, LLC. The outstanding principal amount of the loan, together with accrued and unpaid interest were originally due and payable in full on December 15, 2019.  The Company failed to make a payment on principal and verbally agreed with lender to pay at a future date.  As of May 31, 2021, the outstanding principal balance amounted to $90,000.

On April 6, 2020, the Company obtained a $734,300 Paycheck Protection Program loan from the Small Business Administration (SBA), under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).  On May 21, 2021, the Company was entitled to the full forgiveness of the loan amount plus accrued interest.

On December 5, 2019, the Company entered into a Business Loan and Security agreement with a funding amount of $640,000, payable to American Express Merchant Financing. A loan fee amount of $35,200 was agreed.  As of May 31, 2021, the outstanding balance amounted to $332,597.

On July 16, 2020, the Company obtained a $150,000 loan from the Small Business Administration (SBA) to relieve the economic damage caused by COVID-19. The loan will be repaid in monthly installments of $731.00 (including principal and interest) bearing interest at the rate of 3.75%. The installments will begin Twelve (12) months from the date of the promissory Note. The balance of principal and interest will be payable Thirty (30) years from the date of the promissory Note.

On February 22, 2021, the Company obtained a $1,128,800 Paycheck Protection Program loan from the Small Business Administration (SBA), under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). This loan may be subject to condonation, subject to certain conditions.

9.  **INSURANCE CLAIM**

In September 2017, Hurricanes Irma and Maria hit the entire island of Puerto Rico leaving it without electricity, water and no communication.  The Company's assessment regarding the damage caused by the Hurricanes amounted to approximately $9.8 million. However, the Insurance Company only paid approximately $5 million, which was included in the Statement of Income as an unusual item net of cost incurred in fiscal year 2018.

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

9.   **INSURANCE CLAIM, (Continued)**

Additionally, the Company has a Supplemental Insurance Claim for the damages caused by Hurricane Maria.  The estimated amount of this claim amounted to approximately $29 million as per the preliminary assessment report of July 31, 2018.

10.   **ADVERTISING COSTS**

Costs for advertising are expensed as incurred.  Total advertising expense amounted to $478,411 for the year ended May 31, 2021.

11.   **INCOME TAXES**

On March 12, 2013, the Company renewed its tax exemption under the Puerto Rico Tourism Development Act No. 74 of July 10, 2010, as amended.  It has been granted a 100% tax exemption from municipal construction excise taxes and a partial tax exemption from income license fees, excise taxes and other municipal taxes.  Also, the Company obtained partial tax exemption of property taxes on its Tourism Activity's assets and operations.  The tax exemptions are described as follows:

| | | |
|---|---|---|
| Income | 90% exempt | January 1, 2014 to December 31, 2023 |
| Municipal | 90% exempt | July 1, 2013 to June 30, 2023 |
| Property | 90% exempt | January 1, 2013 to December 31, 2022 |

Income tax provision for the year ended May 31, 2021, differed from amounts computed by applying the applicable income tax rate to pretax income mostly due to the net effect of certain disallowed expenses.

The Company have adopted FASB Interpretation (FIN) No. 48, "*Accounting for Uncertainty in Income Taxes*" - an interpretation of ASC No. 740, which is an accounting standard that prescribes a more-likely-than-not threshold for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return.  This interpretation also provides guidance on the recognition of income tax assets and liabilities, classification of current and deferred income tax assets and liabilities, accounting for interest and penalties associated with tax position and income tax disclosures.

As of May 31, 2021, the tax effects of temporary differences, which give rise to significant portions of the deferred tax assets, are as follows:

| | | |
|---|---|---|
| Net Operating Losses | $ | 438,750 |
| Less: Valuation Allowance | | (438,750) |
| Deferred Tax Asset | $ | - |

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

11. **INCOME TAXES, (Continued)**

In assessing the realization of the deferred income tax asset, management considers whether it is more likely than not that some portion or all of it, will not be realized.  The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which these temporary differences become deductible. Based on this assessment, management believes it is more likely than not that the Company will realize the benefit of the deferred income tax asset.

The Company's policy for interest and penalties related to income tax exposures is to recognize interest and penalties as a component of the provision for income taxes in the Statement of Operations.  As of May 31, 2021, the Company believes that there are no uncertain tax positions and has no accrued income tax related interest and/or penalties in the accompanying Balance Sheet. The Company is potentially subject to income tax audits in the Commonwealth of Puerto Rico for taxable years from 2016 to 2021, until the applicable statute of limitations expires.  Tax audits by their nature are often complex and can require several years to complete.

12. **COMMITMENTS AND CONTINGENCIES**

Homeowners' Association Management Agreement

The Company continues to operate the ESJ Towers Condominium Association (Condominium Hotel) (the Association) according to a Management Agreement, which was originally signed in 1975 and it has been extended on an annual basis.  Under the Management Agreement, the Company has the responsibility of administering, maintaining and operating the Association on behalf of the Board.  The Company has forty-four (44) years of experience in operating and maintaining the Association as a resort hotel condominium project. Among other things, the Company's principal duties include administration of the personnel, including hiring, determining compensation, supervising and discharging such personnel; supervising collection of all sums due from "Unit Owner" and "Vacation Club Owners", and "Club Members"; assuring that the "Common Elements" and "Limited Common Elements" of the Association and the Units in which there are premises interest are properly maintained.

The Council of Co-Owners at its Annual Meeting held on December 11, 2013, authorized the extension of the Management Agreement with the Company for a ten (10) years term, expiring on May 31, 2034.

Homeowners' Association Management Agreement, (Continued)

The Association reimbursed on a monthly basis all expenses incurred by the Company in relation to the administration of the condominium.  The Company bills those charges to the Association, to the account of Unit Owners, tenants and guests, to the extent collected, and for provision of Company's personnel for performance of maintenance, repair and replacement services necessary for maintenance and operation of the condominium, including its commercial, fitness recreational facilities and the units in which there are premises interests. At present time, no management fees have been charged to the Association for these management services; however, the Board provides the use of the facilities to the Company to promote the hotel, real estate and time-sharing business.

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

12. **COMMITMENTS AND CONTINGENCIES**

Around the World Holdings (ATWH), LLC Management Agreement

On June 1, 2016, the Company entered into a management agreement with ATWH to manage the daily operations for a five (5) year term. The monthly payment amounted to $17,000 and represents a total expense of $204,000 for the year ended.

RCI, LLC Affiliation Agreement

On April 5, 2017, the Company signed an affiliation agreement with RCI, LLC for a five (5) years term, to allow vacation club owners enrolls in "*RCI Weeks Exchange Program*" and "*The Registry Collection*" exchange program. On May 31, 2017, the Company received $250,000 as a first payment of an inducement granted of $530,000 as a result of the affiliation. Another payment of $250,000 was collected during the year ended May 31, 2019.

13. **GOING CONCERN**

The Company incurred operating losses of approximately $6.9 million and $4.8 million for the years ended May 31, 2021 and 2020, respectively. This factor creates substantial doubt about the Company ability to continue as a going concern. The management of the Company has taken definite steps to reduce operating costs and increase sales. The ability of the Company to continue its reorganization is dependent on the promptness in obtaining capital through long-term financing agreements with financial institutions or related entities.

As explained in Note 14, the Company filed a voluntary petition for reorganization plan under Chapter 11 of the Federal Bankruptcy Code. The Company will operate the business as a debtor in possession subject to the control and supervision of the Bankruptcy Court. This condition raises substantial doubt about the Company's ability to continue as a going concern.

14. **SUBSEQUENT EVENTS**

On December 9, 2021, the Company was entitled to the full forgiveness of the $1,128,000 Paycheck Protection Program loan amount plus accrued interest from the Small Business Administration (SBA), under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

On June 10, 2022, the Company filed a voluntary petition for reorganization under the provisions of Section 1162 of Chapter 11 of the United States Federal Bankruptcy Code in the United States Bankruptcy Court, Puerto Rico District, on case number 22-01676 (ESL)-11.

The voluntary petition was filed by the Company primarily due to the overall economic recession in Puerto Rico, the effects of Hurricane Maria and the damages caused over the Company's real estate, the effects of the COVID-19 Pandemic over the Company's industry, and its inability to pay its long-term debts, in the ordinary course of business.

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

14. **SUBSEQUENT EVENTS, (Continued)**

Since the petition date, the Company has continued to operate and manage the Company as debtor-in-possession pursuant to Sections 1107 and 1108 of the Code.  As debtor-in-possession, the Company is authorized, under Chapter 11, to continue to operate as an ongoing business, but may not engage in transactions outside the ordinary course of business without approval and consent of the Court. Monthly operating reports are submitted to the Court for review as to receipts and disbursements incurred.

As of petition date, substantially most of Debtor's secured obligations were in default.  Pursuant with FASB Accounting Standards Codification 852-10, "Reorganizations-Overall", (formerly SOP 90-7, Financial Reporting by Entities in Reorganization Under the Bankruptcy Code), liabilities and obligations whose disposition is dependent upon the outcome of the reorganization plan will be segregated and classified in the Company's balance sheet as "Liabilities Subject to Compromise Under Reorganization Proceedings", and will continue to be classified as such until a Plan of Reorganization is confirmed and the final decree is granted.

These liabilities will be reported at the allowable amounts according to the Proposed Plan with adjustments of balances recorded as part of the Reorganization items, as explained below, in the statement of operations.

On June 1, 2023, the Company's Plan of Reorganization and Disclosure Statement was filed. However, after various objections filed, the Company is working on an Amended Plan of Reorganization and Disclosure Statement that will be filed promptly.

Currently, the Company's estimated its allowed claims in the case as follows:

| | |
|---|---:|
| Secured Claims | $  21,154,000 |
| Priority Claims | 982,000 |
| General Unsecured Claims | 26,654,000 |
| Administrative Claims | 1,854,000 |
| Deferred Tax Asset | $  50,644,000 |

The final amounts to be paid over the above claims will depend on the confirmation of the Plan of Reorganization.

During the reorganization process, the Company will incur certain administrative costs related to professional fees paid, as well as the US Trustee Quarterly Fees. Net reorganization items will be presented separately in the Statement of Operations.

The accompanying financial statements have been prepared assuming the Company will be able to confirm a Plan of Reorganization and that will continue as a going concern, even when the Company has suffered net operating losses during the period reported in the accompanying financial statements and prior periods, and the matters described above.

Thus, the accompanying financial statements do not include any adjustments that reflect the future possible effects on the recoverability and classification of assets, or the amount and classification of liabilities that may result from the outcome of the uncertainties concerning Company's ability to continue as a going concern.

**ESJ TOWERS, INC.**

Notes to Financial Statements

May 31, 2021

14.  **SUBSEQUENT EVENTS, (Continued)**

Since December 2019, the spread of COVID-19 has severely impacted many local economies around the globe. The World Health Organization has declared COVID-19 a pandemic resulting in federal, state, and local governments and private entities mandating various restrictions, where businesses are being forced to cease or limit operations for long or indefinite periods of time.  Measures taken to contain the spread of the virus, including travel bans, quarantines, social distancing, and closures of non-essential services have triggered significant disruptions to businesses worldwide, resulting in an economic slowdown.

After close monitoring and responses and guidance from federal, state, and local governments, to mitigate the spread of COVID-19, effective March 16, 2020, the Company closed all its operations until March 15, 2021. The Company continues to monitor developments, including government requirements and recommendations at the national, state, and local level to evaluate possible extensions to all or part of such closures.  Governments and central banks have responded with monetary and fiscal interventions to stabilize economic conditions.

The Company has determined that these events are non-adjusting subsequent events. Accordingly, the financial position and results of operations as of and for the year ended May 31, 2021, have not been adjusted to reflect their impact. The duration and impact of the COVID-19 pandemic, as well as the effectiveness of government and financial institutions responses, remains unclear at this time. It is not possible to reliably estimate the duration and severity of these consequences, as well as their impact on the financial position and results of the Company for future periods.

Management has evaluated events and transactions for potential recognition or disclosures on September 13, 2023, the date the financial statements were available to be issued.



**De Angel & Compañía**
COMPAÑÍA DE RESPONSABILIDAD LIMITADA
CONTADORES PÚBLICOS AUTORIZADOS

PO Box 5460
Caguas, Puerto Rico 00726-5460

Glasgow 1890 College Park IV
San Juan, Puerto Rico 00921-4813
www.deangel.cpa
(787) 758-4428 • Fax 763-9386

September 13, 2023

To the Board of Directors of
**ESJ Towers, Inc.**
Carolina, Puerto Rico

The stockholders and staff of De Angel & Compañía, CPA, LLC, are pleased to announce the successful completion of an independent peer review of our accounting and auditing practice. This review was undertaken as a condition of membership in the American Institute of Certified Public Accountants (AICPA), the national organization of CPAs in public practice, industry, government and education.

In 1988, the members of the AICPA overwhelmingly approved a proposal to require members in public practice to participate in a practice-monitoring program. With the adoption of this proposal, the AICPA implemented a peer review program of unprecedented scope in the CPA profession or any other.  Our participation in peer review demonstrates our firm's desire to measure up to the profession's high standards of professionalism and our commitment to maintaining and improving the quality of our practice.

In August 2000, the Puerto Rico Society of CPAs (PRSCPA) adopted a voluntary peer review program, which follows the lead established by the AICPA.

Our peer review was conducted by **Román Toro & Co., CPA, PSC**, an independent firm (the Reviewer).  The Reviewer first determined that we have an adequate quality control system, and then checked to see that professional's standards were followed in a representative sample of our accounting and auditing engagements.

After thorough study of our policies and procedures, the Reviewer concluded our firm complies with the stringent quality control standards established by the AICPA and the PRSCPA.  Our firm is committed to periodic peer review to foster quality performance.

Bankers, bonding agents, investors, suppliers, legal advisors and others use the financial statements our firm audits, reviews, or compiles. We think those people, our clients, and our own staff deserve independent quality assurance that our firm provides quality services. We are proud of our peer review results and would be happy to answer any questions you might have.

Sincerely,

*Carlos D. Angel*

Carlos De Ángel Ramírez
President

# ROMAN TORO & CO., PSC
## Certified Public Accountants
### Honesty - Integrity - Experience

Members of:
American Institute of Certified Public Accountants
 and PR Society of Certified Public Accountants
José D. Román Toro, CPA, President
Website: www.cparomantoropr.com

PO Box 3043
Yauco PR 00698-3043
Tel. (787) 856-6220
Fax (800) 756-1253

**Report on the Firm's System of Quality Control**

To the Partners of De Angel & Compañía, CPA, LLC
 and the Peer Review Committee of the Puerto Rico Society of CPAs.

We have reviewed the system of quality control for the accounting and auditing practice of De Angel & Compañía, CPA, LLC (the firm) in effect for the year ended April 30, 2021. Our peer review was conducted in accordance with the Standards for Performing and Reporting on Peer Review established by Peer Review Board of the American Institute of Certified Public Accountants (Standards).

A summary of the nature, objectives, scope, limitations of, and the procedures performed in a System Review as described in the Standards may be found at www.aicpa.org/prsummary. The summary also includes an explanation of how engagements identified as not performed or reported in conformity with applicable professional standards, if any, are evaluated by a peer reviewer to determine a peer review rating.

**Firm's Responsibility**

The firm is responsible for designing a system of quality control and complying with it to provide the firm with reasonable assurance of performing and reporting in conformity with applicable professional standards in all material respects. The firm is also responsible for evaluating actions to promptly remediate engagements deemed as not performed or reported in conformity with professional standards, when appropriate, and for remediating weaknesses in its system of quality control, if any.

**Peer Reviewer's Responsibility**

Our responsibility is to express an opinion on the design of the system of quality control and the firm's compliance therewith based on our review.

**Required Selections and Considerations**

Engagements selected for review included engagements performed under *Government Auditing Standards,* including compliance audits under the Single Audit, and an audit of an employee benefit plan.

As a part of our peer review, we considered reviews by regulatory entities as communicated by the firm, if applicable, in determining the nature and extent of our procedures.

**Opinion**

In our opinion, the system of quality control for the accounting and auditing practice of De Angel & Compañía, CPA, LLC, in effect for the year ended April 30, 2021 has been suitable designed and complied with to provide the firm with reasonable assurance of performing and reporting in conformity with applicable professional standards in all material respects. Firm can receive a rating of *pass, pass with deficiency(ies), or fail.* De Angel & Compañía, CPA, LLC, has received a peer review rating of pass.

ROMAN TORO & CO., CPA, P.S.C.
LICENSE #35 - IN FORCE
Expires December 1, 2023

Yauco, Puerto Rico
February 28, 2022

Stamp Number E468205 was
  affixed to the original of this report

*Exhibit J*

# UNITED STATES BANKRUPTCY COURT

San Juan  DISTRICT OF  Puerto Rico

<Enter Division name if applicable, else delete this text>

| | | |
|---|---|---|
| In Re. ESJ Towers Inc. | § | Case No.  22-01676 |
| | § | |
| | § | |
| Debtor(s) | § | |
| | | ☐ Jointly Administered |

## Monthly Operating Report

Chapter 11

Reporting Period Ended: 09/30/2023              Petition Date: 06/10/2022

Months Pending: 16              Industry Classification: 6 6 0 0

Reporting Method:              Accrual Basis ◉              Cash Basis ○

Debtor's Full-Time Employees (current):              45

Debtor's Full-Time Employees (as of date of order for relief):              69

**Supporting Documentation** (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

- ☒ Statement of cash receipts and disbursements
- ☒ Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
- ☒ Statement of operations (profit or loss statement)
- ☒ Accounts receivable aging
- ☒ Postpetition liabilities aging
- ☐ Statement of capital assets
- ☒ Schedule of payments to professionals
- ☐ Schedule of payments to insiders
- ☒ All bank statements and bank reconciliations for the reporting period
- ☐ Description of the assets sold or transferred and the terms of the sale or transfer

s/Charles A. Cuprill-Hernández              Charles A. Cuprill-Hernández, Esq.
Signature of Responsible Party              Printed Name of Responsible Party

10/20/2023              356 Fortaleza Street
Date              Second Floor
              San Juan PR 00919
              Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 11-MOR (12/01/2021)              1

Debtor's Name ESJ Towers Inc.                                                    Case No. 22-01676

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. Cash balance beginning of month | $665,621 | |
| b. Total receipts (net of transfers between accounts) | $136,409 | $6,275,164 |
| c. Total disbursements (net of transfers between accounts) | $486,415 | $6,281,180 |
| d. Cash balance end of month (a+b-c) | $315,615 | |
| e. Disbursements made by third party for the benefit of the estate | $0 | $0 |
| f. Total disbursements for quarterly fee calculation (c+e) | $486,415 | $6,281,180 |

| Part 2: Asset and Liability Status<br>(Not generally applicable to Individual Debtors. See Instructions.) | Current Month | |
|---|---|---|
| a. Accounts receivable (total net of allowance) | $16,698,882 | |
| b. Accounts receivable over 90 days outstanding (net of allowance) | $0 | |
| c. Inventory     (Book ○  Market ○  Other ⊙  (attach explanation)) | $0 | |
| d. Total current assets | $17,470,373 | |
| e. Total assets | $34,564,085 | |
| f. Postpetition payables (excluding taxes) | $1,199,338 | |
| g. Postpetition payables past due (excluding taxes) | $0 | |
| h. Postpetition taxes payable | $0 | |
| i. Postpetition taxes past due | $0 | |
| j. Total postpetition debt (f+h) | $1,199,338 | |
| k. Prepetition secured debt | $21,154,170 | |
| l. Prepetition priority debt | $973,543 | |
| m. Prepetition unsecured debt | $26,464,486 | |
| n. Total liabilities (debt) (j+k+l+m) | $49,791,537 | |
| o. Ending equity/net worth (e-n) | $-15,227,452 | |

| Part 3: Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b. Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c. Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4: Income Statement (Statement of Operations)<br>(Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. Gross income/sales (net of returns and allowances) | $227,941 | |
| b. Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. Gross profit (a-b) | $227,941 | |
| d. Selling expenses | $0 | |
| e. General and administrative expenses | $1,123,195 | |
| f. Other expenses | $0 | |
| g. Depreciation and/or amortization (not included in 4b) | $92,755 | |
| h. Interest | $31,600 | |
| i. Taxes (local, state, and federal) | $0 | |
| j. Reorganization items | $0 | |
| k. Profit (loss) | $-1,019,608 | $-2,665,529 |

Debtor's Name ESJ Towers Inc.                                                                    Case No.  22-01676

| Part 5:  Professional Fees and Expenses | | | | | | |
|---|---|---|---|---|---|---|
| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* | | $0 | $668,442 | $0 | $668,442 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Charles A. Cuprill-Hernández | Lead Counsel | $0 | $536,665 | $0 | $536,665 |
| ii | CPA Luis R. Carrasquillo Ruiz | Financial Professional | $0 | $131,777 | $0 | $131,777 |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |

Debtor's Name ESJ Towers Inc.                                                                    Case No. 22-01676

| | | | | | | |
|-------|--|--|--|--|--|--|
| xxxvii | | | | | | |
| xxxvii | | | | | | |
| xxxix | | | | | | |
| xl | | | | | | |
| xli | | | | | | |
| xlii | | | | | | |
| xliii | | | | | | |
| xliv | | | | | | |
| xlv | | | | | | |
| xlvi | | | | | | |
| xlvii | | | | | | |
| xlviii | | | | | | |
| xlix | | | | | | |
| l | | | | | | |
| li | | | | | | |
| lii | | | | | | |
| liii | | | | | | |
| liv | | | | | | |
| lv | | | | | | |
| lvi | | | | | | |
| lvii | | | | | | |
| lviii | | | | | | |
| lix | | | | | | |
| lx | | | | | | |
| lxi | | | | | | |
| lxii | | | | | | |
| lxiii | | | | | | |
| lxiv | | | | | | |
| lxv | | | | | | |
| lxvi | | | | | | |
| lxvii | | | | | | |
| lxviii | | | | | | |
| lxix | | | | | | |
| lxx | | | | | | |
| lxxi | | | | | | |
| lxxii | | | | | | |
| lxxiii | | | | | | |
| lxxiv | | | | | | |
| lxxv | | | | | | |
| lxxvi | | | | | | |
| lxxvii | | | | | | |
| lxxvii | | | | | | |

Debtor's Name ESJ Towers Inc.    Case No. 22-01676

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxiii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvii | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy) *Aggregate Total* | | | | | |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | | | | | | |
| ii | | | | | | |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |

UST Form 11-MOR (12/01/2021)    5

Debtor's Name  ESJ Towers Inc.                                         Case No.  22-01676

| | | | | | |
|------|--|--|--|--|--|
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |

Debtor's Name  ESJ Towers Inc.                                                                    Case No.  22-01676

| | | | | | |
|------|--|--|--|--|--|
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |

Debtor's Name ESJ Towers Inc.                                                                  Case No. 22-01676

| | | | | | | |
|---|---|---|---|---|---|---|
| | xcix | | | | | |
| | c | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | | |

| Part 6: Postpetition Taxes | Current Month | Cumulative |
|---|---|---|
| a. Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c. Postpetition employer payroll taxes accrued | $0 | $190,810 |
| d. Postpetition employer payroll taxes paid | $0 | $190,810 |
| e. Postpetition property taxes paid | $0 | $25,283 |
| f. Postpetition other taxes accrued (local, state, and federal) | $0 | $0 |
| g. Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

**Part 7: Questionnaire - During this reporting period:**

| | | | |
|---|---|---|---|
| a. | Were any payments made on prepetition debt? (if yes, see Instructions) | Yes ○ No ⦿ | |
| b. | Were any payments made outside the ordinary course of business without court approval? (if yes, see Instructions) | Yes ⦿ No ○ | |
| c. | Were any payments made to or on behalf of insiders? | Yes ⦿ No ○ | |
| d. | Are you current on postpetition tax return filings? | Yes ⦿ No ○ | |
| e. | Are you current on postpetition estimated tax payments? | Yes ⦿ No ○ | |
| f. | Were all trust fund taxes remitted on a current basis? | Yes ○ No ⦿ | |
| g. | Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions) | Yes ○ No ⦿ | |
| h. | Were all payments made to or on behalf of professionals approved by the court? | Yes ○ No ⦿ N/A ○ | |
| i. | Do you have:  Worker's compensation insurance? | Yes ⦿ No ○ | |
| | If yes, are your premiums current? | Yes ⦿ No ○ N/A ○ | (if no, see Instructions) |
| | Casualty/property insurance? | Yes ○ No ⦿ | |
| | If yes, are your premiums current? | Yes ○ No ○ N/A ⦿ | (if no, see Instructions) |
| | General liability insurance? | Yes ⦿ No ○ | |
| | If yes, are your premiums current? | Yes ⦿ No ○ N/A ○ | (if no, see Instructions) |
| j. | Has a plan of reorganization been filed with the court? | Yes ○ No ⦿ | |
| k. | Has a disclosure statement been filed with the court? | Yes ○ No ⦿ | |
| l. | Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? | Yes ⦿ No ○ | |

Debtor's Name  ESJ Towers Inc.                                                                    Case No.  22-01676

**Part 8: Individual Chapter 11 Debtors (Only)**

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |
| l. | Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C § 101(14A)? | Yes ○  No ● |
| m. | If yes, have you made all Domestic Support Obligation payments? | Yes ○  No ○  N/A ● |

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107.  The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6).  The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith.  This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law.  Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records."  *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006).  A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm.  Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.**

s/Steven Nalley                                                          Steven Nalley
_____                _____
Signature of Responsible Party                          Printed Name of Responsible Party

Acting General Manager                                      10/20/2023
_____                _____
Title                                                                       Date

Debtor's Name ESJ Towers Inc.

Case No. 22-01676



PageOnePartOne



PageOnePartTwo



PageTwoPartOne



PageTwoPartTwo

Debtor's Name ESJ Towers Inc.                                                                                    Case No.  22-01676


Bankruptcy1to50


Bankruptcy51to100


NonBankruptcy1to50


NonBankruptcy51to100

Debtor's Name ESJ Towers Inc.                                    Case No. 22-01676



PageThree



PageFour